PORTER | SCOTT
A PROFESSIONAL CORPORATION
Nancy J. Sheehan, SBN 109419
George A. Acero, SBN 226709
350 University Avenue, Suite 200
Sacramento, California 95825
(916) 929-1481
(916) 927-3706 (facsimile)

**Attorneys for Defendants:** REGENTS OF THE UNIVERSITY OF CALIFORNIA, LARRY VANDERHOEF (erroneously sued as LAWRENCE VANDERHOEF), GREG WARZECKA, PAM GILL-FISHER, ROBERT FRANKS and LAWRENCE SWANSON

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AREZOU MANSOURIAN, LAUREN MANCUSO, NANCY NIEN-LI CHIANG, and CHRISTINE WING-SI NG; and all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,<br><br>Defendants. | CASE NO. 2:03-CV-02591-FCD-EFB<br><br>**SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Date: March 28, 2008**<br>**Time: 10:00 a.m.**<br>**Courtroom: 2** |

Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA hereby submits this Separate Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

| **UNDISPUTED MATERIAL FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 1. Although a men's wrestling team at a NCAA member school may have women's wrestlers on it, the NCAA does not sponsor women's wrestling as a sport. | 1. Exhibit A, Declaration of Wendy Walters, ¶3. |
| 2. The NCAA has identified certain sports for women as "emerging sports." In 1997, the NCAA's Committee on Women's Athletics submitted a list of guidelines for identifying emerging sports for women at the collegiate level. Over the years, the criteria | 2. Exhibit A, Declaration of Wendy Walters, ¶ 4; Exhibit Y, Deposition of Judy Sweet, pp. 32:17-25; 40:2-22; 43:1-5; 48:7-10; 108:3- 110:13; Exhibit QQQ, Judith Sweet's CV; Exhibit RRR, NCAA's Criteria for Emerging Sports. |

| | |
|---|---|
| for consideration as an emerging sport have evolved. Those criteria are: (a) the activity in issue must meet the definition of a sport, and there must be scheduled individual or team head-to-head competitions (at least five) within a defined competitive season, and standardized rules ratified by official regulatory agencies or governing bodies; (b) there must be twenty or more varsity teams and/or competitive club teams that currently exist on college campuses for the sport; (c) data must exist that demonstrates support for the sport such as collegiate or intramural sponsorship, high school sponsorship, non-scholastic competitive programs and associational and organizational support; (d) a demonstrated understanding that if the sport is identified as an emerging sport, all NCAA member institutions wishing to sponsor the sport will abide by NCAA rules and regulations; (e) a proposal setting forth suggestions for championship rules and a format for the sport must be submitted; and (f) ten letter of support from the president or athletic directors of member institutions confirming they will sponsor the sport as an emerging sport must be submitted; the letters must be dated within one year of the submission of the proposal requesting identification as an emerging sport. | |
| 3. Archery, badminton, equestrian, rugby, squash, synchronized swimming and team handball are emerging sports. | 3. Exhibit A, Declaration of Wendy Walters, ¶ 4. |
| 4. Women's wrestling has never been included on the list of emerging sports, nor has any organization or person submitted a proposal meeting the above criteria for consideration of women's wrestling as an emerging sport. | 4. Exhibit A, Declaration of Wendy Walters, ¶¶ 4 and 5. |
| 5. The NCAA has received inquiries from USA Wrestling regarding women's collegiate wrestling relating to the criteria for emerging sports. Neither USA Wrestling (via Gary Abbott) or any other proponent has submitted documentation showing that women's wrestling meets the criteria for an emerging sport. | 5. Exhibit A, Declaration of Wendy Walters, ¶ 5. |
| 6. While there has been an increase in the number of girls participating in wrestling at the high school level, that number remains | 6. Exhibit XXX, Stipulation Regarding Participation Numbers; Exhibit B, Declaration of Todd Petr, ¶ 3; Exhibit AAAA, 1981-82 - |

| | |
|---|---|
| well below the number of girls participating in other sports. For example, according to the California Interscholastic Federation website, in 2001 out of a total of 271,214 female high school students, 752 participated in wrestling while 4,588 high school girls participated in golf that year. In 2005, 1,230 girls participated in wrestling, as compared to 5,972 in golf. Between the academic years 1998/99 and 2005/06 no NCAA member institutions reported participation by women in wrestling. | 2005-06 Sports Sponsorship Participation Rates Report, pp. 48, 52, 56, 60, 64, 68, 72 and 76 |
| 7. Until 2003, UC Davis was an NCAA Division II school. However, its wrestling team competed at the Division I level because of a lack of available competition with Division II schools in its geographic area. | 7. Exhibit C, Declaration of Larry Swanson, ¶ 2. |
| 8. UC Davis wrestles in the Pac-10 Conference. The other schools that are members of the Pac-10 Conference for the sport of wrestling are Arizona State, Boise State, Cal Poly, Cal State Bakersfield, Cal State Fullerton, Oregon, Oregon State, Portland State and Stanford. | 8. Exhibit C, Declaration of Larry Swanson, ¶ 2; Exhibit E, Declaration of Lennie Zalesky, ¶ 2 |
| 9. Men's varsity wrestling is an NCAA sponsored sport. The team is counted as a men's sport for purposes of compliance with NCAA regulations relating to the minimum number of teams that a school must have in order to be a member of a particular Division. This campus has not declared wrestling to be a contact sport. Accordingly, students of both genders may try out for the team. | 9. Exhibit C, Declaration of Larry Swanson, ¶ 3. |
| 10. The head coach of the wrestling team is solely responsible for determining which students will be awarded a slot on the team roster, based on his assessment of which candidates are most skilled and qualified to participate in collegiate level wrestling at the Division I level. | 10. Exhibit C, Declaration of Larry Swanson, ¶ 5; Exhibit E, Declaration of Lennie Zalesky, ¶ 2 |
| 11. Any student who is selected for the wrestling team must meet NCAA eligibility requirements, comply with all applicable NCAA regulations relating to wrestling, and comply with UC Davis athletic eligibility requirements. | 11. Exhibit C, Declaration of Larry Swanson, ¶ 4; Exhibit D, Declaration of Michelle Roppeau, ¶¶ 2 and 4. |
| 12. The UC Davis wrestling team competes in a set schedule of competition each year. The competition includes dual | 12. Exhibit C, Declaration of Larry Swanson, ¶¶ 7 and 8; Exhibit E, Declaration of Lennie Zalesky, ¶¶ 8 and 10. |

| | |
|---|---|
| meets with other schools in the Pac-10 conference; participation in invitational tournaments, participation in open tournaments, and participation in NCAA championship events (if applicable). For a number of years the wrestling team held an annual open tournament called the Aggie Open. This event was primarily a fundraiser but also provided opportunities for wrestlers from other schools or clubs to compete in an open tournament (as opposed to a scheduled meet). Since 2006, UC Davis has discontinued the Aggie Open wrestling tournament because it conflicted with Big West conference basketball games. | |
| 13. Anyone can participate in an open wrestling tournament. The UC Davis wrestling team participates in very few open tournaments. Its primary form of competition is dual meets with other Pac-10 schools and the NCAA championships. Coach Zalesky would never recruit or otherwise give a place on the varsity roster to a student, regardless of gender, who was solely interested in participating in open tournaments. While all wrestlers selected for the team may not always compete (such as when they are red-shirting), it is his expectation that every wrestler selected for the team will at some point be able to viably compete in dual meets and championships. | 13. Exhibit E, Declaration of Lennie Zalesky, ¶ 8. |
| 14. Collegiate style wrestling rules are used in dual meets and NCAA sponsored tournaments. The wrestling team practices and competes in those events using collegiate style rules, not freestyle or folk-style rules. | 14. Exhibit E, Declaration of Lennie Zalesky, ¶ 3 . |
| 15. There has never been a separate women's varsity wrestling team at UC Davis. | 15. Exhibit C, Declaration of Larry Swanson, ¶ 6; Exhibit F, Declaration of Greg Warzecka, ¶ 14. |
| 16. The department of Intercollegiate Athletics issues media guides for all varsity sports. The media guides are created using standard background information on the school, athlete photographs and biographical information, rosters, schedules and records. The sports information officer relies on the head coach from each time to provide the necessary information for the team. | 16. Exhibit U, Declaration of Mike Robles, ¶ 3. |
| 17. Former UC Davis wrestling head | 17. Exhibit V, Deposition of Michael |

| | |
|---|---|
| coach Mike Burch described himself as a "significant contributor" to the content of the media guides. | Burch, Volume I, pp. 28:20-24; 253:16-21; 254:8; 255:22. |
| 18. The 1996/97 media guide for wrestling includes a section on "women's freestyle wrestling" on page 11. Two graduate students, Afsoon Roshanzamir and Jennifer Martin were described as members of the Davis Wrestling Club, a local city freestyle club. The description of the wrestling team on pages 10-11 of the 1996/97 media guide are devoid of any mention of women wrestlers; the focus is solely on male wrestlers. Similarly, there are no women listed on the team roster, set forth on page 18 of the guide. | 18. Exhibit BBBB, 1996/97 Media Guide; Exhibit V, Deposition of Michael Burch, Volume I, p. 253:16-21. |
| 19. The 1997/98 wrestling media guide describes wrestling as "the only NCAA Division I men's sport on the UC Davis campus." Page 11 of that year's guide states: "For several years UC Davis has had women participate in its program. Women's amateur wrestling is a new but rapidly growing sport in the U.S., with championships at the national and international level. At UC Davis, women's wrestling has an unofficial status, but women are encouraged to participate to develop their skills." The roster for that school year, submitted by Coach Burch, did not contain any women. | 19. Exhibit V, Deposition of Michael Burch, Volume I, pp. 267:1-4; 270:17-20; Exhibit CCCC, 1997/98 Media Guide, pp. 11, 22. |
| 20. The first time women were listed in the roster contained in the media guide was in the 1998/99 version. There is no separate roster for the women signifying the existence of a separate team, and once again they are described as having "unofficial status." The records for the 1997/98 season which are included in the 1998/99 guide do not contain any information about women. | 20. Exhibit DDDD, 1998/99 Media Guide, pp. 21-23 ; Exhibit V, Deposition of Michael Burch, Volume I, p. 271:1-5. |
| 21. The 1999/00 media guide continued to describe women's wrestling as having unofficial status. No women are listed on the roster in that guide and there are no entries for women in the section setting forth individual results for the previous year. | 21. Exhibit V, Deposition of Michael Burch, Volume I, pp. 276:24- 277:1; Exhibit EEEE, 1999/00 Media Guide. |
| 22. As with earlier years, the 2000/01 media guide does not contain the names of any women on the roster in the guide, nor are women included in the summary of individual records. In this guide, there is a reference to | 22. Exhibit V, Deposition of Michael Burch, Volume I, pp. 282:20-283:3; Exhibit FFFF, 2000/01 Media Guide pp. 18, 22-23. |

| | |
|---|---|
| the "women's wrestling club program," which goes on to reiterate the same language contained in previous guides about women's wrestling having unofficial status at UC Davis. | |
| 23. There has never been a separate budget for a women's wrestling team. | 23. Exhibit F, Declaration of Greg Warzecka, ¶ 14. |
| 24. There has never been a competition schedule submitted by a head wrestling coach indicating the existence of a separate women's wrestling team. | 24. Exhibit H, Declaration of Jennifer Cardone, ¶ 5. |
| 25. When women practiced with the team during the time Burch was the head coach, they practiced both with each other and with males, at the same time as males participated in practice. The women used freestyle wrestling rules, not collegiate wrestling rules. | 25. Exhibit V, Deposition of Michael Burch, Volume I, p. 220: 11-21; Exhibit Z, Deposition of Michael Maben, pp. 5:2-4; 22:18-21; 25:1-25; 32:23-33:13; 34:7-24; 35:16-36:21; Exhibit AA, Deposition of Charlie Hong, pp. 5:2-5; 9:11-20; 12:21-23; 14:7-8, 23-24; 17:6-18:12; 21:17-22:20; Exhibit BB, Deposition of Randall Katz, pp. 5:3-4; 10:5-8; 12:24-13:18; 14:1-2; 23:25-24:3; 31:22-33:6; Exhibit CC, Deposition of AREZOU MANSOURIAN, p. 227:8-18. |
| 26. Afsoon Johnston (nee Roshanzamir) was a member of the first women's national wrestling team in high school. She earned a place on the national team by competing against other women. | 26. Exhibit DD, Deposition of Afsoon Johnston, pp. 17:21-23; 20:10-24. |
| 27. Johnston entered U.C. Davis in the Fall of 1990 and graduated in 1995. | 27. Exhibit DD, Deposition of Afsoon Johnston, pp. 23:3-13; 30:14-15; 30:20-31:2. |
| 28. When Johnston entered UC Davis she advised the coach (Bob Grant) that she was interested in pursuing wrestling on the national level. Throughout the time she attended UC Davis, her participation in dual meets was limited to an exhibition match with a female Chico State wrestler and an open meet with San Francisco State. Johnston weighed 103 pounds, which was significantly below the lowest collegiate weight class of 119 pounds. | 28. Exhibit DD, Deposition of Afsoon Johnston, pp. 31:3-18; 34:15-36:6; 37:20-24. |
| 29. During Johnston's first and second year at UC Davis, she was the only woman who participated with the wrestling team. During her senior year, a veterinary school student named Jennifer Martin trained with Johnston. | 29. Exhibit DD, Deposition of Afsoon Johnston, pp. 37:6-13; 43:20-25. |

| | |
|---|---|
| 30. After Mike Burch became the head wrestling coach in 1995, Johnston continued to be the only woman who participated on the team. During Burch's tenure, Johnston never participated in a match or a meet wearing a UC Davis uniform. Burch did not provide her with coaching for any national or international tournaments. Johnston considered herself to actually be a member of the UC Davis wrestling team only during her freshman year, because after that she was a member of the USA Wrestling national team. | 30. Exhibit DD, Deposition of Afsoon Johnston, pp. 41:9-21; 41:25-42:20. |
| 31. After Johnson's freshman year, the primary focus of her wrestling activities was to train so that she could compete with the national team, not with the UC Davis team. She was not interested in being affiliated with the UC Davis team after her freshman year because doing so would adversely affect her standing on the national team. Johnson never took any steps to try to form a separate women's varsity wrestling team on campus. | 31. Exhibit DD, Deposition of Afsoon Johnston, pp. 42:5-15; 52:4-18. |
| 32. Samantha Reinis entered UC Davis in September, 1997. She participated on the wrestling team in 1998/99, but did not wrestle at all in 1999/00 and 2000/01 because of a chronic injury | 32. Exhibit EE, Deposition of Samantha Reinis, pp. 32:17-19; 11:18-12:20. |
| 33. While Reinis was at UC Davis, the only match or tournament that she competed in was the Aggie Open. She attempted to wrestle in a tournament hosted by Southern Oregon, but could not do so because she did not have an opponent. She never competed in a UC Davis uniform. | 33. Exhibit EE, Deposition of Samantha Reinis, pp. 38:21-39:10; 42:9-44:1; 46:9-12. |
| 34. Former plaintiff Nancy Chiang did not wrestle until her senior year of high school. She participated in only one wrestling match or tournament in high school, losing once by decision and once by pin. | 34. Exhibit II, Deposition of Nancy Chiang, pp. 113:25-114:4; 123:22-25; 126:13-127:23. |
| 35. Chiang entered UC Davis as a freshman in the fall of 1998. Burch did not sponsor her for admission, nor was she recruited. | 35. Exhibit II, Deposition of Nancy Chiang, pp. 93:25-94:1; 134:23-136:1; 138:21-24; 164:21-24; 169:16-170:3. |
| 36. Chiang was not cleared to practice with the team until well into the season, because she didn't obtain her required medical clearance until January 1999. Prior to that time, she could only work out by herself. | 36. Exhibit II, Deposition of Nancy Chiang, pp. 185:9-186:11; Exhibit D, Declaration of Michelle Roppeau, ¶ 7; Exhibit AAA, Wrestling eligibility documents for the 1998/99 regular season. |

| | |
|---|---|
| 37. Chiang was not given a UC Davis uniform, nor did she ever observe a woman wrestler in one. | 37. Exhibit II, Deposition of Nancy Chiang p. 154:10-22. |
| 38. The only match or tournament Chiang participated in during her freshman year was the Aggie Open in January 1999. Chiang wrestled against a woman from a wrestling club and was defeated. | 38. Exhibit II, Deposition of Nancy Chiang, pp. 196:10-13; 190:1-191:2. |
| 39. The only match or tournament that Chiang participated in during her second year was the 2000 Aggie Open. She wrestled against two women, using freestyle rules, and was defeated both times. | 39. Exhibit II, Deposition of Nancy Chiang, pp. 218:7-219:22; 224:16-22. |
| 40. During the 1999/2000 school year Chiang struggled with health problems that eventually deteriorated to the point where she barely attended classes. She enrolled in classes for the spring quarter, but only went to one class and then withdrew. Chiang attempted to return to UC Davis in the fall of 2000 but left again in mid-October. She did not return again and was deemed academically ineligible for intercollegiate sports as of January, 2001. | 40. Exhibit II, Deposition of Nancy Chiang, pp. 73:3-74:1; 75:8-13; 251: 7-252:2; 249:19-23; Exhibit D, Declaration of Michelle Roppeau, ¶ 5. |
| 41. Chiang never participated in world wrestling championships, or the Pan American Games, nor has she ever tried out for the U. S. Olympic Wrestling team. | 41. Exhibit II, Deposition of Nancy Chiang, p. 38:3-25. |
| 42. A student named Abby Schwartzburg appears in the wrestling team media guide for 1999/2000. Schwartzburg appeared to be participating with the team, but had not completed the necessary paperwork to do so. This came to the attention of Compliance Officer Jennifer Cardone in the Spring of 2000, who in turn alerted Associate Athletic Director Pam Gill-Fisher of the issue. Gill-Fisher met with Schwartzburg and Reinis (who was also missing required paperwork) to have them complete the documentation. | 42. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 6; Exhibit H, Declaration of Jennifer Cardone, ¶ 4; Exhibit GGGG, Eligibility Documents for 2000; Exhibit PPPP, Compliance Manual. |
| 43. Schwartzburg entered UC Davis as a transfer student in the fall of 1999. She was no longer registered as a student at UC Davis by February, 2001. | 43. Exhibit D, Declaration of Michelle Roppeau, ¶ 6. |
| 44. A student named Stacey Massola trained with the UC Davis wrestling team in 1996/97 but then quit. A student named Alexis Bell participated in the wrestling | 44. Exhibit V, Deposition of Michael Burch, Volume I, pp. 240:21-242:14; 245:13-21. |

| | |
|---|---|
| program for a very short period of time (two months) in 2000/2001. | |
| 45. During the years Mike Burch was the head coach of the wrestling team, there were never more than four women at any one time participating in the wrestling program. | 45. Exhibit V, Deposition of Michael Burch, Volume I, p. 208:12-16. |
| 46. Other than the pre-season practices and the try-outs (wrestle-off) that MANCUSO and NG attended in the Fall of 2001, women have not tried out for the wrestling team. | 46. Exhibit GG, Deposition of Lennie Zalesky, pp. 28:11-29:14. |
| 47. Neither Burch nor Zalesky are aware of any NCAA Division I school that has a separate women's wrestling team. | 47. Exhibit V, Deposition of Michael Burch, Volume I, p. 238:8-23; Exhibit E, Declaration of Lennie Zalesky, ¶ ¶ 1, 9. |
| 48. Under Burch's leadership of the varsity wrestling team, women were not required to engage in a wrestle-off or any type of competition to earn a spot on the team. Burch knew they did not have the skill necessary to compete even at the lowest weight class. | 48. Exhibit EE, Deposition of Samantha Reinis, p. 57:13-24; Exhibit CC, Deposition of MANSOURIAN, p.147:8-16; Exhibit HH, Deposition of NG, pp. 135:19-136:12;146:19-24; Exhibit V, Deposition of Michael Burch, Volume I, p. 298:6-24. |
| 49. A fundamental aspect of coaching is holding try-outs for walk-on (non-recruited) students who hope to gain a spot on the roster. At the collegiate varsity sport level, there is a presumption that those student-athletes who earn a spot on the team have a skill level commensurate with varsity competition. Conducting wrestle-offs (one-on-one competitions between wrestlers in a weight class) is the process by which the coach determines which students in each weight class have the skills and abilities necessary to compete in the Pac-10 conference. | 49. Exhibit E, Declaration of Lennie Zalesky, ¶¶ 2 and 6; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) pp. 5:8-10; 37:15-22; 38:2-12; 70:25-71:25; 106:21-107:9; Exhibit J, Declaration of Christine Grant, ¶ 28. |
| 50. In Burch's opinion, none of the women had the strength or skills to compete with males; specifically, he stated that they "didn't have a prayer in beating the men on this team." | 50. Exhibit V, Deposition of Michael Burch, Volume I, pp. 218:16-24; 267:1-15; Exhibit W, Deposition of Michael Burch, Volume II, p. 372:22-24. |
| 51. Coach Zalesky, who has competed on the national and international levels, and has coached high school and collegiate wrestling, has always conducted try-outs to determine which students will be placed on the team. During the pre-competition practice period, students who hope to obtain a spot on the team roster must come to practice, engage in conditioning and weight training, and | 51. Exhibit E, Declaration of Lennie Zalesky, ¶ 1, 2. |

| | |
|---|---|
| participate in drills. Shortly before the competition season begins, he conducts wrestle-offs so he and the assistant coaches can determine which student-athletes are the most skilled and best qualified in each weight class. | |
| 52. When asked why the media guides did not contain any information about accomplishments of women wrestlers, Burch stated that the women were not large enough to compete in even the lowest weight class of 125 pounds. | 52. Exhibit V, Deposition of Michael Burch, pp. Volume I, 276:24-277:1; 271:1-5; 275:20-276:16; 277:15-278:7. |
| 53. Burch did not provide the women with UC Davis wrestling uniforms. | 53. Exhibit CC, Deposition of MANSOURIAN, p.144:8-11; Exhibit HH, Deposition of NG, pp. 127:19-128:12; 138:8-16; Exhibit II, Deposition of Nancy Chiang, p. 154:10-22; Exhibit EE, Deposition of Samantha Reinis, p. 46:9-12. |
| 54. The 1999/00 wrestling media guide contains an extensive discussion about the hopes for the team that year. Coach Burch is quoted as saying this was the best team he had had. The guide goes on to describe the contenders in each weight class; the description is devoid of any mention of women, even in the lightest weight class. | 54. Exhibit EEEE, 1999/00 Media Guide. |
| 55. Similarly, the 2000/01 media guide contains an "Outlook" section that touts the hopefuls for that year. Again, there is no mention of women. Coach Burch is quoted as saying "The **guys** are hungry. They believed that for the past five years we've been building. We are still building but now it is time to see some of the fruits of that labor. We want to see more dual meet wins, more Pac-10 place-winners and more national qualifiers this year." There is no reference to accomplishments of women. (Emphasis added.) | 55. Exhibit FFFF, 2000/01 Media Guide, pp. 8-9. |
| 56. The primary types of competition engaged in by varsity wrestlers are dual meets (against teams from other schools in the conference) and post-season championships. Open tournaments are attended at most only once or twice per year. Any person can participate in an open tournament, whether associated with a team or not. During the time Burch was the head wrestling coach, the only type of competition the women wrestlers | 56. Exhibit E, Declaration of Lennie Zalesky, ¶ 8; Exhibit V, Deposition of Michael Burch, Volume I, pp. 228:20-229:11; Exhibit H, Declaration of Jennifer Cardone, ¶ 3. |

| | |
|---|---|
| participated in was open tournaments, primarily the Aggie Open. The only exception was Reinis' attempt to wrestle in a dual meet, which was thwarted because she had no competition. | |
| 57. Prior to the 1998/1999 school year, UC Davis could not offer athletic scholarships to its students, per the rules of the conference it belonged to at the time. Thereafter, the campus moved to a different conference and grants in aid consistent with NCAA guidelines were available to student-athletes. | 57. Exhibit F, Declaration of Greg Warzecka, ¶ 4; Exhibit JJ, Deposition of Jennifer Cardone, pp. 75:21-76:23. |
| 58. Burch submitted grant in aid (athletic scholarship) worksheets for 1998/99, 1999/00 and 2000/01. He never offered any scholarships to women using the worksheet process. | 58. Exhibit V, Deposition of Michael Burch, pp. Volume I, 182:2-8; 183:17-20; 185:17-187:16; 188:4-7; Exhibit X, Deposition of Michael Burch, Volume III, pp. 483:20-484:8; 488:17-20; 489:22-490:10; Exhibit CCC, Grant-in aid documents; Exhibit EE, Deposition of Samantha Reinis, p. 48:11-25. |
| 59. Burch learned that his contract was not going to be renewed on May 29, 2001. Two weeks later (just shortly before he departed UC Davis) he sent an e-mail to Compliance Coordinator Jennifer Cardone and attempted, for the first time, to award scholarship money to MANSOURIAN, NG and MANCUSO. In light of the fact the belated submission of this request, the status of the wrestling team budget, and the fact that the request was made only after Burch learned his contract would not be renewed, Athletic Director Warzecka made the decision to hold the request in abeyance, pending hiring of a new coach. | 59. Exhibit X, Deposition of Michael Burch, Volume III, pp. 495:23-496:11; Exhibit DDD, June 14, 2001 e-mail from Coach Burch regarding proposed grants-in-aid to women wrestlers; Exhibit H, Declaration of Jennifer Cardone, ¶ 7; Exhibit F, Declaration of Greg Warzecka, ¶ 11. |
| 60. All student-athletes who participate in any manner in varsity athletics must complete certain required paperwork such the NCAA Student-Athlete Statement and Drug-Testing Consent Form, and the UC Davis required Academic Plan Form. Failure to submit the required paperwork means that a student is not eligible to participate. Burch did not believe the women needed to complete the mandated paperwork (such as an Academic Plan Form) because the NCAA doesn't recognize women's wrestling. | 60. Exhibit H, Declaration of Jennifer Cardone, ¶ 8; Exhibit W, Deposition of Michael Burch, Volume II, pp. 435:11-436:13. |
| 61. MANSOURIAN entered UC Davis in the fall of 2000 and graduated in June 2004. | 61. Exhibit CC, Deposition of MANSOURIAN, p. 22:24; 23:6; 66:1-11. |

| | |
|---|---|
| She had started wrestling in her sophomore year in high school. | |
| 62. During her first year at UC Davis (2000/2001), MANSOURIAN observed only one other female actively participating in wrestling -- CHRISTINE NG. | 62. Exhibit CC, Deposition of MANSOURIAN, p. 139:1-14. |
| 63. MANSOURIAN did not compete in any dual meets during the 2000/2001 season. The only tournament she competed in was the Aggie Open in January 2001. MANSOURIAN wrestled against two women in the tournament and lost to both. | 63. Exhibit CC, Deposition of MANSOURIAN, pp. 27:23-29:5. |
| 64. MANSOURIAN has never wrestled in a national wrestling tournament, has never participated in the Pan American games, never tried out for the U.S. Olympic team, and never held any national or international rankings as a wrestler. | 64. Exhibit CC, Deposition of MANSOURIAN, pp. 32:20-34:3. |
| 65. MANSOURIAN did not try out for a place on the wrestling team in the fall of 2001. On October 10, 2001 she sent an e-mail to Coach Zalesky in which she stated that she had a new job and a heavy class load. She wrote "I have found it extremely exhausting to wrestle as well. I am thinking that maybe intercollegiate wrestling is too much for me right now and that I would rather in a club (like you suggested earlier) b/c I only have time for practice about 3 times a week…however, I do not by any means want to stop wrestling. I can just not commit to it as much." Zalesky took her message at face value. MANSOURIAN never told him that she made any false statements in this message. | 65. Exhibit MMM, (Deposition Exhibit 406); Exhibit CC, Deposition of MANSOURIAN, p. 338:8-11; Exhibit E, Declaration of Lennie Zalesky, ¶ 7. |
| 66. NG started wrestling in her senior year of high school as part of the school team. She was unable to defeat either the boys or the girls that she wrestled against at the high school level. | 66. Exhibit HH, Deposition of NG, pp. 44:8-14; 51:9-20. |
| 67. NG was not recruited by any school at the college level. She entered UC Davis as a freshman in the fall of 1998 and graduated in September 2002. | 67. Exhibit HH, Deposition of NG, pp. 51:21-24; 16:14-21. |
| 68. During the 1998/99 season, NG was ineligible to practice or compete from the start of the season, in November, until February, 1999 because she failed to turn in an | 68. Exhibit D, Declaration of Michelle Roppeau, ¶ 7; Exhibit AAA (Deposition Exhibit 95). |

Academic Plan Form.

| | |
|---|---|
| 69. During the three years she participated in wrestling, NG competed in only one match or tournament - the National Girls Wrestling tournament in Michigan, held in the spring of 2000. Burch did not accompany her to the tournament, she did not wear a UC Davis while competing, and she did not place. She signed up for the Aggie Open wrestling tournament in her freshman and sophomore years at UC Davis but no one in her weight class showed up to compete and thus she did not participate. | 69. Exhibit HH, Deposition of NG, pp. 25:22-26:5; 26:13-27:7; 98:14-99:4; 99:5-100:8. |
| 70. NG had no desire to practice or wrestle against men; she was more interested in simply working out than she was in competing. She testified during her deposition that "I guess the thing is for me, like I have a fear of competing. And so I tend to avoid it when I can. So that's why I'm not exactly up for competing." | 70. Exhibit HH, Deposition of NG, pp. 122:21-123:7; 131:12-15. |
| 71. NG has never been a member of the U.S. National Wrestling Team, has never participated in the Pan American Games, and has never participated in the World Wrestling Championships. She has never tried out for the U. S. Olympic team nor does she have any plans to do so. | 71. Exhibit HH, Deposition of NG, p. 38:7-20. |
| 72. As of the Spring of her junior year (2001), NG was aware of only herself and MANSOURIAN as female UC Davis students interested in wrestling. Samantha Reinis was graduating and Abbey Schwartzburg had left school, as had Chiang. | 72. Exhibit HH, Deposition of NG, p. 211:1-18. |
| 73. In the fall of 2001, NG and MANSOURIAN spoke to Coach Zalesky and told him they did not have the skills or strength necessary to compete against males for a place on the team. In light of their statements, he urged them to consider developing their skills via membership on the wrestling club sport team, but did not preclude them from trying out. NG understood that Coach Zalesky required all hopefuls to engage in a wrestle-off to determine who would make the team. She participated in a wrestle-off with incoming freshman Plaintiff MANCUSO, who pinned her. | 73. Exhibit HH, Deposition of NG, pp. 211:23-212:24; 245:14-20; 254:22-255:20; Exhibit E, Declaration of Lennie Zalesky, ¶ 6. |

| | |
|---|---|
| 74. MANCUSO wrestled in high school and competed in various high schools tournaments and competitions. She also once competed in the U.S. National Wrestling Championships while in high school, using freestyle rules, and participated in the Aggie Open tournament in early 2001, also while still in high school. | 74. Exhibit KK, Deposition of MANCUSO, pp. 62:7-18; 64:8-14; 65:24-66:8; 82:14-19; 85:9-13; 89:18-23; 113:8-10. |
| 75. MANCUSO entered UC Davis in the Fall of 2001 and received her degree in September, 2006. Her eligibility to participate in varsity athletics expired in June, 2006. | 75. Exhibit KK, Deposition of MANCUSO, p. 39:1-5; Exhibit D, Declaration of Michelle Roppeau, ¶ 5. |
| 76. MANCUSO spent her junior year (2003/04) abroad, studying in New Zealand and then spent November, 2004 through January, 2005 traveling and working there while she was on a planned educational leave from UC Davis. She re-enrolled as a full-time student in February, 2005, took classes and then went to Ireland for a summer session. MANCUSO returned from Ireland in September, 2005 and attended a program in Washington, D.C. from September through December, 2005. | 76. Exhibit KK, Deposition of MANCUSO, pp. 44:15-45:7; 45:20-46:23; 47:1-48:14. |
| 77. As of the date of her deposition (January, 2006) MANCUSO was no longer enrolled in any classes and had filed to graduate in September, 2005. MANCUSO was awarded a degree on September, 15, 2006, which is her official graduation date. She is considered a "summer session 2006 graduate". | 77. Exhibit KK, Deposition of MANCUSO, p. 48:15-21; Exhibit, YYY, Stipulation Regarding MANCUSO Graduation Date. |
| 78. MANCUSO was not initially accepted at UC Davis. | 78. Exhibit KK, Deposition of MANCUSO, pp. 117:20-118:15. |
| 79. Burch asked UC Davis women's soccer coach Mary Claire Robinson to sponsor MANCUSO for admission. Sponsorship means that a student who meets the minimum admissions criteria for the University of California overall, but does not meet the selective admissions criteria used by the UC Davis campus, may be admitted. | 79. Exhibit H, Declaration of Jennifer Cardone, ¶ 6; Exhibit K, Declaration of Maryclaire Robinson, ¶ 2. |
| 80. Robinson agreed to sponsor MANCUSO for admission because MANCUSO ad played soccer on her high school varsity team, that team had won the CIF section championship, and Robinson's recruiting efforts for the 2001/02 school year | 80. Exhibit K, Declaration of Maryclaire Robinson, ¶¶ 2 and 4; Exhibit KK, Deposition of MANCUSO, pp. 131:22-132:15;134:6-25; 135:12-19; 136:7-21. |

| | |
|---|---|
| had not yielded promising results. In sponsoring MANCUSO, Robinson expected MANCUSO to make a good faith effort to try out for the soccer team. MANCUSO came to a few practices, but really had no interest in being on the soccer team. She was not disappointed when she was cut. MANCUSO never competed as a member of the varsity soccer team. | |
| 81. MANCUSO admitted she could not defeat any of the males who were trying out for the team and testified that she had no desire to wrestle against men at the college level because "they would squash me." | 81. Exhibit KK, Deposition of MANCUSO, pp. 192:21-193:4. |
| 82. Consistent with his usual practice and the agreement approved by the OCR, Coach Zalesky held try-outs for the wrestling team in the fall of 2001 by having students in the same weight class engage in wrestle-offs against each other. Coach Zalesky had MANCUSO engage in a wrestle-off against NG first, as both were in the lightest weight class and comparable in their weights. MANCUSO pinned NG quickly and went on to wrestle-off against a male in the same weight class. The male student pinned MANCUSO within 30 seconds. | 82. Exhibit KK, Deposition of MANCUSO, pp. 227:4-8; 227:24-228:20; 229:1-230:7; Exhibit AA, Deposition of Charlie Hong, pp. 15:4-13; Exhibit E, Declaration of Lennie Zalesky, ¶ 6. |
| 83. As a result of the wrestle-offs, Coach Zalesky cut a number of students, including NG and MANCUSO, as well as the male who defeated MANCUSO in the wrestle-off and several other males. These students were cut because they did not have the skills and abilities to wrestle at the NCAA Division I level. Coach Zalesky was allowed a roster maximum of thirty wrestlers, and filled that roster with the most skilled and competitive wrestlers in each weight class. | 83. Exhibit E, Declaration of Lennie Zalesky, ¶ 6. |
| 84. MANCUSO has never participated in a world wrestling competition or the Pan American Games, nor has she made any effort to do so. | 84. Exhibit KK, Deposition of MANCUSO, p. 92:4-21. |
| 85. Athletic Director Warzecka instituted a roster management program. Under the terms of the program, each men's varsity team had an upper limit on the number of student-athletes who could be on the team roster. Although both sexes can try out for a place on the UC Davis wrestling team, it is | 85. Exhibit F, Declaration of Greg Warzecka, ¶¶ 4 and 5; Exhibit XX, Memorandum notifying coaches of the Roster Management Program; Exhibit V, Deposition of Michael Burch, Volume I, p. 284:12-23. |

considered a men's sport because the NCAA only sponsors men's wrestling. The purpose of roster management, which is used for both budgetary and gender equity purposes, is to limit spending. The head coaches of all men's teams were notified in writing of this requirement.

86. In the Fall of 2000, Burch was told via a letter from Warzecka that the limit on the size of the wrestling team roster was thirty student-athletes. Burch had advised the students that because of the roster management program, "it could might come down to some people who really want to be out here not being able to be out here." He did not say this to the women, because in his opinion, the roster cap did not apply to women.

86. Exhibit V, Deposition of Michael Burch, Volume I, pp. 304:1-18; 306:6-307:7; Exhibit YY, October 9, 2000 letter to Coach Burch regarding roster limit.

87. After receiving the letter, Burch sent an e-mail to Warzecka asking him to raise the roster maximum to 32-34 spots. Warzecka agreed to increase the cap to 34. Burch filled all 34 roster spots with males.

87. Exhibit V, Deposition of Michael Burch, Volume I, pp. 310:7-311:9; 315:11-21; Exhibit F, Declaration of Greg Warzecka, ¶ 6.

88. Warzecka did not care whether Burch had all men, or men and women, on the wrestling team roster so long as the total number of student-athletes did not exceed the expanded maximum of 34. He considered the roster management program, including roster maximums or caps, to apply to all members of men's team, no matter what the gender of any particular athlete was. In his opinion, if women who did not have the skill necessary to earn a spot on the team were permitted to remain on a team over and above the roster cap, that would be unfair to males who were not selected for the team because they did not have the necessary skill.

88. Exhibit F, Declaration of Greg Warzecka, ¶ 7.

89. Warzecka and Burch had a discussion about the wrestling team roster in October, 2000. Burch contends that Warzecka requested that Burch move the women to club sport status. Warzecka contends that they discussed Burch's roster and his request to increase the allowable number. During the course of the discussion, Warzecka asked Burch what he was going to do with the women, as they were not included on his proposed roster. Burch said they were not competitive and that he did not have the time

89. Exhibit V, Deposition of Michael Burch, Volume I, p. 318:8-25; Exhibit F, Declaration of Greg Warzecka, ¶ 6.

| | |
|---|---|
| to devote to them. Warzecka replied that in that case, a wrestling sport club should be formed so the women could participate in wrestling at a level that was commensurate with their skills and abilities. | |
| 90. On October 30, 2001 Burch submitted a roster of 34. None of the 34 student athletes listed were women. | 90. Exhibit V, Deposition of Burch, Volume I, p. 317:3-19; Exhibit ZZ, October 30, 2000 letter from Coach Burch with roster. |
| 91. At the end of October or early November 2000, Burch told MANSOURIAN, NG and Bell that the administration was not supportive of women's wrestling and that he had been told to take them off the team. He also told them that notwithstanding the fact they were not on the team, they could continue coming to practices, which they did. | 91. Exhibit CC, Deposition of MANSOURIAN, pp. 157:14-160:1; 165:3-10; 305:5-10; Exhibit HH, Deposition of NG, p. 148:8-24. |
| 92. When Burch met with MANSOURIAN, NG and Bell at the end of October or early November 2000, he did not tell them about the imposition of roster management, or that he had not allotted any of his limited spots to them. | 92. Exhibit V, Deposition of Michael Burch, Volume I, pp. 306:24-307:7, 311:10-312:19, 317:9-321:13; Exhibit W, Deposition of Michael Burch, Volume II, pp. 334:4-335:18; Exhibit CC, Deposition of MANSOURIAN, pp. 157:14-162:13; 167:14-168:9, 224:6-225:5; Exhibit HH, Deposition of NG, pp.148:8-152:22; 189:7-16, 204:19-205:20. |
| 93. On April 25, 2001 NG and MANSOURIAN submitted a written complaint to the Department of Education's Office for Civil Rights (OCR). They alleged they had been subject to gender discrimination because they were told they could no longer participate on the wrestling team. The complaint makes no reference to the overall women's athletics program at UC Davis, nor is there reference to any team other than the wrestling team. Plaintiffs stated in the complaint that they had not tried to resolve their complaint with the school through an internal grievance process. | 93. Exhibit HH, Deposition of NG, pp. 186:19-188:2; Exhibit GGG,Chris Ng's April 24, 2001 OCR complaint; Exhibit CC, Deposition of MANSOURIAN, pp. 216:12-16; 217:1-19; 218:5-8; Exhibit L, Declaration of Dennis Shimek, ¶ 9. |
| 94. Athletic Director Warzecka and Associate Athletic Directors Swanson and Gill-Fisher were notified of the existence complaint in early May via a memo dated April 30, 2001 from NG, MANSOURIAN and Reinis. This was the first notice they were given of the existence of the complaint. This was also the first complaint relating to gender issues in the intercollegiate athletic program that the campus had received during Director | 94. Exhibit CC, Deposition of MANSOURIAN, pp. 228:1-12; 229:18-231:1; Exhibit HH, Deposition of NG, pp. 192:20-193:6; 194:3-16; Exhibit UU,April 30, 2001 memo from Plaintiffs regarding their OCR complaint; Exhibit F, Declaration of Greg Warzecka, ¶ 9; Exhibit I, Declaration of Pam Gill-Fisher, ¶ 7; Exhibit C, Declaration of Larry Swanson, ¶ 9; Exhibit M, Declaration of Robert Franks, ¶ 3; Exhibit L, Declaration of |

| | |
|---|---|
| Warzecka's employment. The campus administrators understood the complaint to relate solely to the wrestling team, not to the intercollegiate athletic program as a whole. | Dennis Shimek, ¶ 9. |
| 95. On May 14, 2001 NG and MANSOURIAN filed a second (supplemental) OCR complaint. This complaint contains a list of allegations pertaining to the wrestling program and the participation of women in it. | 95. Exhibit CC, Deposition of MANSOURIAN, pp. 294:21-295:7; Exhibit HHH, Chris Ng's May 14, 2001 supplemental OCR complaint. |
| 96. On June 26, 2001 NG submitted a third complaint to OCR, on behalf of herself, MANSOURIAN, and MANCUSO. This complaint was based on athletic scholarships issued to various members of the wrestling team, and Warzecka's response to Burch's effort to give female wrestlers scholarship money only after he learned his contract would not be renewed. | 96. Exhibit HH, Deposition of NG, p. 237:11-24; Exhibit CC, Deposition of MANSOURIAN, p. 304:5-25; Exhibit KKK, Chris Ng's June 26, 2001 supplemental OCR complaint. |
| 97. In August 2001, MANSOURIAN filed a fourth OCR complaint. This one was based on the decision not to renew Burch's contract. Plaintiff contended that decision constituted retaliation against women wrestlers. | 97. Exhibit CC, Deposition of MANSOURIAN, p. 312:1-15; Exhibit LLL, Chris Ng's August 13, 2001 supplemental OCR complaint. |
| 98. After OCR representatives advised members of the Athletic Department administration of the substance of the April 25, 2001 complaint, Associate Vice Chancellor Robert Franks conducted an inquiry into the allegation that the Athletic Director had removed the women from the wrestling team roster. He spoke with a number of people regarding the allegations made by the women, including Mr. Warzecka, Dennis Shimek (the campus Title IX compliance officer), Larry Swanson, Pam Gill-Fisher and Mike Burch. As a result of his investigation into the issue, he concluded that Coach Burch had submitted a roster for the 2000/01 season that did not include the women wrestlers, thus they were indeed not part of the wrestling team. Coach Burch denied removing the women from the team, as did Mr. Warzecka. It was Mr. Franks' opinion that Coach Burch had not included the women on the roster that year because there was a roster cap, and he had wrestlers more qualified than the women that he wanted to use to fill the limited roster spots. | 98. Exhibit M, Declaration of Robert Franks, ¶ 4. |

| | |
|---|---|
| 99. On May 9, 2001, Warzecka sent a letter to Burch, requesting that he add NG, MANSOURIAN, Reinis and CHIANG to the team roster, provided they met NCAA, UC Davis and Burch's requirements for membership on the team. Burch declined to do so; accordingly, Vice Chancellor Franks notified the women of the decision. When this offer was made to the women, it was the understanding of the Vice Chancellor that if they desired to remain on the team the following year, they would have to compete for a position just like any other student who wanted to be a member of a varsity team. | 99. Exhibit F, Declaration of Greg Warzecka, ¶ 10; Exhibit JJJ, 2000/2001 wrestling recruiting records; Exhibit M, Declaration of Robert Franks, ¶ 5; Exhibit VV, May 10, 2001 e-mail from Bob Franks to Plaintiffs. |
| 100. On May 14, 2001 Dennis Shimek, the campus Title IX Compliance Officer, sent a letter to the OCR investigator advising here that the women had been placed on the wrestling team roster for the 2000/2001 school year. As a result of this notification, the OCR closed the initial complaint. | 100. Exhibit L, Declaration of Dennis Shimek, ¶ 6; Exhibit FFF, May 14, 2001 letter from Dennis Shimek to Pat Shelton; Exhibit III, May 31, 2001 letter from OCR to Chris Ng; Exhibit LLLL, May 31, 2001 letter from OCR to Chancellor Vanderhoef. |
| 101. Franks met with MANSOURIAN and NG on May 16, 2001 to discuss their status. During the course of the discussion, they asked if the campus would consider having two roster caps for the wrestling team-one for men and one for women. Franks passed on their inquiry to Gill-Fisher, Warzecka and Shimek, the campus Title IX compliance officer. | 101. Exhibit M, Declaration of Robert Franks, ¶ 6. |
| 102. Gill Fisher, Warzecka and Shimek consulted with others, including legal counsel, to determine whether such a suggestion was feasible. The conclusion was that it was not, for a variety of reasons. Of those reasons, the foremost was that as a practical matter, not all students who are interested in participating in varsity athletics have the skill necessary to earn a spot on the team. Each year, the Athletic Department receives eligibility forms from many more students who want to participate in intercollegiate sports than can actually be accommodated on the varsity teams. There was an upper limit to the total number of student athletes who could be on the wrestling team, which was the roster cap assigned by the Athletic Director. | 102. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 8. |
| 103. Franks advised MANSOURIAN and NG via in an e-mail that the campus would not establish separate roster caps for each | 103. Exhibit M, Declaration of Robert Franks, ¶ 6; Exhibit WW, May 17, 2001 e-mail from Bob Franks to Plaintiffs. |

gender.

| | |
|---|---|
| 104. The students had also asked whether the campus would waive the minimum number of participants necessary for a club sport team because they did not know if they could come up with the ten female students who were interested in wrestling which was the minimum number of participants required for a club sport. Franks advised them in an e-mail that the minimum would be waived for them. | 104. Exhibit M, Declaration of Robert Franks, ¶ 6; Exhibit N, Declaration of Laura Hall, ¶ 4. |
| 105. In June, 2001 Craig Reynolds, the chief of staff for Assembly Member Helen Thomson contacted Judy Sweet, Senior Vice President for Championships at the NCAA and asked her if the NCAA (or any other organization) had officially recommended roster caps or policies regarding roster caps. Sweet responded that it was up to each institution to determine how it will comply with gender equity and stated "each program is different so it wouldn't make sense to have established roster caps for everyone." | 105. Exhibit LL, Deposition of Craig Reynolds, pp. 5:2-4; 32:14-18; Exhibit Y, Deposition of Judy Sweet, pp. 32:17-25; 40:2-22; 43:1-16; 48:7-10; 145:11-146:1; 160:3-20; Exhibit QQQ, Judith Sweet's CV; Exhibit SSS, e-mails between Judy Sweet and Craig Reynolds. |
| 106. Roster management is based on the understanding that there is a limit to the number of students who can participate on a varsity team; not everyone who want to do so can be a member of a varsity team. By its nature, intercollegiate athletics is not an "all comers" event. The size of a team is determined by a competitive process that narrows down the squad to the size that is right for the institution. | 106. Exhibit Y, Deposition of Judy Sweet, pp. 89:18-90:14; 91:20-92:5. |
| 107. In the Summer of 2001, Mr. Shimek advised OCR that he believed a resolution could be reached that addressed the concerns raised by the supplemental complaint. | 107. Exhibit L, Declaration of Dennis Shimek, ¶ 7; Exhibit BBB, June 29, 2001 letter from the OCR to Chancellor Vanderhoef. |
| 108. As the result of these efforts, the parties entered into a Voluntary Resolution Plan. The campus administration chose to enter into the Voluntary Resolution Plan because in its opinion, the manner in which Coach Burch had dealt with the issue of women who wanted to participate on the varsity wrestling team had created confusion. The Voluntary Resolution Plan was not an admission by the campus that there had been any violation of state or federal law. Rather, it was a specific plan to develop wrestling as | 108. Exhibit L, Declaration of Dennis Shimek, ¶ 8; Exhibit TT, October 16, 2001 letter from the OCR. |

a club sport and, where warranted by the eligibility and qualifications of female student-athletes, support of their participation on the wrestling team. The Voluntary Resolution Plan contained the following points, among others: (1) male and female students will be encouraged to compete for a position on the varsity wrestling team. The coach of the wrestling team will select those athletes eligible for the final squad list who demonstrate the highest skill and competitive ability in their weight class; and (2) the coach will recruit the best qualified wrestlers, regardless of gender, for the varsity (ICA) team.

| | |
|---|---|
| 109. Trying out for a team is an integral part of varsity athletics. Not everyone who wants to be on a team can be. Those students who do not have the necessary skill to earn a spot of the varsity team may pursue their interest in a sport at the club team level. | 109. Exhibit Y, Deposition of Judy Sweet, p. 81:25-82:20; Exhibit J, Declaration of Christine Grant, ¶ 28; Exhibit E, Declaration of Lennie Zalesky, ¶ 11. |
| 110. UC Davis' sport club program is designed to provide students with the opportunity to learn sports skills, develop an individual potential in a particular sport, become physically fit, engage in competition with teams from other colleges, universities and amateur clubs, and to engage in social interaction and leadership opportunities. There are three levels of sport clubs: Recreational, Competitive II and Competitive I. Recreational teams focus on instruction and recreational activities on campus and do not engage in formal competition. Competitive II teams travel and compete against teams from other universities, colleges and amateur organizations, mostly within UC Davis' geographic region. Competitive I teams also travel and compete against teams from other universities, colleges and amateur organizations but in a format leading up to a national championship and may engage in competitions outside this geographic area. Most of the Competitive I and Competitive II club sports belong to a conference or some national governing body, compete within that conference or governing body, and follow that conference or governing body's rules. In a number of sports, such as the co-ed cycling club, the Competitive I club team is the equivalent to a varsity team since it is the highest level of intercollegiate competition | 110. Exhibit N, Declaration of Laura Hall, ¶ 2. |

offered for that sport.

| | |
|---|---|
| 111. There are currently 36 active club sports on campus: alpine skiing and snowboarding, badminton, baseball, boxing, Brazilian Ju Jitsu, crew, cycling, equestrian, fencing, field hockey, gymnastics, horse polo, ice hockey, judo, kendo, kung fu, men's and women's lacrosse, racquetball, roller hockey, men's and women's rugby, men's and women's soccer, softball, table tennis, tae kwon do, tennis, triathlon, men's and women's ultimate frisbee, men's and women's volleyball, men's and women's water polo and water ski/wakeboard. Of these club teams, 30 compete with club teams from other institutions on a regular basis (meaning at least five competitions a year). The remaining clubs are recreational in nature. Approximately 1,300 students participate on the club teams. The number of club sport teams in existence today is consistent with the number of club teams in existence over the past seven years. | 111. Exhibit N, Declaration of Laura Hall, ¶ 3. |
| 112. Any enrolled student may participate in a recreational club or submit an application to establish a club. Some competitive clubs that participate under a national governing body have established additional eligibility requirements which may make some enrolled students ineligible to participate in those particular club teams. In general, the purpose of the club must be consistent with the sport club mission and there must be a minimum of ten students interested in participating in the club. There are some funds available for distribution to sport clubs, but the bulk of financial support for each club sport is the result of fundraising. The sport clubs use campus recreational facilities and may use University vehicles for transportation to meets and tournaments. | 112. Exhibit N, Declaration of Laura Hall, ¶ 4; Exhibit HHHH, Criteria for Sport Clubs and Application. |
| 113. Prior to the passage of Title IX, the campus had an established women's sports program. The teams in this program were akin to competitive club teams that competed with comparable teams from other schools. This program was overseen by a campus organization known as the Women's Athletic Association (WAA), which organized tournaments for the teams. UC Davis became a founding member of the Association of | 113. Exhibit O, Declaration of Joe Singleton, ¶ 2; Exhibit I, Declaration of Pam Gill-Fisher, ¶ 3. |

| | |
|---|---|
| Intercollegiate Athletics for Women (AIAW) in 1973, which was the national governing body at that time for women's intercollegiate athletics. | |
| 114. Joe Singleton, who was the UC Davis Athletic Director at the time, changed the organizational structure so that women's athletics reported directly to him. To the best recollection of persons who were involved in women's athletics at UC Davis around the time Title IX went into effect, the women's teams that existed at that time were basketball, field hockey, swimming, softball, tennis, volleyball and track/field. These teams competed under AIAW rules, and thus were considered varsity sports. Women's gymnastics, which had previously been a club team, was added in 1974. Women's cross country, which had also previously been a club team, was added in 1977. | 114. Exhibit O, Declaration of Joe Singleton, ¶ 3; Exhibit I, Declaration of Pam Gill-Fisher, ¶ 3; Exhibit MM, Deposition of Ray Goldbar, pp. 9:18-20; 15:13-17:7; Exhibit NN, Deposition of Sue Williams, pp. 5:6-16; 10:15-18; 35:12-17; 60:7-63:8; 84:18-86:4. |
| 115. When the NCAA agreed to sponsor championships in certain women's sports in 1981, U.C. Davis switched its membership in the AIAW to the NCAA, in regard to women's intercollegiate athletics. | 115. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 3. |
| 116. Since the passage of Title IX, the only women's varsity sport that has been eliminated is field hockey. The varsity field hockey team last competed in the 1982/83 school year. Field hockey was dropped as a varsity sport because all other schools in the conference that UC Davis was in at the time had dropped the sport, thus creating a lack of competition. There was also a decrease in interest in that sport at the high school level. The following Fall (1983), it was replaced with varsity soccer, which was a much more popular sport at the high school and collegiate level. There is documentation indicating that consideration was given to starting a golf team in the early 1980's but the plan did not take flight because of the limited interest level. | 116. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 4; Exhibit O, Declaration of Joe Singleton, ¶ 4. |
| 117. In the mid 1990's, the entire University of California system was undergoing severe budget cuts. These budget cuts threatened to significantly affect the intercollegiate and recreational sport programs on campus. A vote was put to the student body via a referendum process in 1994. As a result of this referendum, an initiative known | 117. Exhibit L, Declaration of Dennis Shimek, ¶ 3; Exhibit I, Declaration of Pam Gill-Fisher, ¶ 5. |

| | |
|---|---|
| as the Student Activities and Services Initiative (SASI) was passed. The effect of the SASI was to increase student fees, with the money from the increased fees being used for intercollegiate athletics, intramural and club sports, recreation programs, the Equestrian Center, the Student Health Center, and the Women's Resource and Research Center. | |
| 118. As a result of the passage of SASI, there were funds available to expand the intercollegiate athletics program. In the spring of 1995, consideration was given to adding new varsity teams for women. The campus developed a formal process for evaluating information relating to new varsity teams, and for obtaining proposals from students or other persons who were advocating on behalf of a particular sport. This process was set forth in writing | 118. Exhibit L, Declaration of Dennis Shimek, ¶ 3; Exhibit NNN, Materials regarding 1995 varsity proposals. |
| 119. Proponents of five sports (water polo, crew, badminton, lacrosse and field hockey), all of which had existing club sport teams except badminton, submitted proposals for elevation to varsity status. No proposal was submitted on behalf of women's wrestling. After receiving input from various student athlete groups, from the Director of Intramural and Club Sports, and from the New Women's Sports Advisory Committee, the Acting Athletic Director (Keith Williams) recommended that women's water polo, lacrosse and crew be elevated to varsity status. These three sports became varsity sports in the Fall of 1996. | 119. Exhibit L, Declaration of Dennis Shimek, ¶ 3; Exhibit M, Declaration of Robert Franks, ¶ 2. |
| 120. Indoor and outdoor track are two different sports, and there are different requirements for them under NCAA regulations. When Deanne Vochatzer, the head coach for women's track and field at UC Davis started in her position in 1991, the campus only had an outdoor track team. In her opinion, the lack of an indoor track team adversely affected her ability to recruit student-athletes to UC Davis. Vochatzer met with the Athletic Director in order to make a proposal and to obtain authorization to have women student-athletes compete in indoor track events. She received the authorization to do so, as long as the cost of entering such events came out of the outdoor track budget. | 120. Exhibit P, Declaration of Deanne Vochatzer, ¶ 2. |

| | |
|---|---|
| 121. Women first started competing in indoor track events in approximately 1993 but the sport was not actually established as a team at UC Davis until 1999. At that time, there were a sufficient number of student-athletes to meet the NCAA minimum requirements for an indoor team. The indoor track events that the women competed in prior to 1999 and continuing today were and are all head to head competition with other Division II (now Division I) teams. | 121. Exhibit P, Declaration of Deanne Vochatzer, ¶¶ 2 and 4; Exhibit F, Declaration of Greg Warzecka, ¶ 14. |
| 122. In 2003, another call was made for proposals to consider adding a new women's varsity sport. Again, this was done pursuant to a formal process with written guidelines that specifically set forth the process and the criteria used to select a new sport. Those criteria include (1) the overall impact on gender equity; (2) interest level; (3) sport sponsorship and available competition; and (4) facilities. Proposals were submitted on behalf of five women's sports: bowling, field hockey, golf, horse polo and rugby. Neither the Plaintiffs nor anyone else submitted a proposal on behalf of women's wrestling. | 122. Exhibit F, Declaration of Greg Warzecka, ¶ 15; Exhibit I, Declaration of Pam Gill-Fisher, ¶ 9; Exhibit OOO, April 14, 2003 letter from Pam Gill-Fisher to club sports requesting varsity proposals; Exhibit G, Declaration of Bob Bullis, ¶¶ 2-3; Exhibit IIII, 2003 varsity proposals. |
| 123. Ms. Gill-Fisher chaired a committee consisting of a representative of Athletic Administration Advisory Committee, a representative of the Student Athlete Advisory Committee, and a representative of the Sports Club Council. The committee met with a representative of each sport that submitted a proposal, reviewed the written proposals, and then summarized the information. | 123. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 9; Exhibit JJJJ, Review of Women's Sports Proposal Report. |
| 124. The information pertaining to the proposals was passed on to Athletic Director Warzecka, who reviewed it and made the recommendation that women's golf be added as a varsity sport. The reason he recommended golf over the other sports proposed is that golf is a championship sport in the Big West Conference and per Conference rules, UC Davis was required to add sports that are already part of that conference before adding non-conference sports; women's golf is offered by 451 universities nationally, which reflects the interest level in the sport; the NCAA has a golf championship in all three divisions; U.C. Davis received many inquiries from female high school students who are interested in | 124. Exhibit F, Declaration of Greg Warzecka, ¶16; Exhibit PPP, January 17, 2004 memo from Greg Warzecka regarding the selection of the golf team. |

| | |
|---|---|
| golf; and the local community had indicated a strong support of golf, including use of the El Macero Country Club in Davis. Funding for this additional team came from the intercollegiate athletics budget. In addition, start-up costs and additional funding were provided by supporters of women's golf and alumni donations. Mr. Warzecka set forth the basis for his recommendations in a memorandum to the Vice Chancellor for Student Affairs, Judy Sakaki. | |
| 125. While most teams that are added at the varsity level start out as club sport teams, there is no requirement that a sport exist at the club level before it can be established as a varsity team. By 2003, there was an existing NCAA championship in women's golf, and thus it is not unusual for a school to add a women's varsity golf team without first having a club sport team. | 125. Exhibit F, Declaration of Greg Warzecka, ¶ 16; Exhibit Y, Deposition of Judy Sweet, pp. 32:17-25; 40:2-22; 43: 1-5; 48:7-10; 78:25-79:16; Exhibit QQQ, Judith Sweet's CV. |
| 126. In regard to adding new varsity teams, Athletic Director Warzecka is more inclined to add a sport that is part of a conference. Sports that are part of a conference have a guaranteed number of matches and/or games and it is much easier to schedule contests, as that is done by the conference. If the campus were to add a sport that is not part of a conference, it would be incumbent upon the coaches to find sufficient available competition in this geographic area. He is also more inclined to recommend the addition of a varsity sport that is either an N.C.A.A. championship sport or an N.C.A.A. emerging sport over sports that do not fall within those categories. | 126. Exhibit F, Declaration of Greg Warzecka, ¶ 18. |
| 127. Women's golf was selected as the new varsity sport. Kathy DeYoung was appointed as the head coach for the team in 2004. She spent the 2004/2005 school year developing and recruiting a team, and the team started competition in the 2005/2006 school year. | 127. Exhibit F, Declaration of Greg Warzecka, ¶ 17. |
| 128. When the water polo team was a club team, in addition to the "A" team it also had a "B" or secondary team. After water polo became a varsity sport, it became more and more difficult to find competition for the "B" team level student-athletes, who were the equivalent to a junior varsity team. Other schools within UC Davis' geographic | 128. Exhibit Q, Declaration of Jamey Wright, ¶ 4. |

competition area were dropping their junior varsity teams, and junior colleges did not want to compete with a Division II team. In addition to lack of competition, it became very logistically challenging for the head coach of the water polo team to try to maintain practices for both teams, which in turn adversely affected the quality of the coaching and experience that the student-athletes were receiving.

| | |
|---|---|
| 129. At the end of the 2001 season, head coach Jamey Wright, with the agreement of the leaders of the "B" water polo team, worked with the "B" team members to re-establish the water polo club team and have those athletes compete at the club level, where there was available competition for them. As the result of this change, the number of student-athletes on the roster for the varsity water polo team changed from a number in the forties to a number in the high twenties or low thirties. In the coach's opinion, the quality of the varsity experience for the members of the team increased as a result of the change in the roster size, as he is able to spend more time coaching each athlete. | 129. Exhibit Q, Declaration of Jamey Wright, ¶ 5. |
| 130. There have also been fluctuations in the number of women participating in rowing (crew), for a variety of reasons. In the sport of rowing, most of the members of the varsity team are walk-ons, rather than recruited athletes, because very few high schools have rowing teams. The novice squad consists of walk-ons and recruited first year athletes. The varsity squad consists of any returning student-athlete who has rowed one year on the novice squad. The head coach of the women's rowing team has not been directed to maintain a particular number of student-athletes on the rowing squads. There have been fluctuations in the number of student-athletes on the rowing team in the past few years. The numbers for the varsity squad remain fairly consistent, but the numbers on the novice squad can vary. | 130. Exhibit R, Declaration of Carissa Adams, ¶ 2. |
| 131. Rowing is an extremely physically demanding sport that requires many hours of practice. Since most of the student-athletes who make the team have not participated in rowing at the high school level, they are often not aware of the time commitment involved to | 131. Exhibit R, Declaration of Carissa Adams, ¶ 2. |

row at the varsity level, particularly at the Division I varsity level. Some of the students who try out for the novice squad have never participated in varsity athletics at the high school level at all. There is often a "wave" of resignations on the novice team just after the winter break. Additionally, many novice rowers decide at the end of the year that while they enjoy rowing, they do not want to participate at the varsity level.

| | |
|---|---|
| 132. In addition to having a formal process for the addition of new varsity sports as part of its compliance with Title IX, UC Davis has conducted several surveys of its students to gauge the interest levels of both male and female students in sports that are currently offered at the varsity level and those that are not. In 2004 and 2005, incoming freshmen were surveyed. In the 2004 survey, the sports that students were most interested in were those currently offered as varsity sports, with the exception of badminton, which is not a varsity sport. None of the female respondents expressed an interest in wrestling at the intercollegiate level. In the 2005 survey, a representative sample of freshman students was questioned. The results showed that the highest level of demand for a varsity sport that does not currently exists is for badminton. Only one female respondent expressed an interest in wrestling at the varsity level. | 132. Exhibit I, Declaration of Pam Gill-Fisher, ¶ 11; Exhibit L, Declaration of Dennis Shimek, ¶ 2; Exhibit S, Declaration of Bborie Park, ¶¶ 3 and 5; Exhibit T, Declaration of Gillian Butler, ¶ 4; Exhibit VVV, SARI report on 2004 survey; Exhibit WWW,SARI report on 2005 survey. |
| 133. The UNIVERSITY's expert witness is Dr. Christine Grant. Dr. Grant served as the Women's Athletic Director at the University of Iowa between 1973 and 2000. She holds a Ph.D. and a bachelor's degree in physical education, and has taught extensively on the issue of Title IX and gender equity in athletics. In addition, she has coached at the high school, collegiate and international levels. | 133. Exhibit J, Declaration of Christine Grant, ¶¶ 1 and 3; Exhibit QQQQ, Expert Report of Dr. Grant with attachments, p. 1. |
| 134. Dr. Grant has served as the President-elect, the President and the Past President of the Association for Intercollegiate Athletics for Women, which was the governing body for women's intercollegiate athletics before the NCAA. She also served as a member of the Board of Directors of the National Association of Collegiate Women Athletic Administrators (NACWAA), and then as NACWAA's President between 1987 and 1989. | 134. Exhibit J, Declaration of Christine Grant, ¶ 4, Exhibit QQQQ, p. 1 and p. 4 of her C.V. which is attached to the exhibit. |

| | |
|---|---|
| 135. Dr. Grant has received numerous awards and recognitions for her work in women's intercollegiate athletics, has published extensively on the subject, and has been consulted by the Department of Education on Title IX issues. She has served as and qualified as an expert on Title IX issues in numerous cases including the seminal case of *Cohen v. Brown University*. Of note is the fact that in all of these cases, Dr. Grant has testified on behalf of the plaintiffs. The *Mansourian* case is the first case where she has not testified on behalf of student-athletes. | 135. Exhibit J, Declaration of Christine Grant, ¶¶ 5 and 8; Exhibit QQQQ, p. 1 and her C.V. which is attached to the exhibit. |
| 136. Plaintiffs' expert witness was, until recently, the CEO of the Women's Sports Foundation. The Women's Sports Foundation has never taken the position that girls or women must be given a place on a team simply because they are female. | 136. Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) pp. 105:19-106:14. |
| 137. A school may choose to comply with Title IX using any one of the three prongs. | 137. Exhibit J, Declaration of Christine Grant, ¶ 10; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05), pp. 142:15-143:9; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07), pp.63:23-64:13. |
| 138. A school has many options regarding compliance with Title IX; it doesn't necessarily have to comply with any one sport, or in response to any one request. There is nothing in Title IX that mandates that a college or university must have every sport available for both genders. The decision on which varsity sports will be offered by a college or university is made by the school's administration. | 138. Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) pp. 5:8-10; 103:8-13; 141:14-20; 157:9-21; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07), pp. 6:3-6; 55:11-22; Exhibit J, Declaration of Christine Grant, ¶25. |
| 139. There is nothing in the regulations or clarifications pertaining to Title IX that delineate how often a school must add a new sport in order to comply under prong two. Both the UNIVERSITY's expert and Plaintiffs' expert are of the opinion that in order to comply under prong two, a new sport should be added every two to three years. | 139. Exhibit J, Declaration of Christine Grant, ¶ 12; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05), pp. 151:14-19; 151:20-152:10; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07) p. 73:4-15; Exhibit QQ, Deposition of Donna Lopiano, (taken 10/30/07), p. 195:10-14. |
| 140. The opinions of Dr. Grant and Dr. Lopiano on many issues in this case are harmonious. They agree that in determining whether a school is in compliance under prong two, the OCR suggests looking at a number of factors including when teams began intercollegiate competition, how the | 140. Exhibit J, Declaration of Christine Grant, ¶ 11; Exhibit UUU, "Geena Takes Aim" article published by the Women's Sports Foundation, pp. 1-3; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07) pp 130:13-131: 4). |

intercollegiate team came into existence, whether there is a policy or procedure for adding new sports, and if sports have been eliminated, the reason for the elimination.

| | |
|---|---|
| 141. Dr. Grant and Dr. Lopiano agree there is nothing in the Regulations or Clarifications pertaining to Title IX that delineates how often a school must add a new sport in order to comply under prong two. They both disagree with the prong two hypothetical set forth in the 1996 Clarification to the extent it indicates the addition of a new team every six years is acceptable for a school that is not in compliance on prong one. Grant and Lopiano believe that a more reasonable span is two to three years. | 141. Exhibit J, Declaration of Christine Grant, ¶ 12; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05), pp. 151:14-19; 151:20-152:17; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07 transcript) p. 73:4-15; Exhibit QQ, Deposition of Donna Lopiano, (taken 10/30/07) p. 195:10-14. |
| 142. In Dr. Grant's opinion, UC Davis is in compliance under prong two because it has demonstrated both a history and practice of program expansion. She focuses her opinion on the fact that UC Davis added three new women's varsity sports at once in 1996 (crew, lacrosse and water polo), followed by women's indoor track in 1998/99 and women's golf in 2005. This qualifies as a history of program expansion that is in compliance with Title IX under prong two. | 142. Exhibit J, Declaration of Christine Grant, ¶¶ 10, 14 and 15. |
| 143. UC Davis was under no obligation to add three sports at one time-it could have elected to phase in each new sport every six years (if OCR's example is accepted) or every three years (if the positions of Lopiano and Grant are accepted). Instead, it voluntarily established the three new sports at the same time, significantly expanding participation opportunities for women. Dr. Grant is of the opinion that UC Davis should not be penalized by the addition of three sports at once, but rather its history of expansion should be viewed the same as if it had added one new sport in 1996/96, one in one in 1998/99 and one in 2001/02. | 143. Exhibit J, Declaration of Christine Grant, ¶ 14. |
| 144. If an institution that is complying with Title IX under prong two is not permitted to consider the addition of more than one new women's sport at a time to be the equivalent of adding the new sports on a two to three year staggered schedule, the effect will be to discourage schools that are willing and ready to add more than one new sport for women | 144. Exhibit J, Declaration of Christine Grant, ¶ 14; Exhibit D, Declaration of Michelle Roppeau, ¶ 4; Exhibit ZZZ, NCAA Rule 14.2.1. |

from doing so. This will, in turn, result in the loss of competitive opportunities for young women, the majority of whom have only a four year window in which to compete at the varsity level.

| | |
|---|---|
| 145. In regard to her conclusion that UC Davis has demonstrated a practice of program expansion, Dr. Grant relies on the following factors: (1) the campus has a formalized procedure for considering proposals to add new varsity sports, including a list of the criteria used to assess the proposals and the process that must be followed; (2) this procedure has been used to determine which new women's sports should be added; (3) UC Davis established a Title IX Coordinator position and a Title IX Workgroup in the 1980's. This was done at a time when most universities were ignoring Title IX; (4) UC Davis has had an Athletic Administrative Advisory Committee and a Coach's Advisory Committee for many years, indicating a commitment to broad based input on athletics issues; (5) the campus did self-assessments on its women's athletics program in the 1980's , even when Title IX was not being enforced at all because of the *Grove City College v. Bell* case; and (6) the campus has a Title IX grievance process available to students. All of these factors are indicative of an institution that is dedicated to the ongoing expansion of athletic opportunities for women. | 145. Exhibit J, Declaration of Christine Grant, ¶ 18; Exhibit QQQQ, Christine Grant's expert report; Exhibit NNN, Materials regarding 1995 varsity proposals; Exhibit OOO, April 14, 2003 letter from pam Gill-Fisher to club sports requesting varsity proposals; Exhibit NNNN, 2001-2002 Gender Equity Plan |
| 146. It is of no importance to a prong two assessment whether the proposal to add women's golf as a varsity sport was submitted by an Associate Athletic Director, rather than by a student or a club team. The important issue is whether the school assessed the viability of the proposed sport, including the level of available competition. | 146. Exhibit J, Declaration of Christine Grant, ¶ 15. |
| 147. The fact that UC Davis dropped varsity field hockey in the 1980's and replaced it with women's varsity soccer is not indicative of a failure to demonstrate program expansion. Certain sports can decrease in popularity, which in turn leads to a lack of student interest and a corresponding lack of available competition. Soccer became extremely popular in the 1980's and remains so to this day. | 147. Exhibit J, Declaration of Christine Grant, ¶ 19. |

| | |
|---|---|
| 148. In a prong two analysis, another issue that must be considered is whether, notwithstanding a history of program expansion, there has been a decrease in the number of participation opportunities. The presence of a decrease does not preclude reliance on prong two-rather, the reason for the decrease must be examined. The OCR will consider a valid reason for a decrease. | 148. Exhibit J, Declaration of Christine Grant, ¶ 16; Exhibit KKKK, Excerpts from OCR Title IX Investigator's Manual, p. 24. |
| 149. When first approached about testifying for UC Davis, Dr. Grant noted there were fluctuations in the number of women participating in intercollegiate athletics at UC Davis between 1995 and 2004, per the Equity in Athletics Disclosure Act (EADA) reports. She inquired as to the reason, and was satisfied with the information provided, which was that the campus had eliminated B" or junior varsity water polo and lacrosse teams because of lack of available competition. Dr. Grant, who has considerable experience as an Athletic Director, is well aware of the problem of lack of available competition for intercollegiate junior varsity teams, and was surprised to find that UC Davis maintained its JV teams for as long as it did as most schools eliminated their JV teams in the 1970's. | 149. Exhibit J, Declaration of Christine Grant, ¶ 16. |
| 150. Notwithstanding the fluctuations in the participation numbers, in less than one decade (1995-2004) UC Davis increased women's participation in varsity sports from 32% to 50%, despite being challenged by the fact that the female undergraduate population has increased at greater rates than the male undergraduate population. In Dr. Grant's expert opinion, this is good progress and indicative of continuous program expansion under prong two. | 150. Exhibit J, Declaration of Christine Grant, ¶ 17; Exhibit QQQQ, Report of Dr. Grant, p. 8. |
| 151. The Women's Sports Foundation publishes a document entitled "Playing Fair- A Women's Sports Foundation Guide to Title IX in High School and College Sports. On the issue of the level of interest that must be demonstrated in a sport, the publication states, "Remember, if a complaint is filed, the investigator must find if there is interest by the under-represented sex in adding opportunities. It is not enough for you and one or two friends to say you want to play soccer – there have to be enough females interested to form a team." | 151. Exhibit TTT, "Playing Fair - A Women's Sports Foundation Guide To Title IX in High School and College Sports" (4th Ed.) p. 13; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) p. 107:16-22; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07) pp. 37:11-17; 38:15-20. |

| | |
|---|---|
| 152. The decision as to which sports a schools will sponsor lies solely within the discretion of the administration and/or the Athletic Director. | 152. Exhibit J, Declaration of Christine Grant, ¶ 25; Exhibit PP, Deposition of Lopiano, p.55:19-22 |
| 153. To the knowledge of Defendant's expert, there are only approximately five women's collegiate wrestling teams in the country. Plaintiff's expert is not aware of an NCAA member schools that have a women's wrestling team, nor is she aware of any college or university in the northern California area that had a wrestling club where women participated, during the years that Burch was the wrestling coach at UC Davis. | 153. Exhibit J, Declaration of Christine Grant, ¶ 26; Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) pp. 86:14-19; 162:16-24. |
| 154. The coach of the UC Davis wrestling team is not aware of any Division I school that has a separate women's wrestling team. During the time he has been the head wrestling coach at UC Davis, he has never seen a woman compete on any of the teams that Davis competes against. The only source of possible competition for women wrestlers in this region that he is aware of is Menlo College in California and Pacific University in Oregon. Neither school is an NCAA Division I school, and the UC Davis team, as a member of the Pac-10 conference, does not compete against either of these schools. | 154. Exhibit E, Declaration of Zaleksy, ¶ 9. |
| 155. Menlo College, in the bay area, started a women's wrestling team in 2001. It was a club sport until 2003 and then became a varsity team. However, the coach of the team still considers it a club team because the NCAA does not sponsor women's wrestling. The Menlo College team only uses freestyle wresting rules, not collegiate rules. | 155. Exhibit RR, Deposition of Lee Allen, pp. 5:2-4; 10:6-15; 27:21-24; 30:19-31:17; 43:3-16; 63:5-11. |
| 156. Neither the NCAA nor the NAIA offers a women's wrestling championship | 156. Exhibit J, Declaration of Christine Grant, ¶ 26. |
| 157. Plaintiffs' expert is does not know what UC Davis' normal geographic competition is for the sport of wrestling, nor does she know of any intercollegiate athletic conferences that sponsor women's wrestling | 157. Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07) pp. 92:20-93:3. |
| 158. The decision as to which sports a school will sponsor lies solely within the discretion of the administration and/or the Athletic Director. | 158. Exhibit J, Declaration of Christine Grant, ¶ 25; Exhibit PP, Deposition of Donna Lopiano (taken 6/26/07) p. 55:11-22. |

| | |
|---|---|
| 159. The fact that some women practiced with the males on the wrestling team does not mean there was a separate women's team. Nor was the wrestling team considered a mixed gender team. A mixed gender team is one that has both male and female members, and both male and female members of the team compete against male and female members of comparable teams from other schools. The UC Davis wrestling team was not a mixed varsity team, as the women did not compete against other varsity teams. | 159. Exhibit J, Declaration of Christine Grant, ¶¶ 21 and 22. |
| 160. The term "a true varsity experience", in the context of discussing the under-represented sex, means legitimately receiving coaching, a regular practice schedule, access to medical attention, access to competitive experiences commensurate with their skill level, receipt of awards and travel, receipt of uniforms, and all other benefits of varsity participation that are given to male athletes. | 160. Exhibit OO, Deposition of Donna Lopiano (taken 2/28/05) pp. 135:18-136:16; Exhibit J, Declaration of Christine Grant, ¶ 24. |
| 161. Burch did not hold the women to the same standards as males who tried out for the wrestling team. They were not required to demonstrate any level of skill or ability , and they wrestled using a different style of wrestling than the male wrestlers. Holding women who try out for a team with men to different standards is not required by, or consistent with Title IX. | 161. Exhibit J, Declaration of Christine Grant, ¶ 23. |
| 162. The fact that UC Davis has not declared wrestling to be a contact sport does not mean it is required to give women a spot on the team. Title IX does not require that women who try out for a team that also includes males be allowed to do so under different criteria than those applied to the males. | 162. Exhibit J, Declaration of Christine Grant, ¶ 20. |
| 163. Sports Illustrated for Women named UC Davis as the best Division II school for women athletes in 1999 and 2000. UC Davis has produced three NCAA Women of the Year winners since that program started in 1991. The Woman of the Year Award is given to senior student-athletes who distinguish themselves in the area of academic achievement, athletics, service and leadership. Its women athletes have many national championships, and more than 259 female student athletes at UC Davis have been named | 163. Exhibit U, Declaration of Mike Robles, ¶ 2. |

as All-Americans.

| | |
|---|---|
| 164. UC Davis sponsors fourteen women's varsity teams: basketball, cross country, golf, gymnastics, lacrosse, rowing, soccer, softball, swimming/diving, tennis, indoor track, outdoor track, volleyball and water polo. | 164. Exhibit F, Declaration of Greg Warzecka, ¶ 2. |
| 165. In 2002, Assembly Member Thomson named Associate Athletic Director Pam Gill-Fisher as her Assembly District "Woman of the Year" because of Gill-Fisher's efforts and accomplishments in women's collegiate athletics. The recommendation to bestow this honor on Ms. Gill-Fisher originated with Craig Reynolds. Ms. Thomson could not think of anyone in her Assembly District who qualified for the award more than Gill-Fisher. | 165. Exhibit SS, Deposition of Helen Thomson, p. 5:2-4; p. 10:20-p.11:16; p. 85:7-10; p. 86:7-p. 88:21; Exhibit EEE, letter regarding woman of the year award for Pam Gill-Fisher. |

Dated: January 11, 2008

PORTER SCOTT
A PROFESSIONAL CORPORATION

By ______________________
Nancy J. Sheehan
George A. Acero
Attorneys for Defendant, REGENTS OF THE UNIVERSITY OF CALIFORNIA

## PROOF OF SERVICE

I am a citizen of the United States and a resident of the County of Sacramento. I am over the age of eighteen years and not a party to the above-entitled action; my business address is 350 University Avenue, Suite 200, Sacramento, CA 95825.

On January 11, 2008, I served the following document(s):

**NOTICE OF DEPOSITION WITH PRODUCTION OF DOCUMENTS**

**XX VIA ELECTRONIC FILING.**

___ BY OVERNIGHT DELIVERY. I caused such document to be delivered by overnight delivery to the office of the person(s) listed below.

___ BY FACSIMILE. I caused such document to be faxed to the office of the person(s) listed above with a original or copy of said document placed in the United States mail with postage thereon fully prepaid at Sacramento, California.

addressed as follows:

Kristen Galles
**Equity Legal**
10 Rosecrest Avenue
Alexandria, VA 22301

James C. Sturdevant
Mark T. Johnson
Monique Olivier
**THE STURDEVANT LAW FIRM**
A Professional Corporation
475 Sansome Street, Suite 1750
San Francisco, CA 94111
Facsimile: (415) 477-2420

Noreen Farrell
Debra Smith
**EQUAL RIGHTS ADVOCATES**
1663 Mission Street, Suite 250
San Francisco, CA 94103
Facsimile: (415) 621-6744

I hereby certify under the penalty of perjury that the foregoing is true and correct. Executed on January 11, 2007, at Sacramento, California

[signature]
Cindy Cannon