UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

AREZOU MANSOURIAN; LAUREN
MANCUSO; NANCY NIEN-LI CHIANG;
CHRISTINE WING-SI NG; and all
those similarly situated,

        NO. CIV. S 03-2591 FCD EFB

        Plaintiffs,

      v.                  <u>MEMORANDUM AND ORDER</u>

BOARD OF REGENTS OF THE
UNIVERSITY OF CALIFORNIA AT
DAVIS; LAWRENCE VANDERHOEF;
GREG WARZECKA; PAM GILL-
FISHER; ROBERT FRANKS; and
LAWRENCE SWANSON,

        Defendants.

----oo0oo----

    This matter is before the court on motions for summary
judgment, brought pursuant to Federal Rule of Civil Procedure 56,
filed by defendants Larry[1] Vanderhoef ("Vanderhoef"), Greg
Warzecka ("Warzecka"), Pam Gill-Fisher ("Gill-Fisher"), and

---

[1]    Defendants assert that defendant Larry Vanderhoef was
erroneously sued as Lawrence Vanderhoef.

1

Robert Franks ("Franks") (collectively "defendants" or "UCD").[2]
Plaintiffs Arezou Mansourian ("Mansourian"), Lauren Mancuso
("Mancuso"), and Christine Wing-Si Ng ("Ng") (collectively
"plaintiffs")[3] oppose the motion.  For the reasons set forth
below,[4] defendants' motions for summary judgment are DENIED.

**BACKGROUND**[5]

## A.   Factual Background

Plaintiffs Mansourian, Mancuso, and Ng were all students at
University of California, Davis.  Plaintiff Mansourian entered
UCD in the fall of 2000 and graduated in June 2004.  (VUF ¶ 26.)
Plaintiff Mancuso entered UCD in the fall of 2001 and received
her degree in September 2006.  (VUF ¶ 33.)  Plaintiff Ng entered

---

[2]   Defendant Lawrence "Larry" Swanson withdrew his motion
for summary judgment after the parties filed a Stipulation and
Proposed Order re. Dismissal of all claims against him.

[3]   Plaintiff Nancy Nien-Li Chiang voluntarily dismissed
all claims in this action on June 12, 2007.  (See Mem. & Order
(Docket #195), filed July 12, 2007.)

[4]   Because oral argument will not be of material
assistance, the court orders the matter submitted on the briefs.
E.D. Cal. L.R. 230(g).

[5]   Unless otherwise noted, the facts contained herein are
undisputed.  (See Reply to Pls.' Stmt. of Additional Disputed
Facts ("PDF"), filed Nov. 24, 2010; Reply to Pls.' Opp'n to Def.
Vanderhoef's Stmt. of Undisputed Facts ("VUF"), filed Nov. 24,
2010; Reply to Pls.' Opp'n to Def. Warzecka's Stmt. of Undisputed
Facts ("WUF"), filed Nov. 24, 2010; Reply to Pls.' Opp'n to Def.
Gill-Fisher's Stmt. of Undisputed Facts ("GUF"), filed Nov. 24,
2010; Reply to Pls.' Opp'n to Def. Franks' Stmt. of Undisputed
Facts ("FUF"), filed Nov. 24, 2010.)  Where the facts are
disputed, the court recounts plaintiffs' version of the facts.

The court notes that both plaintiffs and defendants filed
numerous objections to various aspects of evidence submitted in
support of and in opposition to the motion for summary judgment.
Except where otherwise noted herein, the court finds the parties'
objections either without merit or irrelevant to the court's
findings.  As such, the parties' objections are OVERRULED.

UCD in 1998 and graduated in September 2002.  (VUF ¶ 30.)  Each of the plaintiffs wrestled in high school and attended UCD, in large part, to wrestle.  (PDF ¶ 2.)

At the time plaintiffs entered UCD, there had been a wrestling program available to women at UCD.  (PDF ¶ 3.) Plaintiffs contend that there was a long-standing women's varsity wrestling program at UCD.  (PDF ¶ 3.)  Defendants contend that there was a single wrestling program in which women participated at various times.  (PDF ¶ 3.)  However, all parties agree that women wrestlers, including plaintiffs, were listed as varsity athletes on participation lists, roster lists, and in the Aggie Open[6] programs.  (PDF ¶ 13.)  UCD women wrestlers, including plaintiffs, competed in open meets, but did not compete in NCAA competitions.[7]  (PDF ¶ 3.)  Men and women competed against their respective sex, not each other; women wrestlers used women's freestyle rules rather than men's collegiate rules.  (PDF ¶¶ 5-6.)  Women wrestlers, including plaintiffs, also received benefits of varsity status, such as highly qualified coaching, attention unique to the needs of women wrestlers, lockers, training services, academic support services, and laundry services.  (PDF ¶¶ 6, 11-12.)  They attended the end of the year team banquet and received honors from the coach.  (PDF ¶ 14.)

---

[6]   The Aggie Open was an annual wrestling tournament, in which UCD sponsored a women's division.  (PDF ¶ 7.)

[7]   Plaintiffs were required to submit NCAA certification paperwork.  (PDF ¶ 15.)

1    In 2000, all women were removed from the wrestling program

2    after UCD imposed a roster limit[8] for the wrestling team.  (PDF ¶

3    16.)  Plaintiffs assert that the UCD athletic department

4    administration instructed Michael Burch ("Burch"), the wrestling

5    coach, to remove the women from the wrestling team.  (PDF ¶ 16.)

6    Defendants contend that Burke made the decision to remove women

7    from the team because they were not competitive.  (PDF ¶ 16.)

8    Despite their removal from the roster, plaintiffs were

9    permitted to continue practicing with the wrestling team.  (PDF ¶

10   16.)  After Mansourian was injured during a practice in January

11   2001 and sought assistance from a varsity trainer, defendant

12   Warzecka told plaintiffs they could present a potential liability

13   to UCD if they continued to practice with the team because they

14   were not on the varsity roster and thus, not covered by the

15   insurance plan.  (PDF ¶¶ 17-19.)  Plaintiffs assert that Warzecka

16   directed them not to participate in wrestling.  (PDF ¶¶ 18-19.)

17   Plaintiffs were devastated that their wrestling opportunities

18   were eliminated.  (PDF ¶ 20.)

19   Subsequently, plaintiffs filed a number of complaints with

20   the athletic department administration and the U.S. Department of

21   Education's ("DOE") Office for Civil Rights ("OCR").[9]  (PDF ¶

22   21.)  At the same time, soon after the OCR complaints were filed,

23   _____

24   [8]    In November 1998, UCD stated a roster management
     program, which imposed an upper maximum or "cap" on the number of
25   athletes on each men's intercollegiate team.  (WUF ¶ 14.)
     Defendants asserts that the dual goals of the roster cap was to
26   reduce a significant budget deficit and to continue an effort at
     reaching proportionality between gender enrollment and gender
27   participation in athletics.  (WUF ¶ 14.)

28   [9]    OCR is the division of the United States Department of
     Education charged with enforcing Title IX.

4

1  UCD fired Burch for his support of women's wrestling. (PDF ¶
2  27.)

3      Each of the individual defendants was bombarded by public
4  outcry protesting the removal and continued exclusion of women
5  from the varsity wrestling team. (PDF ¶ 28.) Students, the
6  student government, UCD employees, parents, members of the
7  public, and legislators expressed concerns that defendants'
8  actions toward plaintiffs were unfair and discriminatory. (PDF ¶
9  29.) Specifically, Assemblywoman Helen Thomson ("Thomson")
10 challenged UCD's efforts to demote the women wrestlers to club
11 status as "separate but equal" treatment and threatened to
12 withhold a significant source of funding on a UCD building in
13 protest.[10] (PDF ¶ 29.)

14     In May 2001, UCD reinstated plaintiffs to the wrestling team
15 by placing them on the roster. (PDF ¶ 30.) While plaintiffs
16 were allowed to practice with the team and participate in open
17 meets, there were no opportunities for plaintiffs to compete in
18 May 2001. (PDF ¶ 30.)

19     In June 2001, defendant Vanderhoef met with Thomson to
20 discuss the issues raised in the May 3 letter. (PDF ¶ 15.)
21 Thomson also met with defendant Gill-Fisher, who explained the
22 athletic department's position on the issue of women wrestlers.

23 _____

24     [10]   Specifically, on May 3, 2001, Thomson wrote a letter to
   the Chancellor, expressing concern over purported discrimination
25 against female wrestlers. (VUF ¶ 11.) Vanderhoef did not learn
   about the letter until sometime after it was sent to him. (VUF ¶
26 12.) When Thomson did not receive a response, she wrote a letter
   to the Chair of the Assembly Budget Committee asking that he
27 remove the UCD Sciences Laboratory Building from the Budget Bill.
   (VUF ¶ 13.) However, the funding was never in danger of being
28 pulled. (VUF ¶ 13.)

(PDF ¶ 16.)  On June 13, 2001, Vanderhoef had a letter delivered to Thomson (1) setting forth the campus' plan for sustaining opportunities for women in sports; (2) explaining why UCD could not comply with Thomson's request to eliminate the roster cap for the wrestling team; (3) offering to convene a blue ribbon committee of nationally recognized authorities on Title IX to review UCD's intercollegiate athletic program with respect to its compliance with Title IX, with an emphasis on how the campus was handling women's wrestling; and (4) asking her to join with him in making a public statement in support of the campus' athletic program and defendants Warzecka and Gill-Fisher, for their accomplishments in the area of college athletics.  (VUF ¶ 17.) The proposal to have a blue ribbon committee review UC Davis' intercollegiate athletic program in regard to its compliance with Title IX and the manner in which it was handling women's wrestling was made at the suggestion of Donna Lopiano, a recognized expert in Title IX issues who had been contacted by Gill-Fisher.  (VUF ¶ 18.)  After the letter was sent, Thomson had no further meetings with Vanderhoef regarding these issues.  (VUF ¶ 18.)  The proposed blue ribbon committee on UCD's Title IX compliance was never convened.  (VUF ¶ 18; PDF ¶ 74.)

In September and October 2001, the OCR, without consultation with plaintiffs, negotiated with defendants a "voluntary resolution" of plaintiffs' OCR complaints.  (PDF ¶ 31.)  UCD agreed to reinstate the women on the team as a resolution of plaintiffs' complaints, conditioned on plaintiffs' ability to compete against men for slots in the wrestling program.  (PDF ¶ 32.)  UCD's purported reason for requiring women to wrestle-off

6

against men, using men's wrestling rules, (the "wrestle-off policy") was because the places on the team were limited by roster caps. (PDF ¶ 34.) Plaintiffs inquired whether, as females, they would have to comply with a roster cap, which was intended to limit the number of men participating in order to move toward gender equity in participation opportunities; the women were told that they would have to comply with the male roster caps.[11]  (PDF ¶ 35.)

In the fall of 2001, Mansourian, Ng, and Mancuso attended wrestling practices with the team.  (PDF ¶ 39.)  Plaintiffs contend that at practice, the new head wrestling coach, Lennie Zalesky, was hostile to the women and did not provide them with any coaching, tips, or support.  (PDF ¶ 40.)  Mansourian asserts that she stopped attending practices because she felt unwelcome and humiliated.  (PDF ¶ 41.)  Subsequently, under the new wrestle-off policy, Ng wrestled against Manucuso, who beat her. Mancuso then wrestled off against a male wrestler, who beat her. (PDF ¶ 42.)  As a result, all plaintiffs were eliminated from the varsity wrestling program.  (PDF ¶ 43.)

**B.   Individual Defendants**

Defendants Vanderhoef, Franks, Gill-Fisher, and Warzecka are all employees of the UCD who had responsibilities regarding the oversight of administration and operation of athletics at UCD. (PDF ¶ 1.)  Each of these defendants is a state actor.  (PDF ¶ 1.)

---

[11]    Roster caps have not been applied to any women's team at UCD.  (PDF ¶ 37.)

Defendant Vanderhoef served as the Chancellor for the University of California, Davis from 1994 through August 16, 2009.  (VUF ¶ 2.)  The Chancellor is the chief campus officer and is responsible for the organization and operation of the campus. The Chancellor is authorized to delegate responsibilities to a wide variety of administrators.  (VUF ¶ 3.)  However, Vanderhoef was ultimately responsible for UCD's athletic program and compliance with gender equity requirements.  (PDF ¶ 65.)

During the 2000-2001 academic year, Judy Sakaki ("Sakaki") was the Vice Chancellor for Student Affairs and defendant Franks was the Associate Vice Chancellor for Student Affairs at UCD. (VUF ¶ 4.)  Sakaki and Franks, along with the campus Athletic Director, were responsible for the intercollegiate athletic program, including decisions relating to coaches, the selection of sports sponsored at the intercollegiate level, and sports conference issues.  (VUF ¶ 4.)  The Vice Chancellor or her designees were also responsible for overseeing Title IX compliance.  (VUF ¶ 5.)  Vanderhoef relied on Dennis Shimek ("Shimek"), UCD's Title IX compliance officer to oversee and handle Title IX issues, including complaints from students.  (PDF ¶ 68.)  However, although day-to-day decisions were delegated, Vanderhoef tracked UCD's Title IX compliance and met frequently with officials regarding gender equity.  (PDF ¶ 66.)  Indeed, Vanderhoef testified that the "buck" stopped with him.  (PDF ¶ 67.)

Defendant Franks was a senior administrator at UCD from 1994 to 2004 charged with oversight of the athletic department and actively involved in the events at issue in this case.  (PDF ¶

76.)  As the Associate Vice Chancellor for Student Affairs, Franks directly supervised and met weekly with the Athletic Director.  (PDF ¶ 77.)  Among his other responsibilities, Franks was responsible for ensuring that men and women were treated equally in the athletic department, including evaluating whether the department was providing equitable participation opportunities for female students.  (PDF ¶¶ 79, 84.)  Between 1994 and 2004, Franks participated in committees that evaluated the issue of gender equity in UCD's athletic department.  (PDF ¶ 83.)  Franks also carefully reviewed UCD's Equity in Athletics Disclosure Act ("EADA") Reports which quantified how many participation opportunities UCD was offering to men as compared to women.  (PDF ¶ 86.)  Franks also reviewed UCD's proposed addition or elimination of any intercollegiate team and had responsibility to ensure it was a fair process.  (PDF ¶ 87.)  Franks admits that during the period of 1994-2004, he received and reviewed reports and memos that alerted him to gender inequities.  (PDF ¶ 88.)

Defendant Warzecka has been UCD's Athletic Director since 1995, and as such, was responsible for the overall direction, leadership, and management of the UCD Intercollegiate Athletic program.  (PDF ¶¶ 100-01; WUF ¶ 1.)  He was responsible for ensuring gender equity in the athletic department, including regular review of compliance with gender equity laws through committee work and the development of gender equity plans.  (PDF ¶¶ 102, 104-05.)  He also oversaw the addition and elimination of intercollegiate teams.  (PDF ¶ 106.)  Since 1996, Warzecka has prepared and analyzed UCD's EADA Reports.  (PDF ¶ 107.)

From approximately 1985 to 2003, defendant Gill-Fisher was the Associate Athletic Director and Supervisor of Physical Education.  In 2003, Gill-Fisher was the Senior Associate Athletic Director and Senior Woman Administrator with significant responsibility in the intercollegiate athletic department.  Gill-Fisher had a particular expertise in Title IX and had responsibility for UCD's compliance with gender equity laws. (PDF ¶ 126.)  Historically, Gill-Fisher authored or significantly contributed to nearly every report related to gender equity at UCD, including reports that acknowledged UCD athletic department's gender equity failings.  (PDF ¶ 127.)  Defendant Vanderhoef testified that he had faith in Gill-Fisher to make decisions and ensure compliance with gender equity at UCD.  (PDF ¶ 130.)  Similarly, Shimek and senior athletic department administrators relied on Gill-Fisher's opinion and assessment regarding gender equity.  (PDF ¶¶ 131-32.)

**C.   Equal Opportunities in Athletics**

During the relevant time periods in this case, UCD never provided females with athletic opportunities substantially proportionate to their enrollment.  (PDF ¶ 46.)  Specifically, between 1995 and 2005, UCD was short of exact proportionality by over a hundred varsity slots each year.  (PDF ¶ 47.)  A November 9, 1992 UCD memorandum from defendant Gill-Fisher noted that UCD has a "backward slide in compliance" and concluded that UCD "cannot continue with current practices and not risk a law suit and/or investigation by the OCR."  The memorandum further provided, "I believe that unless we make some changes immediately and have on file a plan for compliance in these areas our current

situation is indefensible. . . . we are not being fair to women athletes as things currently stand and in my opinion we are violating the law." (PDF ¶ 46.)  Two years later, a September 1, 1994 UCD memorandum from Gill-Fisher admitted that "participation ratios persist as the most consistent finding of non-compliance at U.C. Davis . . . ." (PDF ¶ 46.)  By an internal UCD letter dated January 13, 1998, defendant Franks was informed that UCD was not where it should be in regards to Title IX compliance. (PDF ¶ 46.)  By letter dated December 2, 1998, California National Organization for Women requested information from defendant Warzecka regarding UCD's plan to rectify the 11.9% discrepancy between percentages of women enrolled and women student-athletes.  (PDF ¶ 46.)  That same year, Warzecka acknowledged that a gender imbalance in the athletic department "is not a new issue." (PDF ¶ 53.)  The 1999 UCD Title IX Working Group admitted that the participation rates of women in the varsity program was not substantially proportionate.  (PDF ¶ 46.)

The 2001-2002 Equity in Athletics Plan acknowledged that the participation rates of women in the varsity program was not substantially proportionate.  (PDF ¶ 46.)  An email dated November 15, 2002, from defendant Gill-Fisher to Shimek warned that participation rates for women in UCD varsity athletics continued to worsen, falling from 6.8% to 9.7% in just one year. (PDF ¶ 46.)  The number of participation opportunities at UCD dropped by a total of 63 between 1999 and 2005; in 1999-2000, 424 female athletes participated, while in 2004-2005, only 368 female athletes participated.  (PDF ¶¶ 57-59.)  UCD's expert agrees that the drop during this time period was "drastic." (PDF ¶ 60.)

Between 1999 and 2005, women student enrollment at UCD experienced significant growth.  (PDF ¶ 61.)  However, from 1995 to 2003, UCD didn't communicate to female students that they could seek the addition of a new women's varsity sport or the process for doing so.  (PDF ¶ 62.)  Rather, during the same time period, UCD rejected varsity applications from numerous women club team members.  (PDF ¶ 48.)  Except for the addition of indoor track for women in 1999,[12] defendants took no further steps to add women's athletic opportunities until 2005.[13]  (PDF ¶¶ 54, 56.)  Indeed, in 2003, when it considered applications to elevate a women's sport to varsity status, it received applications from six sports, five of which it rejected.  (PDF ¶ 64.)

**D.   Procedural Background**

On December 18, 2003, plaintiffs filed the instant action on behalf of themselves and a putative class, asserting six claims for relief: (1) violation of Title IX based on unequal opportunities; (2) violation of Title IX based on unequal financial assistance; (3) retaliation in violation of Title IX; (4) violation of 42 U.S.C. § 1983; (5) violation of the California Unruh Civil Rights Act; and (6) violation of public policy.  Defendant filed a motion to dismiss pursuant to Federal

---

[12]   Plaintiffs contend that this did not offer new athletic opportunities for women because UCD treats indoor and outdoor track as a combined sport, and thus, it merely extended the season for the same varsity outdoor track female athletes.  (PDF ¶ 56.)

[13]   In 2005 UCD added women's golf, which plaintiffs contend added only seven opportunities for women at UCD.  (PDF ¶ 55.)

Rule of Civil Procedure 12(b)(6) on March 5, 2004.  (Defs.' Mot.

to Dismiss (Docket #13-15), filed Mar. 5, 2004.)  The court

denied the motion on May 6, 2004.  (Mem. & Order (Docket #25),

filed May 6, 2004).

Unfortunately, both defendants' and plaintiffs' counsel

suffered illnesses throughout the course of the litigation.  As a

result, both parties stipulated to extend deadlines and to stay

proceedings.  In August 2006, plaintiffs obtained new counsel.

(Notice of Appearance (Docket #134), filed Aug. 18, 2006.)  The

parties submitted a joint status report on January 19, 2007, and

active litigation resumed.  (Joint Status Report (Docket #154),

filed Jan. 19, 2007.)

On February 2, 2007, plaintiffs' filed a motion to amend the

complaint to add new plaintiffs and allegations.  (Pls.' Mot. to

Amend (Docket #158), filed Feb. 2, 2007.)  The court denied the

motion on March 20, 2007.[14]  (Mem. & Order (Docket #175), filed

Mar. 20, 2007.)  The parties thereafter stipulated to dismiss the

class claims.  (Mem. & Order (Docket #195), filed June 12, 2007.)

On June 5, 2007, defendants filed a motion for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

(Defs.' Mot. for J. on Pleadings (Docket #188), filed June 5,

2007.)  The court granted the motion for all claims, except

_____

[14]     On July 24, 2007, the proposed new plaintiffs initiated
a separate lawsuit against UCD.  On October 20, 2009, the court
entered final approval on a Stipulated Judgment and Order,
granting broad injunctive relief on behalf of a class of "All
present, prospective, and future women students at the University
of California at Davis who seek to participate in and/or who are
deterred from participating in intercollegiate athletics at the
University of California at Davis during the Compliance Period."
(Stip. Judgment & Order (Docket #121), filed Oct. 20, 2009.)

plaintiffs' claim against UCD for ineffective accommodation. Specifically, the court granted defendants' motion on plaintiffs' claims under 42 U.S.C. § 1983 against the individual defendants for violation of the Equal Protection Clause.  Noting a split among the Circuits and the absence of any Ninth Circuit precedent, the court concluded that plaintiffs' § 1983 claims were subsumed by their Title IX claims.  (Mem. & Order (Docket #226), filed Oct. 18, 2007.)

On January 11, 2008, defendants filed a motion for summary judgment on the sole remaining claim.  (Defs.' Mot. for Summ. J. (Docket #280), filed Jan. 11, 2008.)  The court granted the motion, concluding that a claim for damages arising out of ineffective accommodation under Title IX required notice to the institution and the opportunity to cure.  The court found that plaintiffs' had failed to give UCD notice and an opportunity to cure.  Accordingly, on April 23, 2008, the court entered judgment and closed the case.  (Mem. & Order (Docket #368), filed Apr. 23, 2008.)

Plaintiffs appealed to the Ninth Circuit Court of Appeals. On April 29, 2010, the Ninth Circuit issued its mandate, reversing the court's dismissal of plaintiffs' § 1983 claims against the individual defendants and Title IX ineffective accommodation claim against UCD.  With respect to plaintiffs' § 1983 claims, the Ninth Circuit noted that subsequent to the court's order, the Supreme Court held in Fitzgerald v. Barnstable School Committee, 129 S. Ct. 788 (2009), that Title IX does not bar § 1983 suits to enforce rights under the Equal Protection Clause.  Mansourian v. Regents of Univ. of Cal., 602 F.3d 957,

14

973 (9th Cir. 2010).  With respect to plaintiffs' Title IX claim, the Ninth Circuit concluded pre-litigation notice and opportunity to cure is not necessary in cases alleging unequal provision of athletic opportunities in violation of Title IX.  Id. at 969. Specifically, it reasoned that the failure to provide equal athletic opportunities rested on an affirmative and intentional institutional decision; thus, imposing a notice requirement would not supply universities with information of which they are legitimately unaware.  Id. at 968.  The Ninth Circuit also found that there were triable issues of fact regarding whether UCD had complied with Title IX's requirements of providing equal athletic opportunities to students of both sexes.  Id. at 969-73.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party.  See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.  Nissan Fire & Marine

Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,
the moving party only needs to show "that there is an absence of
evidence to support the nonmoving party's case." Celotex Corp.,
477 U.S. at 325.

Once the moving party has met its burden of proof, the
nonmoving party must produce evidence on which a reasonable trier
of fact could find in its favor viewing the record as a whole in
light of the evidentiary burden the law places on that party.
See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th
Cir. 1995).  The nonmoving party cannot simply rest on its
allegations without any significant probative evidence tending to
support the complaint.  See Nissan Fire & Marine, 210 F.3d at
1107.  Instead, through admissible evidence the nonmoving party
"must set for specific facts showing that there is a genuine
issue for trial."  Fed. R. Civ. Proc. 56(e).

**ANALYSIS**

Defendants move for summary judgment on plaintiffs' § 1983
claims, alleging violations of the Equal Protection Clause of the
Fourteenth Amendment of the United States Constitution.
Plaintiffs contend that defendants violated their rights under
the Equal Protection Clause in three ways: (1) by affording
plaintiffs fewer opportunities to compete in varsity athletics
than they did men program-wide; (2) by purposefully removing
plaintiffs from the varsity wrestling program based on gender;
and (3) by imposing permanent barriers to the participation of
plaintiffs in the varsity wrestling program through application
of the wrestle-off policy.

16

## A.   Statute of Limitations

Defendants move to dismiss plaintiffs' § 1983 claims on the basis that they are barred by the one year statute of limitations.   Specifically, defendants contend that plaintiffs' claims are based upon discrete acts for which claims must have been filed before Fall 2002.   Plaintiffs contend that their claims are timely because they arise out of defendant's policy of discrimination, which denied equal access to athletic participation and scholarship opportunities each and every day they attended the University.

The applicable statute of limitations for plaintiffs' Section 1983 claim is the same as California's personal injury statute of limitations.   <u>Maldonado v. Harris</u>, 370 F.3d 945, 954 (9th Cir. 2004); <u>Azer v. Connell</u>, 306 F.3d 930, 935 (9th Cir. 2002).   In California, an aggrieved party must commence an action for personal injury caused by an alleged wrongful act or neglect within two years of the act.   Cal. Code Civ. Proc. § 335.1.   The two-year limitations period, however, was extended in 2003; before January 1, 2003, when § 335.1 became effective, the limitations period for personal injury claims was one year.   Cal. Code Civ. Proc. § 340(3), <u>repealed</u>.

A legislative extension of the statute of limitations period will extend the limitations period of an actionable claim if the extension occurred *before* the claim for relief became time barred under the prior limitations period.   <u>See Maldonado</u>, 370 F.3d at 955; <u>Douglas Aircraft Co. v. Cranston</u>, 58 Cal. 2d 462, 465 (1962).   On the other hand, once a claim is time barred it will not be revived by the extension to the applicable limitations

17

period unless the legislature expressly declared that the amendment of the limitations period applied retroactively. <u>Maldonado</u>, 370 F.3d at 955; <u>Bartman v. Estate of Bartman</u>, 83 Cal. App. 3d 780, 787-78 (1978).  Plaintiffs initiated this lawsuit on December 18, 2003.

"Determining whether a plaintiff's charge is timely . . . requires identifying precisely the unlawful . . . practice of which he complains."  <u>Lewis v. City of Chicago</u>, 130 S. Ct. 2191, 2197 (2010) (internal quotations and citation omitted).[15]

### 1. Discrete Acts

"A discrete retaliatory or discriminatory act 'occurred' on the day that it happened."  <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 110 (2002).  Where a discrete act is the basis for a discrimination claim, the timely filing period begins to run from that date.  <u>Id.</u>  Such acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  <u>Id.</u> at 113.

The term "practice" does not convert related discrete acts into a single unlawful practice for the purposes of timely filing.  <u>Morgan</u>, 536 U.S. 101, 111 (2002).  The Court has defined

---

[15]  Both plaintiffs and defendants contend that the court has already resolved the statute of limitations issue in their favor.  The court acknowledges that it has addressed the statute of limitations in its orders on defendants' motion to dismiss, defendants' motion for judgment on pleadings, and defendants' motion for summary judgment.  The court has concluded that plaintiffs' claims based on discrete acts are time-barred while plaintiffs' claims based on systemic violations are not.  While the Ninth Circuit did not address the court's rulings regarding plaintiffs' claims based upon discrete acts, it affirmed the court's rulings regarding systemic violations.  <u>See</u> <u>Mansourian</u>, 602 F.3d at 973-74.  As set forth, *infra*, the court draws the same distinctions and reaches the same conclusions in response to the individual defendants' motions for summary judgment.

18

a "discrete act" of discrimination as one that constitutes a separate, actionable unlawful practice that is temporally distinct.  Id. at 114.  In the employment context, the Court pointed to "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of such discrete acts.  Id.  A cause of action accrues when the discrete, unlawful action occurred.  Id.  If a defendant "engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed."  Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 628 (2007).  However, "a new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."  Id. (discussing the Court's holding in Morgan and other related cases).

     The current *effects* of discriminatory conduct "cannot breathe life into prior, uncharged conduct."  Id.  In Ledbetter, a female retiree sued her former employer under Title VII and the Equal Pay Act for alleged sex discrimination reflected in negative evaluations, which resulted in her receiving lower paychecks than her male counterparts.  Id. at 2163-64.  The plaintiff argued that each of the paychecks she received constituted a new, actionable discriminatory act.  Id. at 2169. The Court rejected this argument, holding that the actionable discrete conduct occurred when the pay decision was made, not when a paycheck was issued pursuant to that allegedly discriminatory decision.  Id. at 2175-76; see Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (holding that

the denial of a disabled employee's request for accommodation is a discrete discriminatory act that starts the clock running on the day it occurs because it does not require repeated conduct to establish an actionable claim).

In this case, plaintiff's Equal Protection claims arising from (1) the alleged purposeful removal of plaintiffs from the varsity wrestling program based on gender; and (2) the imposition of permanent barriers to the participation of plaintiffs in the varsity wrestling program by application of the "wrestle-off policy" are discrete acts that occurred, at latest, in the Fall of 2001.  Specifically, plaintiffs claim that defendant UCD first excluded them from the wrestling program and then failed to give them a fair opportunity to obtain a position on the team by requiring them to compete against men, using men's rules.  These claims are akin to a claim of termination and failure to hire or promote in the employment context.  As such, they are appropriately characterized as discrete acts, and the cause of action accrued when the conduct occurred in Fall 2001.

While plaintiffs claim that the discriminatory acts continued because they were unable to wrestle each and every day that they were students at UCD, this inability was merely the *effect* of defendant's prior, allegedly discriminatory conduct. There is no evidence that defendants ever removed plaintiffs from the team after Fall 2001 or applied the allegedly discriminatory wrestle-off policy against them after Fall 2001.[16]  As set forth

---

[16]  The court notes that this analysis might be different if there was any evidence that defendants continued to *use* the alleged discriminatory "wrestle-off" policy within the limitations period.  In <u>Lewis v. City of Chicago</u>, the Supreme

1  in Ledbetter, the current effects of discriminatory conduct does
2  not extend the statute of limitations.  127 S. Ct. at 2169.

3          The rationale applied by the Ninth Circuit in Cherosky v.
4  Henderson is similarly applicable to some of the claims in this
5  case.  330 F.3d 1243 (9th Cir. 2003).  In Cherosky, current and
6  former employees brought suit against the United States Postal
7  Service under the Americans with Disabilities Act, challenging
8  the denial of their requests to wear respirators while on duty.
9  Id. at 1244-45.  The Ninth Circuit found that the heart of the
10 plaintiffs' complaint stemmed from the individualized decisions
11 to deny the plaintiffs' requests and, as such, were discrete
12 acts.  Id. at 1247.  Similarly, in this case, the allegations in
13 plaintiff's complaint challenging their removal from the
14 wrestling team and the alleged barriers imposed to prevent them
15 from gaining a place on the wrestling team stems from
16 individualized decisions by defendants regarding the UCD
17 wrestling program and these particular plaintiffs.  As such,
18 these decisions are discrete acts.

19 ─────────────────────
20 Court held that a disparate treatment claim under Title VII could
   be based on the subsequent application of an alleged
21 discriminatory policy that had been adopted outside of the
   limitations period.  130 S. Ct. at 2197.  In Lewis, the
22 plaintiffs challenged selection of firefighters based upon the
   results of an allegedly discriminatory test administered in 1995.
23 While it was undisputed that a challenge to the administration of
   the test and the selection of the first round of applicants from
24 the scores was time-barred, the Court held that the use of those
   same test scores to select applicants over the next six years
25 constituted new actionable violations.  Id. at 2199.

26         However, in this case, there are no allegations or evidence
   that defendants ever applied the same allegedly discriminatory
   policy to plaintiffs after the try-outs in the Fall 2001.
27 Accordingly, implementation and application of the allegedly
   discriminatory wrestle-off policy to plaintiffs in Fall 2001 is
28 time-barred.

                                21

Therefore, the court concludes that plaintiff's Equal Protection claims arising from (1) the alleged purposeful removal of plaintiffs from the varsity wrestling program based on gender; and (2) the imposition of permanent barriers to the participation of plaintiffs in the varsity wrestling program through application of the wrestle-off policy are discrete acts that accrued in Fall 2001.  The statute of limitations then in effect was one year and expired in Fall 2002, prior to the filing of the complaint in this action.  Accordingly, plaintiffs' claims based on this conduct is time-barred, and defendants' motions for summary judgment with respect to these claims are GRANTED.[17]

**2.   Systemic Discrimination**

A plaintiff may set forth a claim for unlawful discrimination by showing a systematic policy or practice of discrimination that inflicts injury during the limitations period.  Douglas v. Cal. Dept. of Youth Authority, 271 F.3d 812, 822 (9th Cir. 2001); see Gutowsky v. County of Placer, 108 F.3d 256, 259 (9th Cir. 1997).  "A systemic violation claim requires no identifiable act of discrimination in the limitations period, and refers to general practices or policies."  Id. (internal quotations and citation omitted).  "In other words, if both discrimination and injury are ongoing, the limitations clock does not begin to tick until the invidious conduct ends."  Id. (quotation and citation omitted).

---

[17]   The court also notes that while this alleged conduct may not be independently actionable, it may be used as evidence in support of plaintiffs' timely claims of intentional, systemic discrimination.

22

The Ninth Circuit has expressly held in this case that "[a] university's ongoing and intentional failure to proved equal athletic opportunities for women is a systemic violation." Mansourian, 602 F.3d at 974.  Further, § 1983 "is presumptively available to remedy a state's ongoing violation of federal law." Id. (quoting AlohaCare v. Haw. Dep't of Human Servs., 572 F.3d 740, 745 (9th Cir. 2009)).  As such, the Ninth Circuit held that this court was "quite correct" in concluding that plaintiff's claims challenging the lack of women's equal access to athletic participation at UCD were not time-barred.[18]

As previously noted by both the court and the Ninth Circuit, plaintiffs in this case allege that defendants violated their equal protection rights by affording plaintiffs fewer opportunities to compete in varsity athletics than they did men program-wide.  Plaintiffs contend that defendants intentionally engaged in such discriminatory conduct each and every day they attended UCD.  Plaintiff Ng graduated in September 2002, plaintiff Mansourian graduated in June 2004, and plaintiff

---

[18]   Defendants assert that this argument is precluded by the court's prior determination regarding the availability of a pattern and practice method of demonstrating liability.   The court notes that its pattern and practice analysis was undertaken with respect to plaintiffs' claims arising out of discrete acts conducted prior to the limitations period, not with respect to allegations regarding the systemic unequal and ineffective accommodation of women in athletics.   The court also notes that this discussion analyzed the availability of method of proof, not a theory of liability.   Therefore, this analysis has no applicability to the timeliness of plaintiffs' claims regarding systemic discrimination.

Further, as noted *supra*, defendants' conduct that occurred outside of the limitations period may be relevant in demonstrating an intentional, systemic policy or practice of discrimination.

Mancuso graduated in September 2006.  As such, plaintiffs timely
filed their complaint regarding their allegation that "UCD
violated the Equal Protection Clause by maintaining an athletics
program that discriminates on the basis of gender."[19]
Mansourian, 602 F.3d at 973 (9th Cir. 2010).

## B.   Constitutional Violation

Defendants move for summary judgment, asserting that there
is insufficient evidence that they intentionally discriminated
against plaintiffs or acted with deliberate indifference to their
constitutional rights.  Plaintiffs oppose the motion, arguing
that defendants knowingly violated their Equal Protection rights
by denying them an equal opportunity to participate in varsity
sports.

The Equal Protection Clause of the Fourteenth Amendment
provides that no State shall "deny to any person within its
jurisdiction the equal protection of the laws."  U.S. Const.
Amdt. 14, § 1.  This is "essentially a direction that all
similarly situated persons should be treated alike."  City of
Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "The
purpose of the equal protection clause of the Fourteenth
Amendment is to secure every person within the State's
jurisdiction against intentional and arbitrary discrimination,
whether occasioned by express terms of a statute or by its

---

[19]   The court notes that while plaintiffs' opposition
proffered three bases for their Equal Protection claim, the Ninth
Circuit only defined plaintiffs' Equal Protection claim as one
challenging UCD's athletic program.  Mansourian v. Regents of
Univ. of Cal., 602 F.3d 957, 973 (9th Cir. 2010).  Indeed, it was
only with respect to this limited definition of plaintiffs' claim
that the Ninth Circuit affirmed the court's conclusion that
plaintiffs' claim was timely filed.

improper execution through duly constituted agents." Sioux City
Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923); see
Williams v. Vidmar, 367 F. Supp. 2d 1265, 1270 (N.D. Cal. 2005)
(noting that the Equal Protection clause "is not a source of
substantive rights or liberties, but rather a right to be free
from discrimination in statutory classifications and other
governmental activity"). Accordingly, "[t]o establish a § 1983
equal protection violation, the plaintiffs must show that the
defendants, acting under color of state law, discriminated
against them as members of an identifiable class and that the
discrimination was intentional."[20]   Flores v. Morgan Hill Unified
Sch. Dist. ("Flores"), 324 F.3d 1130, 1134 (9th Cir. 2003)
(citing Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740
(9th Cir. 2000); Oona R.S. v. McCaffrey, 143 F.3d 473, 476 (9th
Cir. 1998)).

Where a University decides "to sponsor intercollegiate
athletics as part of its educational offerings, this program
'must be made available to all on equal terms.'" Haffer v. Temple
Univ., 678 F. Supp. 517, 525 (E.D. Pa. 1998) (quoting Brown v.
Bd. of Educ., 347 U.S. 483, 493 (1954)). The Ninth Circuit has
recognized that not only must "*overall* athletic opportunities . .
. be equal" to satisfy the Equal Protection Clause, but that
"denial of an opportunity in a specific sport, even when overall

---

[20]    A party seeking to uphold a gender-based classification
must demonstrate that the classification "serves important
governmental objectives and that the discriminatory means
employed are substantially related to the achievement of those
objectives." Mississippi Univ. for Women v. Hogan, 458 U.S. 718,
724 (1982). In this case, defendants submit neither evidence nor
argument in support of an important government objective or a
substantial relationship.

opportunities are equal, can be a violation of the equal

protection clause." <u>Clark v. Arizona Interscholastic Ass'n</u>, 695

F.2d 1126, 1130-31 (9th Cir. 1982); <u>see</u> <u>Hoover v. Meilkejohn</u>, 430

F. Supp. 164, 170 (D. Colo. 1977) (noting that the standard under

the Equal Protection Clause "should be one of comparability, not

absolute equality," where male and female teams are given

"substantially equal support" for "substantially comparable

programs"); <u>Leffel v. Wisconsin Interscholastic Athletic Ass'n</u>,

444 F. Supp. 1117, 1122 (D. Wis. 1978) ("[T]he defendants may not

afford an educational opportunity to boys that is denied to

girls.").

   Proof of discriminatory intent or purpose is required to

show a violation of the Equal Protection Clause. <u>City of</u>

<u>Cuyahoga Falls v. Buckeye Cmty. Hope Found.</u>, 538 U.S. 188, 194

(2003). Such intent is satisfied by a showing that the

defendants either intentionally discriminated or acted with

deliberate indifference. <u>Flores</u>, 324 F.3d at 1135.

Discriminatory intent "implies that the decision maker . . .

selected or reaffirmed a particular course of action at least in

part 'because of' not merely 'in spite of' its adverse effects

upon an identifiable group." <u>Personnel Adm'r v. Feeney</u>, 442 U.S.

256, 279 (1979); <u>see</u> <u>Flores v. Pierce</u>, 617 F.2d 1386, 1389 (9th

Cir. 1980) (recognizing that the deviation from previous

procedural patterns and the adoption of an ad hoc method of

decision making without reference to fixed standards, among other

things, were sufficient to raise an inference of pretext on an

equal protection claim). Deliberate indifference may be found if

a school official or administrator responds or fails to respond

to known discrimination in a manner that is clearly unreasonable.
See Flores, 324 F.3d at 1135.

"[D]irect, personal participation is not necessary to
establish liability for a constitutional violation." al-Kidd v.
Ashcroft, 580 F.3d 949, 965 (9th Cir. 2009) (quoting Kwai Fun
Wong v. United States, 373 F.3d 952, 966 (9th Cir. 2004)).
Supervisors can be held liable under § 1983:

> (1) for setting in motion a series of acts by others,
> or knowingly refusing to terminate a series of acts by
> others, which they knew or reasonably should have known
> would cause others to inflict constitutional injury;
> (2) for culpable action or inaction in training,
> supervision, or control of subordinates; (3) for
> acquiescence in the constitutional deprivation by
> subordinates; or (4) for conduct that shows a "reckless
> or callous indifference to the rights of others."

Id. (quoting Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th
Cir. 1991)).  Moreover, the Ninth Circuit has expressly held that
school officials "are liable for their own discriminatory actions
in failure to remedy a known [discriminatory] environment." Oona
R.S., 143 F.3d at 477 (affirming the district court's holding
that individual defendants were not entitled to qualified
immunity from the plaintiff's peer sexual harassment claim based
upon a known hostile environment).

### 1.  Defendant Vanderhoef

In this case, plaintiffs present evidence that defendant
Vanderhoef was deliberately indifferent to plaintiffs'
constitutional right to equal treatment in athletics.  It is
undisputed that Vanderhoef held ultimate responsibility for UCD's
compliance with gender equity requirements.  It is also
undisputed that Vanderhoef tracked UCD's Title IX compliance and
met frequently with officials regarding gender equity.

27

Plaintiffs present evidence that during the relevant time periods
in this case, UCD never provided females with athletic
opportunities substantially proportionate to their enrollment.
Further, "the elimination of women from the varsity wrestling
team . . . took place in the context of an overall contraction of
female athletic participation opportunities that began in 2000."
Mansourian, 602 F.3d at 970.   Moreover, the Ninth Circuit
concluded that UCD eliminated women's varsity athletic
opportunities "in the context of a women's athletics program that
was, at best, stagnant."   Id.   Accordingly, because plaintiffs
have presented evidence that (1) defendant Vanderhoef was
ultimately responsible for gender equity in athletics at UCD; (2)
defendant Vanderhoef tracked UCD's compliance with Title IX,
which during all relevant times was demonstrating greater
disparity in gender equity; and (3) defendant Vanderhoef failed
to take or direct any action to rectify this known, allegedly
discriminatory circumstance, plaintiffs have raised a triable
issue of fact that defendant Vanderhoef acquiesced in the
constitutional deprivation of equal rights by subordinates and
showed "callous indifference" to the rights of plaintiffs as
female athletes.   See Flores, 324 F.3d at 1136 (holding that a
school administrator's failure to investigate and remedy a known
discriminatory circumstance that impacted the plaintiffs
supported a finding a deliberate indifference).

### 2.   Defendant Franks

Plaintiffs also present evidence that defendant Franks was
deliberately indifferent to plaintiffs' constitutional right to
equal treatment in athletics.   It is undisputed that Franks was

28

responsible for ensuring that men and women were treated equally
in the athletic department, including evaluating whether the
department was providing equitable participation opportunities
for female students.  It is also undisputed that during the
period of 1994-2004, Franks received and reviewed reports and
memos that alerted him to gender inequities.  However, despite
the responsibility to ensure gender equity and the knowledge that
UCD was not providing such equity, plaintiffs present evidence
that Franks failed to take or direct any action to rectify this
known, allegedly discriminatory circumstance.  Accordingly,
plaintiffs have raised a triable issue of fact that defendant
Franks showed "callous indifference" to the rights of plaintiffs
as female athletes.  See Flores, 324 F.3d at 1135-36 (holding
that a school administrator's failure to take any further steps
once he knew his remedial measures were inadequate supported a
finding of deliberate indifference).

### 3.  Defendant Warzecka

Plaintiffs similarly present evidence that defendant
Warzecks was deliberately indifferent to plaintiffs'
constitutional right to equal treatment in athletics.  It is
undisputed that since 1995, Warzecka was responsible for ensuring
gender equity in the athletic department, including regular
review of compliance with gender equity laws through committee
work and the development of gender equity plans and oversight
regarding the addition and elimination of intercollegiate
programs.  Since 1996, Warzecka has prepared and analyzed UCD's
EADA Reports, which, during the relevant periods, reflected
increasing gender disparity in athletic opportunities.  Further,

as a defendant responsible for the oversight of the addition and
elimination of teams, plaintiffs present sufficient evidence from
which a reasonable juror could infer that Warzecka was aware that
UCD was eliminating varsity athletic opportunities for women at a
time when overall female athletic participation was decreasing
"drastically."  Plaintiffs also present evidence that despite
this knowledge, numerous varsity applications from female
students were rejected.  Accordingly, plaintiffs have raised a
triable issue of fact that defendant Warzecka showed "callous
indifference" to the rights of plaintiffs as female athletes.
See Flores, 324 F.3d at 1135-36.

**4.   Defendant Gill-Fisher**

Finally, plaintiffs present sufficient evidence that
defendant Gill-Fisher was deliberately indifferent to plaintiffs'
constitutional right to equal treatment in athletics.  It is
undisputed that Gill-Fisher had responsibility for UCD's
compliance with gender equity laws.  It is also undisputed that
Gill-Fisher authored or significantly contributed to nearly every
report related to gender equity at UCD, including reports that
acknowledged UCD athletic department's gender equity failings.
Indeed in 2002, Gill-Fisher noted that participation rates for
women in UCD varsity athletics continued to worsen, falling from
6.8% to 9.7% in just one year.  However, despite defendant Gill-
Fisher's responsibility over compliance with gender equity laws
and despite knowledge of UCD's lack of gender equity in athletic
participation at the relevant times, plaintiffs present evidence
that Gill-Fisher failed to take or direct any action to rectify
this known, allegedly discriminatory circumstance.  Accordingly,

30

1  plaintiffs have raised a triable issue of fact that defendant

2  Gill-Fisher showed "callous indifference" to the rights of

3  plaintiffs as female athletes.   See Flores, 324 F.3d at 1135-36.

4  **C.   Qualified Immunity**

5       Defendants contend that even if there are triable issues of

6  fact regarding whether a constitutional violation occurred, they

7  are entitled to qualified immunity because they did not violate a

8  clearly established constitutional right.   Plaintiffs contend

9  that the availability of a constitutional claim arising out of

10  the unequal treatment of women in high school and college

11  athletics is well-settled.

12       "Government officials who perform discretionary functions

13  generally are entitled to qualified immunity from liability for

14  civil damages 'insofar as their conduct does not violate clearly

15  established statutory or constitutional rights of which a

16  reasonable person would have known.'"   Flores, 324 F.3d at 1134

17  (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

18  "Determining whether officials are owed qualified immunity

19  involves two inquiries: (1) whether, taken in the light most

20  favorable to the party asserting the injury, the facts alleged

21  show the officer's conduct violated a constitutional right; and

22  (2) if so, whether the right was clearly established in light of

23  the specific context of the case."   al-Kidd v. Ashcroft, 580 F.3d

24  949, 964 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194,

25  201 (2001)).   "For a constitutional right to be clearly

26  established, its contours must be sufficiently clear that a

27  reasonable official would understand that what he is doing

28  violates that right."   Id. (quoting Hope v. Pelzer, 536 U.S. 730,

31

739 (2002) (internal quotation marks omitted)).  It is within the court's "sound discretion" to address these two prongs in any sequence it deems appropriate.  <u>Pearson v. Callahan</u>, --- U.S. ---, 129 S.Ct. 808, 818 (2009).

In order to find that the law was clearly established, a court "need not find a prior case with identical, or even 'materially similar,' facts."  <u>Flores</u>, 324 F.3d at 1136-37 (quoting <u>Hope</u>, 536 U.S. 730).  Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  <u>Hope</u>, 536 U.S. at 741.  Rather, a court must "determine whether the preexisting law provided the defendants with fair warning that their conduct was unlawful."  <u>Flores</u>, 324 F.3d at 1137 (internal quotations omitted) (noting that case law can render the law clearly established).  Specifically, the Supreme Court has held:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."

<u>Hope</u>, 536 U.S. at 739 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)); <u>see</u> <u>al-Kidd</u>, 580 F.3d at 971 (noting that "dicta, if sufficiently clear, can suffice to clearly establish a constitutional right.") (internal quotation omitted)).

At the time of the alleged discriminatory conduct in this case, the law, as set forth by the United States Supreme Court and the Ninth Circuit, was clear that the Equal Protection Clause of the Fourteenth Amendment creates the right to be free from

purposeful discrimination in education by state actors.
Mississippi Univ. for Women, 458 U.S. at 731; Oona, R.S., 143
F.3d at 476 (holding that it was clearly established well prior
to 1988 that the Equal Protection clause proscribed any
purposeful discrimination by state actors on the basis of
gender).  More specifically, as early as 1982, the Ninth Circuit
recognized that the Equal Protection Clause may be violated when
overall athletic opportunities are unequal as well as when there
is inequality in opportunity in a given sport.  Clark, 695 F.2d
at 1130-31 (acknowledging the Equal Protection right, but holding
that the discrimination in favor of an all girls volleyball team
was substantially related to an important governmental interest).

    Further, to the extent that Title IX encompasses the same or
similar principles regarding equal access to athletic
opportunities as those required by the Equal Protection Clause,
the Ninth Circuit has expressly stated in this case,

> The statute known as Title IX, 20 U.S.C. § 1681, is
> widely recognized as the source of a vast expansion of
> athletic opportunities for women in the nation's
> schools and universities, so much so that a company
> that sells women's athletic apparel now mimics its
> name.  See www.titlenine.com.

Mansourian, 602 F.3d at 961.  Indeed, the Ninth Circuit expressly
held that because a University has a clear, "affirmative
obligation[] to provide nondiscriminatory athletic participation
opportunities and continually to assess and certify compliance
with Title IX," a University need not receive notice and an
opportunity to respond before a plaintiff's filing for a claim of
monetary damages arising out of alleged ineffective
accommodation.  Id. at 968.  While the court notes that the Ninth

Circuit addressed the University's liability as an institution,
plaintiffs present evidence that defendants in this case were
those responsible for ensuring the University's compliance with
Title IX, specifically, and gender equity, generally.  As set
forth above, the plaintiffs also presented evidence that each
individual defendant was deliberately indifferent[21] to
plaintiffs' constitutional right to equal access to athletic
opportunities.  Therefore, defendants are not entitled to
qualified immunity.

[21]   All defendants assert that UCD was Title IX compliant
or that, at minimum, they reasonably believed UCD was Title IX
compliant.  However, the Supreme Court has noted, "[e]ven where
particular activities and particular defendants are subject to
both Title IX and the Equal Protection Clause, the standards
establishing liability may not be wholly congruent."  Fitzgerald,
129 S. Ct. at 797.  It is unclear whether UCD's or defendants'
compliance with Title IX's interpretive regulations would serve
as an adequate defense to plaintiffs' Equal Protection claims.

However, the court need not reach this issue.  The Ninth
Circuit previously held that plaintiffs raised a triable issue of
fact regarding UCD's compliance with Title IX.  Through this
motion, as set forth infra, plaintiffs have also presented
sufficient evidence that each individual defendant was
responsible for ensuring gender equity, was aware of the alleged
lack of compliance with both Title IX and gender equity
generally, and failed to take or direct any conduct to remedy the
allegedly discriminatory situation.

Further, defendants' reliance on the OCR settlement is
irrelevant to the issue before the court in this case.  The OCR
never addressed whether UCD was Title IX compliant or, more
importantly, whether UCD was offering female student athletes
equal access to athletic opportunities sufficient to satisfy the
Equal Protection Clause.  (See Mem. & Order (Docket #368), filed
Apr. 23, 2008, at 14-15 (noting that plaintiffs did not provide
defendants with notice and an opportunity to cure a Title IX
violation arising out of ineffective accommodation because none
of plaintiffs' OCR complaints provided any indication of a claim
for failure to provide sufficient athletic opportunities for
women).)

Accordingly, defendants' motions for summary judgment regarding plaintiffs' claims arising out of the provision of unequal athletic opportunities are DENIED.

**CONCLUSION**

For the foregoing reasons, defendants' motions for summary judgment are GRANTED in part and DENIED in part.  To the extent plaintiffs' § 1983 claims are based upon the removal of plaintiffs from the varsity wrestling program or upon the imposition of permanent barriers to the participation of plaintiffs in the varsity wrestling program through application of the wrestle-off policy, such claims are dismissed as time-barred.  However, plaintiffs have presented triable issues of fact with respect to their § 1983 claims arising out of the assertion that defendants violated the Equal Protection Clause by maintaining an athletics program that discriminates on the basis of gender.

IT IS SO ORDERED.

DATED: December 8, 2010

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE