UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

AREZOU MANSOURIAN; LAUREN
MANCUSO; NANCY NIEN-LI CHIANG;
CHRISTINE WING-SI NG; and all
those similarly situated,

                                    NO. 2:03-cv-2591 FCD EFB

          Plaintiffs,

     v.                             MEMORANDUM AND ORDER

BOARD OF REGENTS OF THE
UNIVERSITY OF CALIFORNIA AT
DAVIS; LAWRENCE VANDERHOEF;
GREG WARZECKA; PAM GILL-
FISHER; ROBERT FRANKS; and
LAWRENCE SWANSON,

          Defendants.

----oo0oo----

     The opportunity for students to participate in

intercollegiate athletics is a vital component of educational

development.  Such participation helps young adults develop

leadership, confidence, determination, grace, discipline, and a

myriad of other qualities that will serve them long after they

1

leave college.  All students, regardless of gender, should have equal access to participation in athletics.  Indeed, both the Constitution and federal law require it.

This case arises out of plaintiffs Arezou Mansourian ("Mansourian"), Lauren Mancuso ("Mancuso"), and Christine Wing-Si Ng's ("Ng") (collectively "plaintiffs") claims that defendants Regents of the University of California (the "University" or "UC Davis"), Larry[1] Vanderhoef ("Vanderhoef"), Greg Warzecka ("Warzecka"), Pam Gill-Fisher ("Gill-Fisher"), and Robert Franks ("Franks") (collectively, "defendants") deprived them of the equal opportunity to participate in varsity[2] athletics while they were students at UC Davis, in violation of both Title IX and the Equal Protection Clause of the Constitution.  Specifically, plaintiffs assert that they were wrongly deprived of their opportunity to participate in intercollegiate wrestling.  Through this suit, plaintiffs seek money damages and declaratory relief. Defendants assert that, at all relevant times, the UC Davis athletic program and each individual defendant complied with constitutional and federal mandates regarding gender equity.

The court held a fifteen day bench trial from May 23, 2011 through June 15, 2011.  Considering the evidence presented therein, the evidence submitted through stipulation, and the parties' written submissions thereafter, the court enters the

---

[1]    Defendants assert that defendant Larry Vanderhoef was erroneously sued as Lawrence Vanderhoef.

[2]    Throughout its order, the court uses "intercollegiate" and "varsity" interchangeably.

following findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT[3]

**I.   Plaintiffs**

1.   Plaintiff Christine Wing-Si Ng ("Ng") entered UC Davis in Fall 1998 and graduated in September 2002. (Am. Pretrial Conference Order ("Pretrial Order") [Docket # 549], filed May 4, 2011, ¶ 6.)

2.   Plaintiff Arezou Mansourian ("Mansourian") entered UC Davis in Fall 2000 and graduated in June 2004. (Id. ¶ 7.)

3.   Plaintiff Lauren Mancuso ("Mancuso") entered UC Davis in Fall 2001 and received her degree in September 2006. (Id. ¶ 8.) Pursuant to a stipulation of the parties, her relevant time period at UC Davis is from Fall 2001 to December 2005. (Trial Transcript ("TT") 554:1-4; 2325:6-17.)

**II.   History of Gender Equity in Intercollegiate Athletic Participation Opportunities at UC Davis**

4.   UC Davis is a campus of the University of California system that receives federal funds for its educational programs and is subject to Title IX of the Education Amendments of 1972 ("Title IX"). (Pretrial Order, Stipulations, ¶ 1.)

5.   The record is undisputed that since 1970, female students at UC Davis demonstrated great interest in athletic opportunities. (See JX 14, 15; PX 7, 391.) Indeed, hundreds of female students participated each year during the 1980s, 1990s,

---

[3]   To the extent that any of the court's findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.

and 2000s in club team sports such as archery, badminton, bowling, cycling, crew, fencing, equestrian, lacrosse, rifle, ski, water polo, and sychronized swimming. (TT 1155:22-1156:5; 1410:12-20; see PX 17, 391.)

6. However, at all relevant times, females were the underrepresented sex in UC Davis' intercollegiate athletics program. (Pretrial Order, Stipulations, ¶ 1.)

7. Before the passage of Title IX, UC Davis had a philosophy, set forth in "The Davis View" to offer intercollegiate athletics to the greatest number of students possible. (TT 1836:14-18.)

8. As early as May 27, 1970, UC Davis applied this philosophy to conclude that it was desirable to expand both its women's and men's intercollegiate athletic programs. (JX 14, at FP.0749.)

9. Based on the best recollection of those involved in the campus athletic program, when Congress enacted Title IX in 1972, UC Davis supported 7 intercollegiate sport teams for women: basketball, field hockey, swimming, softball, tennis, volleyball, and track & field. (Pretrial Order ¶ 14.)[4]

10. In January 1972, the UC Davis Women's Intercollegiate Athletic Subcommittee, made up of students belonging to the

---

[4]   The governing entity for women's intercollegiate sports at that time was the Association of Intercollegiate Athletics for Women ("AIAW"). (Pretrial Order ¶ 14.) In 1981, UC Davis became a member of the NCAA for purposes of women's intercollegiate athletics. (Pretrial Order ¶ 16.) The NCAA does not prohibit a member school from adding non-NCAA sports so long as a school meets the requirements for sport sponsorship minimums for its division. (Id.) At all relevant times, UC Davis met those NCAA requirements. (Id.)

Women's Athletic Association (including defendant Gill-Fisher),
prepared a report for the Intercollegiate Athletic Advisory
Board.  The report was designed to show the current philosophies,
practices and needs of the women's intercollegiate athletic
program at UC Davis, as well as trends at the local, regional,
and national level.  (JX 15; TT 1616:10-1621:10)

11.  The report recommended that the campus add women's
gymnastics and badminton as intercollegiate sports.  (JX 15; TT
1616:10-1621:10.)

12.  In 1974, UC Davis added women's gymnastics as an
intercollegiate sport.  (Pretrial Order ¶ 15; TT 1821:10.)  There
is no evidence that women's badminton was ever added as an
intercollegiate sport.

13.  In or about 1976, Gill-Fisher chaired a committee to
evaluate UC Davis' compliance with Title IX.  (TT
1613:24-1615:22.)

14.  In July 1978, Gill-Fisher co-authored a UC Davis Title
IX compliance review, which recommended, *inter alia*, that women's
cross-country be considered an intercollegiate sport for 1978.
(JX 16; TT 1622:5-1623:12)

15.  In 1978, UC Davis upgraded women's cross-country to
intercollegiate status. (TT 1622:20-1623:6.)

16.  Subsequently, UC Davis discontinued women's field
hockey at the end of the 1982-1983 school year.  (Pretrial Order
¶ 17.)

17.  The discontinuation of women's field hockey was done
for legitimate, non-discriminatory reasons; interest in the sport

5

as well as viable competitive opportunities at the
intercollegiate level were decreasing.[5]

18.   In the 1980s, interest in field hockey was on a
downward slope as the number of teams nationwide decreased and
the interest in field hockey in California high schools
decreased.  (TT 1821:11-15; 1838:16-1839:4.)

19.   In the 1980s, only seven colleges in California played
field hockey at all.  Over that decade, NOR-PAC, the conference
in which UC Davis played field hockey, decreased in size from
seven schools to three schools.  (TT 2461:2-5; 2462:21-2464:9.)

20.   Further, finding fields suitable for field hockey was a
pervasive problem because field hockey requires an even,
manicured surface that makes it difficult for field hockey teams
to share fields with teams from other sports.  (TT
2461:14-2462:19.)

21.   At the same time, interest and competition was
increasing rapidly in women's intercollegiate soccer.  (TT
1821:11-15, 1838:4-1839:3; 1625:3-1627:7.)

22.   UC Davis evaluated the high schools, junior colleges,
and universities in its area and saw many schools were offering
soccer, with the result that UC Davis had a solid recruiting base

---

        [5]   The court finds that plaintiffs failed to raise any
credible question regarding the decreasing level of competitive
intercollegiate opportunities through the testimony of Sharon
Gish ("Gish"), the UC Davis field hockey coach at the time the
sport was eliminated.  Gish was not involved in the decision to
drop field hockey and could not recall whether UC Davis informed
her of the reasons it chose to drop the sport.  (TT 2465:1-
2466:1.)  Moreover, she had neither a consistent basis for
knowledge nor a clear recollection of the competitive
opportunities in field hockey subsequent to UC Davis' elimination
of the sport.

and expectation of competition in women's soccer. (TT 1626:21-1627:7.)

23.  As such, women's field hockey was replaced by women's intercollegiate soccer in the fall of 1983. (Pretrial Order ¶ 17.)

24.  Thereafter, sometime in the late 1980s, UC Davis appointed Dennis Shimek as its Title IX Compliance Officer.[6] (TT 2331:5-9; 1858:2-16.)

25.  In 1989, UC Davis commenced a comprehensive Title IX review, which formed the foundation for UC Davis' subsequent progress in program expansion for women student-athletes. (JX 17; TT 1630:9-1633:6; 1826:3-1827:2.)

26.  The review made findings that UC Davis was not in compliance with Title IX under any of part of the three prong test.[7] (JX 17, at 10-17.)  Specifically, when compared to the enrollment rates of male and female students, the data collected in the review confirmed that UC Davis was offering men hundreds more athletic participation opportunities than women relative to enrollment.[8] (JX 17, at 3763.)

---

[6]  The court notes that plaintiffs did not name Shimek as a defendant, even though he was the UC Davis official in charge of Title IX compliance.

[7]  See infra, at Conclusions of Law I.A.2.

[8]  The review also stated that UC Davis had eliminated a women's golf team. (JX 17, at 12.)  However, UC Davis asserts that it never eliminated women's intercollegiate golf because it never sponsored it prior to its addition in 2004.  Based upon the sole mention of the alleged women's golf team in the report without any other documentation or testimony to support its existence, the court finds that UC Davis did not support a women's varsity golf team prior to its addition in 2004.

Similarly, "The Davis View" referred to women's

7

27. In accordance with the philosophy espoused in "The Davis View," UC Davis preferred trying to add women's teams rather than eliminate men's teams in attempting to comply with Title IX. (TT 2342:24-2343:8; 646:2-12.)

28. As such, the review resulted in a recommendation that UC Davis establish steps to increase women's participation opportunities. (JX 17, at 10-17.)

29. Moreover, beginning in 1990, and continuing through 1992, then Assistant Athletic Director Pam Gill-Fisher recommended that UC Davis eliminate the junior varsity football team to save funding and decrease the disparity between men's and women's intercollegiate athletic participation opportunities. (TT 1637:10-1638:19.)

30. The January 10, 1991 Report on Intercollegiate Athletics, prepared by athletic department administrators, reported that women were receiving 300-400 fewer participation opportunities than men for each year from 1986 to 1991, and recorded a drop of 120 female participation opportunities from 1989 to 1991 alone. (PX 13, at DEF 1266.)

31. On June 27, 1991, Gill-Fisher submitted a Title IX review to then Athletic Director Jim Sochor, noting the discrepancy in male and female participation rates and that no steps had been taken to increase athletic participation opportunities for women. (JX 18.)

---

intercollegiate competition in rifle. (JX 14, at 5.) Because there is no evidence that this sport was in existence at the time Title IX was passed, the court finds the reference to women's rifle to be irrelevant.

32.  On December 20, 1991, Gill-Fisher submitted an update regarding Title IX compliance from June to December 1991, noting that participation opportunities remained a problem.  (JX 19; TT 641:23-643:7.)

33.  On June 5, 1992, Gill-Fisher prepared the next Title IX review, again noting that participation opportunities were a major concern.  (JX 66.)

34.  In November 1992, Gill-Fisher wrote a Title IX compliance memorandum to then Athletic Director Keith Williams ("Williams"), warning of backsliding on movement toward Title IX compliance.  In order to deal with participation ratios, the memorandum recommended, *inter alia*, eliminating all junior varsity teams, establishing roster caps for all sports, and adding women's crew and women's golf.  Gill-Fisher also warned that UC Davis needed to implement a plan to address participation ratios or risked facing an OCR complaint or potential lawsuit. (JX 22; TT 1646:2-1649:9.)

35.  In December 1992, Gill-Fisher alerted then Vice Chancellor for Student Affairs, Bob Chason, to participation ratio issue and potential solutions, including capping men's rosters and adding women's sports.  (JX 23; TT 1389:2-1389:25.)

36.  Junior varsity football and men's junior varsity basketball were dropped following the recommendation from Gill-Fisher.  (JX 26; TT 1638:10-14; 649:11-651:12.)

37.  On May 27, 1993, Gill-Fisher wrote a strongly-worded Title IX report to Athletic Director Williams, again expressing major concern with participation ratios.  Specifically, the report noted that while football was mandated to have 180

9

participants, it still had 250.  The report also noted that there were 40 women on a national championship club water polo team and that there was strong interest in forming an intercollegiate women's crew team.  Gill-Fisher stated her opinion that the University was not providing women with participation opportunities as required by law.  (PX 25.)

38.  Also in May 1993, Williams prepared a preliminary draft of a plan to address several Title IX concerns.  The draft plan included expansion of women's sports opportunities combined with elimination of junior varsity football within the coming year.[9] The draft plan also noted that the current year participation ratios were 68% men and 32% women, but contemplated a 3-5 year timeline for achieving participation ratio compliance.  (JX 25; TT 670:13-674:2.)

39.  In 1992-1993, UC Davis was facing massive budget cuts that would have eliminated, among other things, state funds for athletics, resulting in a total program cut of about 70 percent. (TT 652:19-654:19; 1190:13-1192:16.)

40.  In response, UC Davis worked with student organizations to propose student referendums for additional fees to preserve the athletic program.  (TT 653:1-5; 1193:24-1195:18.)

41.  In 1993, students passed a referendum that provided for three years of additional student funding.  (TT 1196:5-11.)

42.  In 1994, students passed a second referendum (the "SASI" referendum) that provided for sufficient fee increases to

---

[9]     The plan expressly noted that the size of the football roster was an "almost impossible obstacle relative to Title IX." (JX 25.)

10

1  preserve the current program and add three new women's sports.

2  (TT 690:6-24; 1196:12-1197:9.)

3      43.  UC Davis elevated women's water polo, lacrosse, and

4  crew from club status to varsity status.  (Pretrial Order ¶ 23.)

5      44.  The addition of the three new intercollegiate sports

6  established 131 additional participation opportunities for women

7  in the 1996-1997 school year, the first year those new teams

8  competed.  (JX 89; TT 1393:8-10.)

9      45.  In December 1996, Gill-Fisher sent then Athletic

10  Director Warzecka a memo, warning that although the addition of

11  the new sports would improve the participation ratio for women's

12  athletic opportunities, it would not alone solve the

13  participation opportunity discrepancy.  She recommended analyzing

14  the size of the men's teams to determine whether they were

15  carrying more student-athletes than necessary for competition.

16  (JX 35; TT 1661:13-1663:3; 1019:3-1020:2.)

17      46.  In December 1997, Dave Wampler of the UC Davis

18  Administrative Athletic Advisory Committee ("AAAC") sent then

19  Associate Vice Chancellor for Student Affairs Franks and Warzecka

20  a letter, noting the continuing disproportion of women's

21  participation rates based upon the "NCAA Gender Equity Survey, UC

22  Davis 1996-1997."  The AAAC recommended that the size of most

23  men's sports teams be reduced.  (JX 37; TT 1020:10-1021:8.)

24      47.  In November 1998, the difference between the female

25  enrollment percentage and the female athletic participation

26  percentage was almost 12 percent.  (JX 89.)  Warzecka had a goal

27  of achieving a participation ratio disparity of only 5 percent.

28  (PX 54; TT 1022:20-1026:3.)

48.   UC Davis implemented a roster management program for men's intercollegiate teams as part of its efforts toward achieving substantially proportionate athletic participation opportunities.   Roster management was needed because some of the men's teams were unnecessarily large in relation to how many competitors they needed, and the large numbers put a strain on the budget; trimming the excess participants helped address the participation ratio.   (TT 2064:20-2068:18; JX 35.)

49.   In December 1998, UC Davis Provost and Executive Vice Chancellor Grey appointed Gill-Fisher and members of a Title IX workgroup to advise the athletic department about Title IX issues.   A multi-year plan was to be established and monitored by the workgroup.   (PX 59; TT 2025:9-2028:10.)

50.   At the same time, Title IX reporting switched to a more collective approach involving the Title IX workgroup.   Warzecka testified that the change was made because he viewed Title IX compliance as a University-wide issue, not the responsibility of one individual.   (TT 2026:19-2028:10; see also TT 2366:18-2367:9.)

51.   In the 1998-1999 school year, UC Davis declared women's indoor track & field as a separate intercollegiate sport.   (TT 2049:23-2050:9.)

52.   Although women had been competing in indoor track & field events as UC Davis student-athletes prior to the 1998-1999 school year, (1) additional funding was allocated to expand the number of indoor track & field venues UC Davis women were able to travel to and compete at; (2) the NCAA changed its reimbursement rules allowing UC Davis to be eligible for reimbursement of

indoor track & field championship expenses; and (3) the EADA
reporting template began listing indoor track & field as a
separate sport from outdoor track & field.  (TT 2046:18-2050:19.)

53.  As such, the court finds that indoor track & field was
elevated to varsity status in the 1998-1999 school year, and
participation opportunities for female student-athletes increased
as a result of this addition.[10]

54.  In May 1999, the Title IX Workgroup prepared a draft
3-year plan for UC Davis athletics, noting that the participation
rate of women athletes had risen to about 48 percent, but was
still less than the 55 percent female undergraduate enrollment.
The plan projected that further roster management of men's teams
would reduce the discrepancy of female athletic participation to
5 percent in the next school year.  Ultimately, despite the
application of a men's roster management program, increasing
female enrollment at the University kept the discrepancy at 6
percent for 1999-2000.  (JX 43; TT 2028:13-20-2033:9.)

55.  As of October 2001, there were intercollegiate teams
for women at UC Davis in 13 sports:  basketball, cross-country,
gymnastics, lacrosse, rowing, soccer, softball, swimming/diving,
tennis, outdoor track & field, indoor track & field, volleyball,
and water polo.  (Pretrial Order ¶ 18.)

---

[10]   The court notes that the Ninth Circuit has previously
held that the dispute over how to characterize the addition of
indoor track & field was irrelevant because, as set forth *infra*,
in the 1999-2000 school year, "women varsity athletes at UCD
reached a historic high in both total numbers and proportion of
female athletes to enrolled women students."  Mansourian v.
Regents of the Univ. of Cal., 602 F.3d 957, 970 (9th Cir. 2010).
However, for the sake of completeness and clarity, the court
makes this finding.

13

56.   As of that date, there were intercollegiate teams for men at UC Davis in 12 sports:  baseball, basketball, cross-country, football, golf, soccer, swimming/diving, tennis, outdoor track & field, indoor track & field, water polo, and wrestling.  (Id.)

57.   In 2001, the Title IX Workgroup prepared the Equity in Athletics Plan, which set forth a goal of achieving Prong One compliance via roster management and, if the female undergraduate population continued to increase, by adding new women's sports.  (JX 48, 49; TT 2054:21-2059:1.)

58.   In December 2003, the Title IX Workgroup issued a Gender Equity Strategic Review in the form of a table.  The review set a plan to "act on" club sports interest in obtaining varsity status, to "review" the student body regarding its interest in athletics, and to "evaluate" the athletic program to ensure it was complying with Title IX.  (DX GG; TT 2366:18-2370:14.)

59.   In 2004, the Title IX Administrative Advisory Committee (formerly the Title IX Workgroup) issued a new review, now titled the ICA[11] Strategic Plan 2004-2007, in a format to conform to NCAA membership committees' forms.  The plan set out the action of adding women's golf and continuing to implement and review roster management.  (DX MM; TT 2059:5-2060:10.)

60.   In 2004, UC Davis added women's golf as an intercollegiate sport.  (TT 2159:7-2160:12; JX 81.)

---

[11]   "Intercollegiate Athletic"

14

61.  As of December 2005, there were intercollegiate teams for women at UC Davis in 14 sports:  basketball, cross-country, golf, gymnastics, lacrosse, rowing, soccer, softball, swimming/diving, tennis, outdoor track & field, indoor track & field, volleyball, and water polo.  (Pretrial Order ¶ 19.)

62.  As of that date, there were intercollegiate teams for men at UC Davis in 12 sports:  baseball, basketball, cross-country, football, golf, soccer, swimming/diving, tennis, outdoor track & field, indoor track & field, water polo, and wrestling.  (Id.)

63.  In 2003, UC Davis announced that it would reclassify from NCAA Division II to NCAA Division I; the process took four years to complete.  (Id. ¶ 26.)

**A.   Applications for Addition of Women's Sports Teams**

64.  UC Davis monitored undergraduate interest in athletics by looking at participation in club sports and intramurals.  (TT 2341:7-2342:16.)

65.  However, it did not conduct a survey of student interest prior to 2004, did not conduct an analysis in writing, and had no formal policy for evaluating and assessing interest. (TT 1410:21-1411:13; 1736:23-1737:3; 2190:7-25; 2192:11-24.)

66.  Further, there is no evidence that UC Davis had an established process by which it assessed interest by high school students, outside athletic associations, or other academic institutions.

67.  Indeed, aside from the two times they solicited varsity applications in 1994 and 2003, UC Davis did not implement a formal system for assessing interest in specific athletic

15

opportunities from 1972-2005.  (TT 1253:22-24; 1279:13-19; 1410:21-1411:1; 1411:2-13; 1736:23-1737:3; 2192:1-24.)

### 1.   Women's Cross-Country[12]

68.   In response to requests made from intercollegiate athletic coaches, UC Davis upgraded women's cross-country to varsity status in 1978.  Specifically, Sue Williams, who became the women's varsity cross-country coach, provided information supporting the upgrade to then Athletic Director, Joe Singleton ("Singleton").  Singleton sought information regarding whether cross-country had a viable pool of potential athletes, whether Sue Williams could create a potential schedule with similar institutions, and whether cross-country was competitively viable. (TT 1511:5-1512:11; 1622:20-1623:6.)

69.   Gill-Fisher recommended the upgrade in the July 1978 Title IX review.  (JX 16; TT 1622:5-1623:12.)

### 2.   Women's Water Polo, Lacrosse, and Crew

70.   UC Davis solicited proposals for new women's varsity sports in 1995 and again in 2003.  (Pretrial Order ¶ 22.)

71.   In January 1995, a sport selection advisory committee chaired by the acting Athletic Director was formed to evaluate teams and identify the three women's sports to be added.  (TT 696:3-25.)

72.   The campus developed a detailed, analytical process for selecting the new sports, which involved input from persons outside of the Athletic Department.  The process involved a

---

[12]   The court notes that there was little to no specific evidence presented regarding the process used to add women's soccer as a varsity sport in 1983.

series of steps: (1) the committee would prepare materials for interested parties to use in preparing new sport proposals, including a description of the relevant criteria; (2) the intercollegiate athletic administration would provide support to groups interested in making a proposal, or intercollegiate athletic staff would develop the proposal themselves if no representative group was available for a potential new sport; (3) proposals would be circulated to a number of campus committees and organizations; (4) the sport selection committee would meet with groups making proposals; (5) the sport selection committee would receive comments from interested committees and organizations; (6) the sport selection committee would summarize comments and assist the Athletic Director in making final recommendations; and (7) the Athletic Director would submit new sport recommendations to the Associate Vice Chancellor for Student Affairs.  (JX 31.)

73.  The committee developed a detailed set of criteria to evaluate the new sport proposals, including impact on gender equity, interest in the sport at various levels, sport sponsorship and competitive opportunities within conference or NCAA, availability and cost of appropriate facilities, equipment and operating expenses for the sport, use of training rooms, coaching requirements, minimum roster numbers for a successful program, and anticipated success at the NCAA level.  (JX 31; TT 696:3-700:5; 1727:14-1729:13.)

74.  In 1995, the following women's club teams submitted applications to be elevated to varsity status at UC Davis: water

polo, lacrosse, crew, badminton, and field hockey.  (Pretrial

Order ¶ 23.)

75.   After receiving input from various constituent groups

and the sport selection committee, UC Davis elevated women's

water polo, lacrosse, and crew to varsity status.  (<u>Id.</u>; TT

707:6-708:9; 1200:5-16; JX 34.)

76.   The decision to add these sports was responsive to the

developing interests and abilities of female students at UC

Davis.  (TT 1657:22-1660:24.)

77.   Viable women's club teams already existed for all three

sports, and each had increasing rates of participation at both

high school and collegiate levels.  (TT 705:3-5; JX 28-30 &

33-34.)

78.   Specifically, the women's water polo club team had won

championships at the club level, and the sport was on the NCAA

list of emerging sports for women.  (TT 1487:5-1489:4; JX

28.0945-46; JX 30; JX 34.)

79.   Women's lacrosse had high participation rates at UC

Davis (ranging from 40-100 women over the five years before it

was elevated to varsity), and nationwide high school

participation in women's lacrosse had dramatically increased 131%

over the previous five years.  (JX 29, 34.)

80.   Crew for women had large sports club participation at

UC Davis, first-rate facilities at Lake Natoma and the Port of

Sacramento, and a PAC-10 championship.  (JX 28, 33-34.)

81.   Although it was a close call in comparison to lacrosse,

field hockey was not chosen.  The majority of the committee

believed that nearby competition in lacrosse would likely be more

plentiful because more colleges in UC Davis' region had club teams that might be moving up to intercollegiate status.  (TT 708:19-709:25.)  Field hockey also had much more stringent and expensive field requirements than lacrosse.  (TT 723:22-724:25.)

### 3.  Women's Indoor Track & Field

82.   In 1993, the women's intercollegiate track & field coach, Deanne Vochatzer ("Vochatzer"), approached the Athletic Director, Keith Williams ("Williams") about the issue of adding indoor track & field as a varsity sport.  She believed it would be beneficial to the members of the outdoor track & field team and would aid in recruiting.  Mr. Williams approved of having student-athletes compete in indoor track & field events, but given the financial crisis occurring at the time, required Vochatzer to find funds within her existing team budget to do so. (TT 1562:6-1563:17.)

83.   Shortly after defendant Warzecka became Athletic Director, Vochatzer raised the issue of indoor track & field with him and requested additional funds in order to take female student-athletes to indoor track & field events.  (TT 2049:4-9.)

84.   The facility in Reno where many of the indoor track & field events were held had fallen into disrepair, and thus it was necessary to travel further distances to competitions, such as Seattle and Idaho.  (TT 1565:2-1566:4.)

85.   The NCAA began reimbursing championship expenses for indoor track & field for Division II schools in the 1996-1997 school year.  (TT 1566:5-14.)

86.   Warzecka agreed to provide more funding so the team could compete in more indoor track & field competitions and NCAA indoor track & field championships.  (TT 2048:11-2050:19.)

87.   The first year UC Davis was able to report indoor track & field as a separate sport on its EADA report was 1998-99. (JX 4, at B52.)  UC Davis began reporting indoor track & field as a separate sport in its 1998-1999 EADA report.  (Id.; TT 2046:11-2047:9; see also JX 89.)

### 4.   Women's Golf

88.   The process for adding women's golf was based on the same process that was used to add the three sports in 1995-96. (TT 1726:5-16.)

89.   The process of program expansion began again in 2002. (TT 2364:23-2365:20; TT 2129:17-2131:2; DX EE.)

90.   In April 2003 information was disseminated to club sport teams, students, and other members of the campus community regarding the process and criteria to be used for selection of a new intercollegiate sport for women.  (TT 1726:17-1727:13; 1730:11-14; 2135:17-2136:17; JX 74.)

91.   The criteria for assessment of potential intercollegiate sports included impact on gender equity, interest in the sport at various levels, sport sponsorship and competitive opportunities within conference or NCAA, availability and cost of appropriate facilities, equipment and operating expenses for the sport, use of training rooms, coaching requirements, minimum roster numbers for a successful program, and anticipated success at the NCAA level.  (TT 1727:14-1729:13; JX 74.)

92.   The following women's club teams submitted applications for varsity status at UC Davis: field hockey, rugby, horse polo, and bowling.  (Pretrial Order ¶ 24.)

93.   A proposal to add golf as a varsity sport for women was submitted by Associate Athletic Director Bob Bullis.  (Id.)

94.   The 1995 process, upon which the 2002-2003 process was based, specifically stated that an intercollegiate athletic employee would prepare the proposal if no representative group was available to prepare a proposal for potential new women's sports.  (JX 31, at RPD1.2187.)

95.   The addition of women's golf at UC Davis had been discussed multiple times before the 2002 process, including as early as November 9, 1992.  (TT 1656:4-13, 1730:1-1732:8; JX 22.)

96.   Indeed, Warzecka had received an inquiry from the President of California National Organization for Women ("Cal NOW") in December 1998 suggesting the addition of women's golf. (JX 41.)

97.   Further, there was high participation in women's golf at California high schools and junior colleges, and the sport was attracting numerous e-mail inquiries from prospective students. (TT 1734:15-1735:7.)

98.   Defendant Warzecka recommended to Vice Chancellor for Student Affairs, Judy Sakaki, that golf be added as the next intercollegiate sport for women because: (1) golf was already played as a championship sport in the Big West Conference, and UC Davis was therefore required by conference rules to add conference championship sports before adding other sports; (2) competition was plentiful because 451 colleges had

intercollegiate women's golf programs; (3) women's golf had an NCAA championship in all three NCAA divisions; (4) golf was offered for women at 639 high schools and 27 junior colleges, providing a strong recruiting base; (5) UC Davis was receiving numerous e-mail inquiries about the availability of women's golf; (6) the Davis community indicated strong interest and financial support for women's golf; and (7) a local golf club course was available.  (TT 2160:1-2163:11; JX 81.)

99.  In June of 2004, UC Davis announced that it would add women's golf as a new varsity sport.  (Pretrial Order ¶ 25.)

100. Head coach, Kathy DeYoung, was appointed at that time and spent academic year 2004-2005 building the team.  This included developing a budget, constructing a schedule of competition, obtaining equipment, and spending time with the golf programs at Washington, UCLA, and Berkeley to learn how top programs operate.  (Id.; TT 2164:7-2165:4; 2259:15-2260:5.)[13]

101. The team commenced competition in the fall of 2005. (Pretrial Order ¶ 25.)

102. Under all the relevant circumstances, the court finds the addition of women's golf was responsive to the developing interests and abilities of female student-athletes.

103. There were a number of legitimate reasons UC Davis choose not to elevate the other sports that sought intercollegiate status when it elevated women's golf.

---

[13]    Plaintiffs' expert, Donna Lopiano, agreed that a year is needed to get a new sport ready for competition.  (TT 945:11-20.)

104. With respect to field hockey, although there was a longstanding club team, UC Davis did not have an adequate turf facility to host intercollegiate field hockey competition. (TT 2137:2-20; JX 80.)  Further, none of the schools in the Big West Conference, which UC Davis was joining, had varsity field hockey teams, and there were only three teams in all of California. (TT 2147:11-2151:11.)

105. With respect to rugby, women's rugby was designated an emerging sport by the NCAA, but there was no conference with existing competition for a schedule, and only one other intercollegiate team in the country. (TT 2138:1-6; 2158:13-22; JX 78, at 5.)

106. With respect to horse polo, there was a lack of regional competition, a lack of local facilities for competition, and the sport would have required considerable expenses for maintaining and transporting horses. (TT 2138:10-2139:1.)

107. With respect to women's bowling, UC Davis had an existing club and a facility, but it was not an NCAA sport and the only existing intercollegiate competition was in the Southeast, necessitating considerable travel costs and lost student class time. (TT 2139:2-2140:10, 2144:25-2146:18.)

108. Accordingly, these sports were not chosen for elevation to varsity status.

/////

/////

/////

/////

/////

23

**B.   Equity in Athletics Disclosure Act ("EADA") Reports[14]**

109. EADA reporting began in 1995-1996. (JX 1; TT 1823:24-1824:1.)

110. Pursuant to the requirements of the EADA, UC Davis has submitted a report to the Department of Education, Office for Civil Rights, each fall since 1996 setting forth: (1) undergraduate enrollment numbers at UC Davis by gender; and (2) the number of male and female participants on intercollegiate sport teams on campus. (Pretrial Order ¶ 20.)

111. The parties agree that Joint Exhibit 89 accurately reflects the relevant information provided on the EADA reports for each year from 1995 through 2006.

112. In 1995-1996, there were 211 total female participants in varsity athletics.[15] The difference between the female enrollment percentage and the female athletic participation percentage was 20 percent. (JX 89.)

113. In 1996-1997, there were 348 total female participants in varsity athletics. The difference between the female enrollment percentage and the female athletic participation percentage was 11 percent. (JX 89.)

---

[14] The Equity in Athletics Disclosure Act ("EADA") "requires federally funded universities to report to the Department of Education and make available to students the number of undergraduates and athletes, broken down by sex, as well as sex-segregated data on operating expenses, coach salaries, athletic scholarships, recruiting expenditures, and revenues." Mansourian v. Regents of the Univ. of Cal., 602 F.3d 957, 968 (9th Cir. 2010) (citing 20 U.S.C. § 1092(g)).

[15] The court does not consider plaintiffs' "unduplicated count" as the Ninth Circuit has recognized that courts "count participation opportunities, not individuals, when comparing the number of 'athletes' to overall student enrollment." Mansourian, 602 F.3d at 966, n.12.

114. In 1997-1998, there were 383 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 11 percent.  (JX 89.)

115. In 1998-1999, there were 426 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 7 percent.  (JX 89.)

116. In 1999-2000, there were 424 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 6 percent.  (JX 89.)

117. In 2000-2001, there were 407 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 7 percent.  (JX 89.)

118. In 2001-2002, there were 361 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 9 percent.  (JX 89.)

119. In 2002-2003, there were 389 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 7 percent.  (JX 89.)

120. In 2003-2004, there were 373 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 6 percent.  (JX 89.)

25

121. In 2004-2005, there were 363 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 6 percent.  (JX 89.)

122. In 2005-2006, there were 401 total female participants in varsity athletics.  The difference between the female enrollment percentage and the female athletic participation percentage was 5 percent.  (JX 89.)

123. Between 1998-1999 and 2001-2002, UC Davis eliminated 65 female participation opportunities.  (JX 89.)  31 of these eliminated participation opportunities arose as a result of the elimination of the women's water polo and women's lacrosse junior varsity (or "B") teams, which were dropped in 2000-2001 due to lack of sufficient competition at the intercollegiate level.  (JX 5, 7; TT 1840:3-1842:2.)

124. The women's water polo coach requested the change regarding the junior varsity team because fewer colleges were sponsoring "B teams," thereby decreasing the opportunities for junior varsity players to play in games.  (TT 1494:2-1495:6.) The women's water polo coach helped re-establish the UC Davis club team, which went on to have considerable success in competition.  (TT 1495:7-1496:7.)

125. The women's junior varsity lacrosse team was also discontinued at the request of the coach, Elaine Jones, on the basis of lack of competition from other colleges.  (TT 1634:8-1635:10; 1665:11-1666:25; 2073:4-2074:3; 2076:21-2077:8.)

126. The lack of competition was a legitimate reason to drop the JV teams.  (TT 1834:23-1835:8, 1835:21-1836:10.)

127. However, UC Davis did not replace the dropped opportunities. (JX 17.)

128. By 2005, actual athletic participation opportunities for female students were at their lowest point since 1997. (JX 89.)

### C.   Expert Testimony[16]

129. Plaintiffs' expert Dr. Donna Lopiano ("Dr. Lopiano") is a nationally and internationally recognized, leading expert in gender equity in athletics. (JX 85; TT 760:21-761:3; 761:25-762:22; 763:4-773:23; 775:3-778:17.) Dr. Lopiano has served as an expert witness in over 30 cases, including in seminal cases addressing Title IX and the Equal Protection Clause in athletics, such as Cohen v. Brown University and Haffer v. Temple University. (JX 85, at 6-7; TT 776:14-777:4.)

130. Dr. Lopiano is currently the Chief Executive Officer of Sports Management Resources, a consulting firm. (JX 85.) She was the Chief Executive Officer at the Women's Sports Foundation. She has also been a coach of multiple sports and an athletic director for more than 18 years at the University of Texas at Austin. (JX 85; TT 764:17-23; 766:2-2-767:5.). She was active in the development of regulations to implement Title IX and various policy interpretations and guidelines promulgated by the

---

[16]   The court notes the unusual nature of the type of expert testimony advanced in this case. Specifically, both Dr. Lopiano and Dr. Grant gave testimony regarding their conflicting opinions on whether UC Davis complied with Title IX and achieved gender equity requirements, the issues at the heart of this litigation. However, given the unique nature of the quasi-factual, quasi-legal issues surrounding Title IX, the court allowed such expert testimony. The court recounts the relevant testimony of the experts under its Findings of Fact and whether it adopts or rejects the opinions under its Conclusions of Law.

Department of Education's ("DOE") Office for Civil Rights ("OCR"), including the OCR's 1979 Policy Interpretation, the OCR's 1996 Clarification of the Three-Prong Test, and the OCR's 2011 Clarification of Prong Three.  Dr. Lopiano also assisted in the development of the 1980 and 1990 versions of the OCR Investigator's Manual and trained staff at OCR regional offices on various issues related to Title IX in athletics.  (TT 775:3-776:13).

131. The court found Dr. Lopiano to be qualified as an expert witness in this matter on the issues of gender equity in athletics, Title IX, athletic administration, and roster management.  (TT 777:17-23.)

132. Defendants' expert Dr. Christine Grant ("Dr. Grant") is also a nationally and internationally recognized, leading expert in gender equity in athletics.  (JX 83; TT 1794:3-1800:5.)  Dr. Grant has served as an expert witness in several cases, including in seminal cases addressing Title IX in athletics, such as Cohen v. Brown University.  Before this case, Dr. Grant has always testified on behalf of student-athletes.  (JX 83; TT 1803:14-1804:13.)

133. Dr. Grant is a Senior Associate at Sports Management Resources, a consulting firm.  She has also been a coach of multiple sports and was an athletic director for 27 years at the University of Iowa.  (JX 83; TT 1785:13-1788:13; 1789:19-23.) She was also active in the development of regulations to implement Title IX and various policy interpretations and guidelines promulgated by the OCR, such as the OCR's 1979 Policy

Interpretation and the OCR's 1996 Clarification of the Three-Prong Test.  (TT 1800:6-1803:8.)

134. The court found Dr. Grant to be qualified as an expert witness in this matter on the issues of gender equity in athletics, Title IX, athletic administration, and roster management.  (TT 1811:4-1812:6.)

135. Dr. Grant has known Dr. Lopiano since the 1970s. Indeed, during the pendency of this case, Dr. Grant was hired by Dr. Lopiano's consulting firm, Sports Management Resources.  (TT 1792:11-23.)

136. This is the first case in which Dr. Grant and Dr. Lopiano have been on opposite sides of a case.  (TT 1793:22-24.)

### 1.   Proportionality

137. Schools exercise total jurisdiction over the proportion of males and females in their athletic programs.  They control and predetermine the number of males and females participating in the programs through their selection of which sports to offer male and female students and by making decisions about the quality of the coaching and the quality of the program.  (TT 994:22-995:7; 1880:4-1881:10.)

138. As used in this case, the "proportionality" measure compares the percentage of women enrolled at UC Davis with the percentage of women participating in the intercollegiate athletic program.  (TT 819:16-820:3.)  A university provides equal participation opportunities in intercollegiate athletics if women occupy the same percentage of athletic opportunities in the intercollegiate athletic program as their enrollment percentage. (TT 820:19-821:12).

29

139. The number of participation opportunities that a school would have to add for women to achieve actual proportionality (equity with what is provided to male students proportionate to enrollment) is known as the participation gap.  (TT 823:14-827:23.)

140. Both Dr. Grant and Dr. Lopiano testified that, in the Title IX context, "substantial" proportionality is reached if the participation gap is less than the size of a female sports team that could be added.[17]  (TT 820:19-821:12; 1876:14-1877:8.)

141. An institution may not rely on a set percentage from actual proportionality for this measure because that will translate into a different number of actual participation opportunities depending on the size of a school.  (TT 1877:2-8).

142. Dr. Lopiano used the athletic participation numbers set forth in UC Davis' EADA Reports for each year from 1995-1996 through 2004-2005 to calculate the participation gap between male and female students.  (JX 1-9.)  She then identified the number of actual female participation opportunities that UC Davis would

_____

[17]     Because as set forth *infra*, the parties have stipulated for the purposes of this action that UC Davis was not in compliance with Prong One of the three-part test, the court does not reach the merits of the validity of this contention as applied to the facts of this case.  However, the court has some misgivings about the practical application of such a test, particularly in combination with plaintiffs' concurrent advancement of the "team of one" theory.  Under plaintiffs' combined theories, to the extent an institution has not added a team where individual competition is possible, such as swimming, indoor track & field, outdoor track & field, cross-country, fencing, or wrestling, that institution would not be "substantially" proportionate if the participation gap was equal to one student who was interested in participating in such a sport.

30

have had to have added to reach gender equity in terms of
intercollegiate participation opportunities, as follows:

| Year | Female Enroll-ment | Female Enroll-ment % | Female Athlete % | % Disparity | Female Athletes # | Male Athletes # | Add'l Female Athletes needed # |
|------|------|------|------|------|------|------|------|
| 1995-1996 | 9,352 | 52% | 32% | -20% | 211 | 441 | **267** |
| 1996-1997 | 10,054 | 53% | 42% | -11% | 348 | 472 | **184** |
| 1997-1998 | 10,118 | 54% | 42.7% | -11.3% | 383 | 513 | **219** |
| 1998-1999 | 10,596 | 55% | 47.8% | -7.2% | 426 | 466 | **144** |
| 1999-2000 | 10,446 | 56.6% | 50.5% | -6.1% | 424 | 416 | **119** |
| 2000-2001 | 11,783 | 56% | 49.2% | -6.8% | 407 | 420 | **128** |
| 2001-2002 | 12,494 | 56.2% | 47.3% | -8.9% | 361 | 403 | **156** |
| 2002-2003 | 11,331 | 56.4% | 49.2% | -7.2% | 389 | 401 | **130** |
| 2003-2004 | 11,660 | 55.9% | 50.1% | -5.8% | 373 | 371 | **97** |
| 2004-2005 | 12,834 | 55.34% | 50.25% | -6.1% | 363 | 368 | **101** |

(JX 84A; TT 823:14-830:17.)

## 2.   History and Continuing Practice of Program Expansion

143. A school must have both a history and a continuing
practice of intercollegiate athletics program expansion for women
if it wants to claim program expansion under Title IX.  (TT
830:18-831:40; 832:20-833:18; 1877:18-1878:12.)

144. The number of intercollegiate participation
opportunities added is determinative of whether a school has
engaged in program expansion for female students, not the number
of teams added.  (TT 788:6-11; 1884:10-13.)

145. Roster management of men's teams is not program
expansion for female students.  (TT 858:20-859:8; 1901:16-21.)

31

146. If a school eliminates participation opportunities for female students, it must replace those opportunities and continue to expand.  (TT 834:13-835:10; 1898:14-24.)

147. Despite agreeing upon these general principles, plaintiffs' expert, Dr. Lopiano, and defendants' expert, Dr. Grant, offered conflicting testimony on the issue of whether UC Davis adequately expanded the women's intercollegiate athletic program.

148. Dr. Lopiano testified that UC Davis did not have a continuing practice of program expansion because it dropped female participation opportunities between 1998 and 2005 without replacing them.  (TT 834:18-835:10; 837:5-840:21; 842:10-15).

149. Dr. Lopiano opined that UC Davis had not adequately expanded participation opportunities for women because (1) UC Davis did not add a woman's team for nine years; and (2) over those nine years, there was an overall net decline in actual participation opportunities for female student-athletes.  (TT 837:5-19; 846:16-847:8; 854:15-856:6).

150. Dr. Grant testified that an institution must expand every 2-3 years to rely on Prong Two.  (TT 1896:9-25).  She opined, however, that despite UC Davis' net loss in participation opportunities between 1998 and 2005, defendants adequately expanded their women's program.

151. She testified that UC Davis should be given a nine-year "credit" for the three teams added in 1996, as though UC Davis had added one every 2-3 years.  (TT 1908:5-9; 1903:10-13).

152. Dr. Grant also testified that the decline in participation opportunities from 1998-99 to 2001-02 was due to

cutting two JV teams for legitimate reasons and normal

fluctuations in the size of women's teams that, in fact,

fluctuated upwards in 2002-03 and 2005-2006.  (TT 1905:15-1907:8;

1933:22-1934:5; JX 89.)

153. She asserted that the fluctuation in women's athletic

participation rates under the circumstances, where the percentage

of women undergraduates enrolled at UC Davis was growing, did not

indicate an end to progress by UC Davis toward gender equality.

(TT 1835:19-1844:10.)

154. Neither plaintiffs' expert nor defendants' expert

testified regarding how to measure or determine a "normal"

fluctuation in athletic participation opportunities.  At most,

Dr. Lopiano testified that if a school was experiencing "normal"

fluctuations in participation opportunities, one would see

fluctuations going up and down over time, rather than a steady

decrease in participation opportunities.  (TT 832:20-834:6.)

However, there was no evidence regarding how steep such

fluctuations may be or over what period of time one should see

such fluctuations rise and fall.

**III. Participation of Women in Wrestling at UC Davis**

155. The court notes that it has previously dismissed as

time barred all claims, under both Title IX and 42 U.S.C. § 1983,

arising from the elimination of wrestling opportunities in 2000-

2001 and for implementation of a policy that required them to

wrestle-off against men in 2001 (the "wrestle-off policy").

(Mem. & Order [Docket #226], filed Oct. 18, 2007; Mem. & Order

[Docket #509], filed Dec. 8, 2010.)

33

156. The court clarified that the only viable claims were based upon the more general claims that defendants violated their rights by failing to provide equal accommodation of athletics to women each and every day plaintiffs were students at UC Davis. (Mem. & Order [Docket #509], filed Dec. 8, 2010; Mem. & Order [Docket #594], filed May 18, 2011.)

157. However, the court noted that evidence relating to the elimination of wrestling and the implementation of the wrestle-off policy could be relevant to plaintiffs' broader claims. Despite repeated clarifications regarding the court's prior rulings, during the course of trial, plaintiffs' counsel again erroneously asserted that none of their Title IX claims had been dismissed as untimely. (See Mem. & Order [Docket #594], filed May 18, 2011.)

158. Further, plaintiffs' evidence at trial consisted almost entirely of testimony and exhibits relating to the alleged elimination of women's wrestling and implementation of the wrestle-off policy.

159. Moreover, in their proposed conclusions of law, plaintiffs *for the first time* assert that UC Davis violated the contact sports provision of the 1979 Policy Interpretation by eliminating and/or failing to provide varsity wrestling opportunities for women.[18]

---

[18]   The court notes that for the same reasons set forth in its various memoranda & orders on this issue, all plaintiffs' claims arising out of the elimination of varsity wrestling and/or implementation of the "wrestle-off" policy are time-barred, discrete acts.  However, for the sake of completeness and in an abundance of caution, the court addresses these issues herein.

160. Accordingly, the court makes the following findings of fact.

**A.  History of Female Participation in Wrestling at UC Davis**

161. A handful of women participated in wrestling at UC Davis for many years before the controversy at the heart of this dispute arose.

162. UC Davis also sponsored a women's division in its annual Aggie Open wrestling tournament.  (Pretrial Order ¶ 28.)

163. "Open" wrestling tournaments allow all persons who wish to participate, as long as they satisfy tournament qualifications, such as age.  (Id. ¶ 29.)

164. Afsoon Roshanzamir (Afsoon "Johnston" after marriage), a talented female athlete, began practicing with the varsity wrestling program in the early 1990's in preparation for international competition.  (Johnston Dep. at 30:20-24; 31:3-32:12; 36:13-24; 37:25-38:6; 39:16-20).

165. Johnston started UC Davis as a freshmen in 1990 and inquired with Bob Brooks ("Brooks"), then head wrestling coach of the men's intercollegiate program.  (Johnston Dep. at 30:14-15; 31:5-11.)

166. Johnston testified that she introduced herself, informed Brooks that she was pursuing wrestling on the national level, and stated that she wanted to be a part of the UC Davis team.  Specifically, she testified that "if [she] could have a corner of the mat and a workout partner, that [she] would be happy."  (Johnston Dep. at 31:14-18.)

35

167. Johnston practiced and sparred with men, even if they were above her weight class. (Johnston Dep. at 65:1-12; Collier Dep. at 13:14-24 (testifying that he sparred with Johnston when she was 118 pounds and he was 134 pounds).) Specifically, during her freshman year, she practiced with the starting 119 pound male wrestler. (Johnston Dep. at 65:1-12.)

168. Johnston didn't expect to be in the starting line-up, but expected that she would be required to compete against either men or women in open tournaments. (Johnston Dep. at 69:19-25.)

169. During her freshman or sophomore year, Johnston competed unofficially in a dual meet against a female wrestler at Chico State; however, their points did not go against the team score. (Johnston Dep. at 34:15-25.) She wore a UC Davis singlet while competing. (Johnston Dep. at 34:15-25.)

170. Johnston also competed in a men's tournament while she was a student at UC Davis. (Johnston Dep. at 35:1-22.) She also wore a UC Davis singlet in this match. (Johnston Dep. at 35:18-22.)

171. Johnston was provided with locker room and training services and received equal coaching opportunities as the men. (Johnston Dep. at 36:13-24.)

172. Johnston was on the UC Davis wrestling roster and participation lists in the 1992-1993 school year and the 1993-1994 school year. (Pretrial Order ¶ 30.)

173. However, Johnston testified that she only considered herself as being on the UC Davis team/squad her freshman year, 1990-1991. After that, she trained with the UC Davis team, but considered herself only to be a an "unofficial member" of the

36

team.  (Johnston Dep. at 42:3-12.)  Johnston did not take any steps to form a separate women's varsity wrestling team. (Johnston Dep. at 52:4-7.)

174. Despite being an "unofficial member" of the team, Johnston received locker room and training services and competed in open tournaments, such as the Aggie Open.  (Johnston Dep. at 42:16-43:4.)

175. During Johnston's senior year, she practiced and trained with Jennifer Martin ("Martin"), a graduate student at UC Davis.  (Johnston Dep. at 43:21-24.)

176. No other female undergraduate students participated in wrestling at Davis during the five years that Johnston was a UC Davis student.  (Johnston Dep. at 41:5-17.)

177. After Johnston graduated in 1995, she and Martin continued to workout with the UC Davis wrestling team and received coaching by the head coach of the men's intercollegiate program, Michael Burch ("Burch"), as well as assistant coaches. (Johnston Dep. at 44:9-21.)

178. Stacey Massola was on the UC Davis wrestling roster and participation lists in the 1997-1998 school year.  (Pretrial Order ¶ 31.)

179. Former plaintiff Nancy Chiang ("Chiang") was on the wrestling roster and participation lists in the 1998-1999, 1999-2000, and the 2000-2001 school year.  Chiang participated in two Aggie Open wrestling tournaments during the time she attended UC Davis.  (Pretrial Order ¶ 32.)

180. Abby Schwartzburg ("Schwartzburg") was on the wrestling roster and participation lists in the 1999-2000 school year. (Pretrial Order ¶ 33.)

181. Alexis Bell was on wrestling rosters in the 2000-2001 school year. (Id. ¶ 34.)

182. Samantha Reinis ("Reinis") was on the wrestling roster and participation lists for the 1997-1998 and the 1998-1999 school years. Reinis suffered an injury and did not compete during the 1999-2000 and the 2000-2001 school year, although she did continue to attend practices during that time. (Id. ¶ 35.)

183. Women were listed on the wrestling team squad, participation, or rosters lists for the 1992-1993, 1993-1994, 1997-1998, 1998-1999, 1999-2000, and 2000-2001 school years. (Id. ¶ 36.)

184. Women wrestlers were counted on the EADA reports as intercollegiate/varsity wrestling athletes for the following academic years: 1997-1998, 1998-1999, and 1999-2000.[19] (Pretrial Order ¶ 37.)

185. From 1992-1993 to 2000-2001, a total of nine individual women appeared on the roster. (Id. ¶¶ 30-35, 38-40.)

186. The most women appearing on the roster in any one year was five women in 2000-01. (TT 85:15-20; 403:1-5.)

---

[19]   Plaintiffs assert that the listing of "W. Wrestling" in plaintiffs' exhibit 49 demonstrates that UC Davis considered women's wrestling as a separate varsity sport. However, Warzecka testified that plaintiff's exhibit 49 was an internal EADA tracking document; because women were listed as varsity athletes in wrestling as a result of their inclusion on the men's team, they had a separate column in the document. (TT 1100:23-1101:25.) Under these facts, plaintiff's assertion is without merit.

187. Burch testified that a full women's team would consist of 12 to 15 women wrestlers.  He admitted he never had that many women wrestlers at UC Davis.  (TT 309:16-310:3.)

**B.  UC Davis' Description of Women's Participation in Wrestling**

188. When Mike Burch coached the UC Davis wrestling program from 1995 to 2001, the media guide for the team each year described women's wrestling as having "unofficial status."  (TT 239:4-9, 383:23-385:4; 2092:2-2095:5; DX UU-YY.)

189. The wrestling media guide for 1996-1997 included a heading "Women's Freestyle Wrestling," which referred to "[t]wo women who are members of the Davis Wrestling Club (a local freestyle wrestling club) [that] have spent time training with the Aggies."  (DX UU, at MAN0184.)  This alluded to the participation of Johnston and Martin, women who were not undergraduate students at UC Davis at the time.  (See Johnston Dep. at 44:9-21.)

190. The 1997-1998 media guide featured a picture and informational paragraph relating to then freshman Reinis. However, it also provided: "At UC Davis, women's wrestling has an unofficial status, but women are encouraged to develop their skills."  (DX VV, at MAN0208.)

191. The 1998-1999 media guide featured the pictures and personal statistics of freshmen Nancy Chiang ("Chiang"), plaintiff Ng, and sophomore Reinis.  Again, the media guide provided: "At UC Davis, women's wrestling has an unofficial status, but women are encouraged to develop their skills."  (DX WW, at MAN0246.)

192. Similarly, the 1999-2000 media guide featured pictures and information relating to sophomores Chiang and Ng and juniors Reinis and Abby Schwarzburg and similarly provided: "At UC Davis, women's wrestling has an unofficial status, but women are encouraged to develop their skills." (DX XX, at MAN0273.)

193. Finally, the 2000-2001 media guide stated: "At UC Davis, women's wrestling has an unofficial status, but women are encouraged to participate and develop their skills via the UC Davis Wrestling Club." (DX YY, at MAN0299

194. There was never a separate media guide for women's wrestling at UC Davis. (TT 384:5-8.)  Burch provided no information about women's wrestling results or other accomplishments for the media guide.  (TT 378:4-388:9.)

195. Based upon comments made to Gill-Fisher in 1999-2000, it appears that Schwartzburg and Reinis understood that they were not part of a separate women's varsity team.  While the students were filling out physical clearance paperwork in her office, Gill-Fisher asked if they wanted to form a women's wrestling club team; Schwartzburg and Reinis responded that they were happy working out with the men's team.  (TT 1672:12-1674:8.)

196. Plaintiff Ng recognized, at the time she was a student at UC Davis, that she was participating on a men's wrestling team.  Specifically, on September 26, 2000, she wrote in her student-athlete questionnaire that the most interesting thing she had done was "being on a guy's wrestling team."[20]  (PX 283, at

---

[20]   To the extent Ng testified that this statement referred only to her participation in high school wrestling, the court finds such testimony lacks credibility.

39.)  The next year, on the same form, she wrote that if she could change anything about wrestling it would be "having a women's team."  (PX 283, at 50.)  Ng testified that she hoped a women's team would "be developed some day at UC Davis."  (TT 527:13-19.)

### C.   Plaintiffs' Participation in Wrestling at UC Davis

197. Plaintiff Ng was on the roster for the intercollegiate wrestling program in academic years 1998-1999 and 1999-2000. (Pretrial Order ¶ 38.)  Ng also practiced with the intercollegiate wrestling program during Fall 2000.  (Id.)

198. Ng completed NCAA and UC Davis eligibility requirements and, in exchange for payment, was provided with a UC Davis duffel bag that contained a t-shirt, a sweatshirt, and a beanie.  (TT 477:19-478:13; 485:17-23; 513:20-25.)

199. Burch did not require Ng to compete for a place on the team in 1998-1999 and 1999-2000.  (TT 477:19-478:18; 480:7-12.) Indeed, unlike every other intercollegiate athletic coach that testified at trial, Burch did not make cuts to his team.  (TT 452:18-454:11.)

200. Ng was also not required to compete or try-out for the team in Fall 2000.  (TT 480:12-15.)

201. Ng was removed from the roster and cut from the program in October 2000.  She was placed back on the roster in May 2001. (Pretrial Order ¶ 38.)

202. In the Fall 2001, Ng came to wrestling practices until she and others were cut by then head coach Lenny Zalesky ("Zalesky") in October 2001.  (Id.)

41

203. During the periods of time that Ng was on the roster, and during the time she attended practices in the Fall 2001, she was entitled to all of the benefits of varsity status, including lockers, training, academic support, laundry, access to the varsity weight room, and coaching.  (Id.; TT 485:4-16.)

204. Despite being on the wrestling roster for three years, Ng never competed in a PAC-10 dual meet.  (TT 514:1-23; Pretrial Order ¶ 38.)

205. Ng did not compete in any of the Aggie Opens because there were no competitors in her weight class.  (TT 514:1-24.)

206. Rather, Ng competed in only one event during her years at UC Davis, the National Girls and Women's Wrestling Tournament in Michigan, which was open to elementary school level students through college students.  (TT 506:16-507:1-15; 513:5-19; 514:1-9.)  She did not wear a UC Davis singlet in that event, nor did she compete on behalf of UC Davis.  (TT 513:5-19; 514:7-24; 520:19-20.)

207. Plaintiff Mansourian practiced with the intercollegiate wrestling program during Fall 2000.  (Pretrial Order ¶ 39.)

208. Masourian completed NCAA and UC Davis eligibility requirements and, in exchange for payment, was provided with a UC Davis duffel bag that contained wrestling shoes, a sweatshirt, and a beanie.  (TT 280:12-18; 90:7-24; 157:18-24.)

209. Mansourian was not required to compete or try-out for the team in Fall 2000.  (TT 143:21-23.)

210. She was removed from the roster and cut from the program in October 2000.  She was placed back on the roster in May 2001.  (Pretrial Order ¶ 39.)

211. Mansourian attended practices in Fall 2001 until October 2001. (Id.)

212. During the periods of time that Mansourian practiced and was on the roster, she was entitled to all of the benefits of varsity status, including lockers, training, academic support, laundry, access to the varsity weight room, and coaching. (Id.; TT 93:25-94:7.)

213. During her four years at UC Davis, Mansourian's only competition was in the Aggie Open in January 2001, but she did not wear a UC Davis singlet. (TT 158:5-159:8.)

214. During the time Michael Burch coached the wrestling team, women generally wrestled against other women using freestyle rules. These rules differ from the collegiate rules used by men. (Pretrial Order ¶ 41.)

215. While at UC Davis, plaintiffs Ng and Mansourian wrestled only against women and used freestyle rules.[21] (Id.)

216. Plaintiff Mancuso practiced with the intercollegiate wrestling program during Fall 2001 until she and others were cut from the varsity wrestling roster in October 2001. (Pretrial Order ¶ 40.)

---

[21] Plaintiff Mansourian testified that she decided to attend UC Davis because she wanted to wrestle. She testified that Johnston was her idol, and she knew Johnston had wrestled at Davis. (TT 62:12-23.) However, as set forth above, Johnston admitted that for four of her five years at UC Davis, she was an "unofficial member" of the men's intercollegiate wrestling program. Further, she also testified that during her freshman year, she not only practiced with men, but expected, was willing, and, in fact, did compete against men in open tournaments.

217. Mancuso was entitled to all of the benefits of varsity status, including lockers, training, academic support, laundry, and coaching until October 31, 2001.  (Id.)

218. Mancuso never competed in wrestling during her years at UC Davis.  (TT 585:16-586:19.)

219. The UC Davis men's wrestling program competed in the PAC-10.  (TT 361:6-8.)  No PAC-10 school had a women's wrestling team during Burch's tenure as wrestling coach at UC Davis.  (TT 383:2-4.)

220. Burch never had any of the UC Davis women wrestlers compete in a PAC-10 dual meet.  He testified that there were no women wrestlers in any PAC-10 varsity dual meet lineups.  (TT 382:3-11.)

221. Burch testified that 6 of the 10 PAC-10 teams had women on the team during the time he was the coach.  (TT 2469:24-2470:9.)  However, he admitted that none of the women wrestlers from UC Davis ever competed against women on those teams.[22]  (TT 2474:7-20.)

222. While Burch was coaching at UC Davis, no California four-year colleges had an all-women's intercollegiate wrestling team.  (TT 397:7-17.)

223. Although Burch was aware that Lee Allen coached a wrestling club in the Bay Area at Menlo College, he never set up a dual meet between Menlo College and the women wrestlers on the UC Davis wrestling team.  Burch only spoke to Allen about

_____

[22]    In Burch's six years of coaching UC Davis wrestling, he only once took a woman wrestler, Reinis, to possibly compete in a PAC-10 dual meet at Portland State against another woman; but, Reinis ultimately did not compete.  (TT 381:7-382:2.)

44

arranging possible open freestyle competitions.  (TT 398:21-399:20.)

224. Burch testified that there were a number of specific club events and open tournaments he could have scheduled for women wrestlers; however, the UC Davis women wrestlers only attended 4 of those events:  the Aggie Open, the California State University Bakersfield Open, a freestyle state tournament, and nationals in Las Vegas.  (TT 2471:19-2472:8; 2479:2-20.)  The women wrestlers had to pay their own way to those events.  (TT 2480:3-7.)

225. Unlike every other coach of a women's varsity athletic team that testified at trial, Burch did not have a regular schedule of competition for women wrestlers.  (See TT 1473:7-21; 1489:18-1491:17; 1556:5-1557:5; 2254:25-2255:6; 2260:9-11.)

226. Although Burch testified women wrestlers represented UC Davis at such open meets, most of the women did not wear UC Davis uniforms at those events.  (TT 2479:25-2480:2; 2480:22-2481:4.)

227. None of the plaintiffs ever wrestled in a UC Davis wrestling singlet.  (TT 2480:22-2481:4.)

**D.   The Status of Women's Varsity Wrestling at UC Davis**

228. There was never a women's intercollegiate or "varsity" wrestling team at UC Davis.

229. Rather, based upon the above facts, women only had "unofficial status" on the men's intercollegiate wrestling team at UC Davis.

230. Plaintiffs received all the benefits of varsity status as a result of their "unofficial status" on the men's intercollegiate team.

231. However, as set forth *infra*, once UC Davis required the wrestling team to administer cuts to comply with a roster cap on men's varsity sports, plaintiffs were cut from the men's team.

232. Plaintiffs were not cut from the men's team because of their sex. Rather, plaintiffs were cut, first by Burch and then by Zalesky, because, like the other male student-athletes that did not make the roster, they could not compete at the Division I, Pac-10 level in intercollegiate men's wrestling.

### E.   Michael Burch

233. In 1995, UC Davis hired Burch as a wrestling coach. (Pretrial Order ¶ 27.)

234. Burch was employed at UC Davis from 1995 to 2001 as the Head Coach of the UC Davis men's varsity wrestling program and as a lecturer in religious studies and exercise biology. (TT 239:4-9; 252:4-5.)

235. The court finds the majority of Burch's testimony wholly lacking in credibility. Indeed, the court finds that many of the underlying circumstances that gave rise to this litigation were a result of Burch's misrepresentations to plaintiffs.

236. Despite plaintiffs' belief to the contrary, Burch was not an ardent supporter of women's participation in intercollegiate competitive wrestling.[23]

---

[23]   The court notes that this finding is not equivalent to a finding that Burch was not open to or encouraging of female participation in wrestling generally. However, the undisputed evidence demonstrates that Burch made virtually no efforts to establish a separate women's varsity team or even provide women wrestlers with adequate intercollegiate competitive opportunities until after such efforts could be personally beneficial to him.

a.   As set forth above, Burch testified that 6 of the 10 PAC-10 teams had women on the team during the time he was a coach; however, no UC Davis female wrestler ever competed against any of these women.

b.   While Menlo College had a women's wrestling club and a coach known for his support of women's wrestling opportunities, Burch never set up a dual meet between the Menlo College club and the UC Davis women wrestlers.

c.   While Burch testified that there were a number of events and open tournaments he could have scheduled, the women wrestlers at UC Davis competed in only a handful of events over the period when Burch was the head coach of the men's varsity wresting program.   Indeed, in the over two full years that she was an unofficial member of the men's team, Ng competed in only one event, unaccompanied by Burch and not on behalf of UC Davis.

d.   Burch testified that he lacked "institutional support" for finding competition for women.   However, there was no evidence that (1) additional funding was necessary to schedule more competitions; (2) Burch requested such additional funding; or (3) Burch lacked the authority to reapportion his own budget to better pursue more competitive opportunities for women wrestlers.   Rather, Burch's claimed lack of "institutional support" is based purely on his vague conclusions that the "administration" did not support women wrestlers.

237. Burch did not begin advocating for the establishment of separate women's intercollegiate wrestling team until it became

47

tied to the prospect of his attaining full-time coaching status.[24]

a.   At the end of the winter quarter in 2000, Burch and Gill-Fisher discussed the prospects of Burch attaining full-time coaching status.  Gill-Fisher explained that per UC Davis' gender equity plan, the next head coaches to go full-time would be from women's intercollegiate teams.  In response, Burch suggested designating women's wrestling as a separate varsity team; Gill-Fisher pointed out that several other women's club sports were closer to meeting the requirements for an intercollegiate team.  (TT 1677:14-1679:5.)

b.   At the end of the meeting, Burch said he "didn't give an F-- about Title IX" before storming out and slamming the office door.  (TT 1677:14-1679:5.)[25]

c.   Burch never approached Warzecka regarding starting a women's team, needing funding for such a team, or whether he could create a competitive schedule for such a team.  (TT 1104:21-25.)

_____

[24]   As set forth *infra*, the first complaints and various public protests and meetings relating to wrestling, including women's varsity status, began in April 2001.

[25]   The court finds that Burch's testimony that he had "numerous conversations" on unspecified dates regarding women's wrestling is not credible.  (See TT 315:6-317:9.)

At an unspecified time, Burch left an unlabeled envelope containing a packet about women's wrestling for Gill-Fisher in her athletic department box without a note.  Gill-Fisher believed it had been misfiled and was intended for Burch so she placed it in his inbox.  Burch did not subsequently discuss the packet with Gill-Fisher.  (TT 318:23-319:7; 1679:6-1680:2; PX 206.)  This is not evidence of serious advocacy for women's wrestling by Burch or a lack of support for women's wrestling by Gill-Fisher.

d.   By contrast, when coaches Williams and Vochatzer saw there was sufficient interest and available intercollegiate competition in women's cross-country and women's indoor track & field, they took affirmative steps to work with their respective Athletic Directors to develop teams in those sports.  (TT 1511:1-1512:14; 1562:6-1565:22; 2045:18-2050:19.)

238. Moreover, Burch only attempted to award scholarship money to women wrestlers *after* he was notified in May 2001 that his contract would not be renewed.  (JX 68 (request in e-mail dated June 14, 2001); TT 445:10-15.)

a.   Before being notified of the non-renewal of his contract, but after being notified that the women wrestlers had been reinstated on the varsity roster, Burch submitted scholarship requests for the next year; none of the women wrestler's names were on this list.  (DX A5; TT 441:4-445:15.)

b.   UC Davis had a policy that outgoing coaches do not participate in grant decisions and the incoming coach determines who receives grant-in-aid awards.  (TT 2122:18-2124:25; JX 69.)

239. Burch manipulated the wrestling team to participate in public protests and to circulate petitions for his own interest. (TT 1456:19-1457:11.)

a.   Burch told the wrestling team that to save the wrestling team itself, they should join in public protests to return the women wrestlers to the roster.  (TT 1455:10-21.)

b.   In flyers distributed at a protest in May 2001, allegations were made that, in addition to being guilty of sex discrimination, the UC Davis athletic department also underfunded minor sports, such as wrestling, and mistreated coaches and staff

49

members, such as Burch.  (TT 745:20-749:8; PX 89; see TT

200:13-203:6; 541:10-542:8.)

c.    Petitions that circulated around campus called not

only for "reinstatement" of the women wrestlers on the varsity

team, but also that "all head coaching position be promoted to

full-time positions."  (PX 86.)

**F.    Events Related to Wrestling at UC Davis in 2000-2001**

240. In 2000, UC Davis implemented a roster management plan

to limit the size of its men's teams.  In Fall 2000, Warzecka

sent a letter to the coaches of all men's intercollegiate teams

advising them of the maximum size of their team roster.  (TT

2099:13-25; JX 44.)

241. On October 9, 2000, Warzecka gave Burch the roster cap

for wrestling.  Men's wrestling was initially given a roster cap

of 30 student-athletes, which would allow for three wrestlers in

each of the ten weight classes used in intercollegiate wrestling.

(TT 2100:1-2, 2102:19-2103:2; 2283:14-2284:2 (number of weight

classes); 407:24-408:23; JX 44.)  The roster cap number was

increased to 34 at Burch's request.  (TT 410:7-412:18;

2101:6-2102:18; JX 45.)

242. Warzecka did not care who Burch selected to fill the

allotted roster spots or what gender they were, so long as Burch

did not exceed the maximum roster size.  (TT 2100:6-15, 2103:3-9)

a.    Warzecka's testimony is consistent with the

testimony of every UC Davis intercollegiate coach, aside from

Burch, questioned at trial on this issue.  These coaches

testified that they had complete discretion to select who made

their teams; at no time did UC Davis athletic administrators tell

50

them who to recruit, sponsor, or place on the team.  (TT 1472:6-10; 1493:11-14; 1517:1-11; 1551:4-1553:10.)

b.    Further, Burch admitted that for his first five years he had the sole authority to choose which wrestlers were selected for the wrestling team.  (TT 414:6-22; 2080:16-2081:14.)

c.    As such, the court finds that Burch's testimony that Warzecka and/or Gill-Fisher "ordered" him not to allot any of the roster spots to women is not credible.  (See TT 415:2-24.)

d.    The court also accepts the credible testimony of Warzecka and Gill-Fisher that they never restricted a coach's ability, including Burch's ability, to recruit or sponsor a student-athlete, so long as rules relating to admission and sponsorship were otherwise followed.[26]  (TT 1668:25-1669:19; 2081:8-2081:1.)

243. Warzecka met with Burch in October 2000 to discuss the roster cap for the wrestling team.  Warzecka asked Burch what he was going to do with the women wrestlers.  Burch responded, "I don't give a damn about those women, they can't compete with anybody on the men's roster."  (TT 1087:17-1088:3.)

244. Warzecka's immediate response was to suggest that Burch form a club sport (1) to give the women an opportunity to participate and compete; and (2) to promote and market women's wrestling.  (TT 1088:19-23.)

245. Burch did not suggest implementing a separate roster cap for women wrestlers.  (TT 2104:7-2105:5.)

---

[26]    Indeed, Gill Fisher was aware that Burch recruited and sponsored Samantha Reinis, a female wrestler, and had no objection.  (TT 1669:6-19.)

246. Burch filled the 34 roster spots with male students. His final roster included a cover memorandum stating that final cuts had been made and the women were being moved to club status. (TT 324:24-325:12; JX 46.)

247. Burch did not tell plaintiffs Mansourian and Ng that he had a limited number of roster spots when he falsely informed them that Warzecka had ordered them off the roster.  (TT 423:3-424:6.)

248. After removing them from the 2000-01 roster, Burch let the women wrestlers continue to attend practices in Fall 2000, with access to the weight room and training services.  (TT 424:7-425:6.)

249. This situation did not come to Gill-Fisher and Warzecka's attention until January 2001 when Mansourian injured her neck and sought training services, which was a significant insurance concern for UC Davis.  (TT 167:9-169:25; 2106:14-2107:25.)

250. Mansourian received training services before being sent to the emergency room.  (TT 168:25-169:17.)

251. Following Mansourian's injury, Warzecka met with Mansourian and Ng in January 2001.  Warzecka met with them to explain that, because Burch had not included them on the roster, they were not covered by the intercollegiate athletics insurance policy and that they could move to club status to use the club sports insurance policy.

   a.   Warzecka's concern about liability was based on his understanding and experience that, if an athlete was not covered by the University's insurance policy and was injured, the

school could be liable for the injuries.  (TT 2106:14-2111:23; 96:25-97:11; 490:14-18.)

      b.   To facilitate plaintiff's continued participation in wrestling, Warzecka made an exception to standard University practice by agreeing to (1) allow Mansourian and Ng to use taping and icing services; and (2) waive the minimum number of students required to form a club team.  (TT 2106:14-2111:23; JX 51.)

252. In that meeting, Warzecka also expressed his concern that having women on the men's wrestling team might lead to NCAA classification of the team as a mixed-gender team.  He was not clear how Division I rules and regulations would apply to a mixed-gender team, but later learned that the wrestling team could have been declared a mixed-gender team and continued to compete at the Division I level.  (TT 2108:9-2109:4; see also TT 96:18-97:15.)

253. Warzecka invited Mansourian and Ng to see him if they had any problems.  (TT 2106:14-2111:23.)

254. The court finds that Warzecka was not hostile to Mansourian or Ng at this meeting.

255. After the January meeting, Warzecka e-mailed Burch to inform him about the meeting with Mansourian and Ng.  The e-mail stated that UC Davis would work towards forming the women's club team, and that Mansourian and Ng would be allowed to continue practicing with Burch, to use the weight room, and to use training services for taping and icing.  (JX 51.)

      a.   Warzecka expected that Burch would help form the club by marketing and promoting it.  (TT 2111:8-2113:7.)

b.   Burch did not reply to the e-mail. (TT 427:11-429:10.)

256. No evidence was presented that Mansourian, Ng, or Burch made any complaints about the wrestling situation from January 2001 through the end of April 2001.  Neither plaintiff Mansourian, nor plaintiff Ng, nor any other woman wrestler filed a Title IX grievance against the athletic department prior to April 2001.  (TT 2337:20-2338:3.)

257. On April 24, 2001, Mansourian and Ng filed a complaint with the OCR regarding their allegedly improper removal from the wrestling team.  (PX 83; Pretrial Order ¶ 42.)  Ng filed a supplemental OCR complaint dated May 14, 2001.  (PX 97.)

a.   Plaintiffs based their complaint almost entirely on the erroneous information that had been given to them by Burch.  (TT 161:24-163:14; 528:9-529:5.)

b.   Plaintiffs Mansourian and Ng admitted that they *were not concerned about the athletic program as a whole, just their ability to wrestle*.[27]  (TT 180:22-181:1; 534:23-535:6.)

258. On or about April 30, 2001, defendants were notified of the OCR complaint when Mansourian taped a memorandum to Gill-Fisher or Warzecka's office door.  (TT 124:4-12.)

a.   The memo stated that Ng, Reinis, and Mansourian had filed an OCR complaint because "the administration" had

---

[27]   The court notes that plaintiffs' failure to bring any complaints about the athletic program as a whole is not a bar to their ability to pursue their claims for money damages, as the Ninth Circuit held that notice and an opportunity to cure is not required.  <u>Mansourian</u>, 602 F.3d at 968-69.

1   removed them from the wrestling team.  (TT 178:24-180:21;

2   535:7-536:2; JX 53.)

3           b.   Ng, Reinis, and Mansourian requested reinstatement

4   to the wrestling team.  (TT 178:24-180:21; 535:7-536:2; JX 53.)

5       259. On May 1, 2001, Gill-Fisher removed the notice taped to

6   her door and showed it to Warzecka.  (TT 1688:8-1689:4; JX 53)

7       260. Franks and Shimek conducted an investigation into

8   plaintiffs' claims, and Shimek opened the lines of communication

9   with OCR regarding the complaint.  (TT 2371:11-2372:7; 2378:5-

10  2379:1.)

11      261. Shimek and Franks concluded that there had been a

12  misunderstanding regarding the women's status on the men's

13  wrestling team and decided an equitable resolution would be to

14  reinstate them to the team, as they had requested.  (TT

15  1225:22-1226:16; 2372:15-2373:18.)

16      262. Warzecka wrote Burch on May 9, 2001, asking him to

17  reinstate the women to the team.  (TT 2114:8-25; JX 55.)

18      263. Burch refused to reinstate the women, claiming that

19  because it was not his idea to remove the women from the roster

20  in Fall 2000, he should not be the one to reinstate the women.

21  (TT 431:13-432:18; 2115:1-14; PX 94.)

22      264. Accordingly, in order to avoid putting the women

23  student-athletes in the middle of a dispute between Burch and

24  Warzecka, Franks reinstated them himself on May 10, 2001.  (TT

25  1225:22-1226:10; JX 56.)

26      265. As a result, within ten days of receiving notice of the

27  complaint requesting reinstatement, defendants reinstated the

28

women to the men's varsity wrestling roster.  (TT 1225:22-1227:2; see TT 181:14-182:25; 536:6-22; JX 56.)

      a.   Reinstatement was not illusory; although regular season competition for wrestling was over in May 2001, plaintiffs could still attend practices, train, and use the weight room. (TT 1689:16-1690:18.)

      b.   Reinstatement returned Mansourian and Ng to the position they had before Burch cut them from the team – eligible to compete for a spot on the team.  (TT 2372:15-2373:18; JX 55.)

266. Despite having requested reinstatement, on or about May 11, 2001, Mansourian and Ng responded by stating they could not accept reinstatement until they conferred with their attorney. (JX 57.)

267. Franks responded that he understood and respected their intention to discuss the matter with others before deciding; he also offered to meet with Mansourian and Ng if they thought it would be helpful.  (TT 184:15-25; JX 57.)

268. On May 16, 2001, Franks met with Ng and Mansourian. Franks agreed to look into issues raised by plaintiffs, including (1) whether UC Davis would establish a separate roster cap for women wrestlers; (2) whether UC Davis would waive the minimum number of students required for creation of a women's wrestling club sport team; and (3) whether the club team could practice at the same time as the intercollegiate team.  (TT 1241:2-1242:19; see TT 185:11-13; 537:8-14; 1245:20-1246:2.)

269. Franks consulted with Warzecka, Shimek, and Gill-Fisher, who, in turn, consulted with various outside experts.  (TT 1242:22-1243:3.)  Specifically, UC Davis consulted

Title IX attorneys Janet Justus and Janet Judge regarding whether the campus should create a separate roster for women wrestlers. (TT 1691:25-1693:19.)  Based on their advice, UC Davis decided not to create a separate roster on the men's varsity team for women wrestlers.  (TT 1242:22-1244:13.)

270. Franks provided a response to Mansourian and Ng on May 17, 2001.  (TT 1241:24-1244:13, 1245:20-1246: 17; JX 58.)

a.   Franks understood that plaintiffs did not want to have to compete against men for the limited number of spots on the men's wrestling team, but believed that allowing them to be on an intercollegiate team solely because of their gender and without having the requisite skills would violate the law.  (TT 1181:11-25.)

b.   Franks also believed that creating a separate cap for women wrestlers would be unfair to other students who also hoped to be on the wrestling team or any other intercollegiate team.  (TT 1244:15-1245:19 ("There's a global perspective here that's very important.  I had two to four women who had an issue. Had I done what they recommended, I would have had 24,000 reasons not to do that because we would have bypassed a process by which we establish teams or permitted people separately or independently somehow to make a team without whatever the normal competitive process was.").)

c.   However, the administration agreed to waive the minimum number of participants necessary to form a club sport team because plaintiffs did not believe they would be able to find ten students who were interested in forming a club team. (TT 1241:24-1244:13; 1246:11-17; JX 58.)

    d.    The administration also informed plaintiffs
Mansourian and Ng that it would allow a wrestling club team to
practice at the same time as the intercollegiate wrestling team.
(TT 1245:20-1246:10; JX 58.)

271. Mansourian and Ng were not willing to accept
reinstatement; they wanted a contract guaranteeing them a spot on
the wrestling team the next year.  (TT 538:21-540:12; PX 105.)

272. On May 31, 2001, the OCR sent a letter addressed to
Chancellor Vanderhoef, with attention to Shimek, indicating that
OCR had closed the complaint regarding the wrestling team.  (TT
2375:11-2377:1; JX 61.)

273. In October 2001, OCR confirmed the terms of a Voluntary
Resolution Plan ("VRP"), providing that women wrestlers would
have the opportunity to compete for roster positions and that UC
Davis would support any efforts to form a wrestling club that
would include any interested women.  (TT 2384:17-2387:23; DX CC.)

    a.    UC Davis relied on the VRP in their handling of
the women wrestler's complaints.  (TT 2125:12-2127:16;
2171:8-2172:6; 2173:8-9; see TT 1723:21-1725:1; DX AA.)

    b.    OCR did not request or require that UC Davis
establish a separate women's wrestling team or have a women-only
try-out to make the team.  (TT 2387:24-2388:3.)

## 1.    Student Protests and Meetings

274. In May 2001, Michael Maben, chosen as captain of the
wrestling team by Burch, organized the "Operation Mayhem" protest
at the Aggie Auction, the biggest fundraiser of the year for UC
Davis intercollegiate athletics.  Wrestlers snuck into the
auction, took off their formal clothes to reveal wrestling

singlets, carried signs, and distributed flyers.  The flyers
alleged that the athletic program engaged in sexual
discrimination, misappropriated student funds, underfunded minor
sports, and *mistreated coaches* and staff.  (TT 739:10-20,
745:20-749:8; PX 89; <u>see</u> TT 200:13-203:6; 541:10-542:8.)

275. Plaintiffs' complaints regarding wrestling were also
discussed by the Associated Students of UC Davis ("ASUCD").

276. Mansourian and Ng accused Warzecka and Gill-Fisher of
acting hostilely towards them at ASUCD meetings, but neither
Mansourian nor Ng supported their allegation with any specific
comments made or conduct by Warzecka or Gill-Fisher.  (TT
171:8-9; 499:12-501:7.)

a.   Indeed, Mansourian cannot remember how many people
were at the meeting, how big the room was, or where she stood in
relation to Gill-Fisher when the allegedly "hostile" comments
were made.  (TT 170:20-171:20.)

b.   Similarly, Ng testified that she "just got the
sense" Gill-Fisher wasn't going to support the women wrestlers.
(TT 542:14-16.)

277. As such, based upon the evidence submitted, the court
cannot make a finding that Warzecka or Gill-Fisher were "hostile"
to plaintiffs at ASUCD public meetings.

278. Rather, there is evidence that both Gill-Fisher and
Warzecka were unfairly targeted at the ASUCD meetings.

a.   Based upon Burch's misrepresentations to
plaintiffs, Warzecka and Gill-Fisher were erroneously blamed for
removing the women wrestlers from the 2000-2001 roster.  (<u>See</u> TT
742:1-743:6.)

b.   Indeed, at one of the meetings, Burch accused Gill-Fisher of removing women wrestlers from the team based on a roster he presented.   Burch's accusation is not supported by the roster itself.   The roster is a participation list that sets forth which wrestlers competed in an NCAA event in 1998-1999. Coaches prepare participation lists, and Gill-Fisher signs off on them in relation to her NCAA compliance duties.   Two women, Ng and Chiang, were crossed off the participation list in blue ink; Burch's signature is in blue ink.   Gill-Fisher initialed the participation list with an "ok" in black ink.   Burch's accusation against Gill-Fisher is not credible.   (TT 433:21-439:1; 1702:10-1705:19; JX 40.)

c.   At least one observer at one of the ASUCD meeting described it as "vile" and that "there was nothing positive to be had out of it."   Specifically, the witness observed that vile things were said about Gill-Fisher during the meeting; Gill-Fisher was accused of not supporting female student-athletes. (TT 1567:6-1568:7.)

**2.   Involvement of Assemblywoman Thomson**

279. Also in May 2001, Burch and some of the women wrestlers met with State Assemblywoman Helen Thomson.   (TT 432:19-433:20.)

280. Thomson wrote to Chancellor Vanderhoef on behalf of the women wrestlers, but did not receive an immediate response because Vanderhoef was out of town at the time.   As a result, Thomson threatened to withhold state funding for a planned UC Davis laboratory building.   (TT 1334:16-1337:12; JX 54; JX 59.)

281. A response was eventually sent by Provost Gray while Vanderhoef was still away from campus. (TT 1337:15-1338:19; JX 54; JX 59.)

282. Upon his return, Vanderhoef personally communicated with Thomson in order to address her concerns about the treatment of women in the UC Davis wrestling program. (TT 1338:22-1342:19; JX 65-66.)  Thomson withdrew her threat to withhold funds for the laboratory building. (TT 1341:3-1342:13; JX 65-67.)

283. On June 7, 2001, Jennifer Alley, Executive Director of the National Association of Collegiate Women Athletic Administrators ("NACWAA"), e-mailed a number of Title IX experts affiliated with NACWAA, stating that Gill-Fisher was asking for help and support to aid UC Davis in responding to Thomson. (TT 1710:13-1714:12; JX 63.)

284. The next day, Dr. Donna Lopiano, plaintiffs' expert in this case, sent an e-mail directly to Gill-Fisher suggesting that, in order to lower the emotional level of the political controversy involving Thomson, UC Davis should issue a public statement that (1) it took such allegations seriously; (2) it would investigate them, including appointing a Blue Ribbon Commission; and (3) it would report back to Thomson. (TT 862:24-865:10; 1712:1-1713:18; JX 64.)

285. On June 8, 2001, Gill-Fisher and Sue Williams met Assemblywoman Thomson at her home to discuss the wrestling situation. (TT 1717:6-1720:25; 1528:15-20; DX X.)  That same day, Ms. Williams sent Thomson a copy of a letter a number of coaches had signed for publication in the Davis Enterprise

61

newspaper; the letter set forth the University's position and the problems of allowing non-team members to practice with varsity teams.  (TT 1523:7-1529:22.)

286. Thomson issued a press release stating that the Chancellor was now fully engaged in the women's wrestling situation.  (TT 1340:17-1341:8.)

287. On June 13, 2001, Vanderhoef offered, in writing, to appoint a Blue Ribbon Commission if Thomson so wished.  Thomson did not respond to this offer.  (TT 1342:4-1343:20; JX 66.)

### 3.    The "Wrestle-Off" Policy

288. Burch's career as the head wrestling coach ended in June 2001, and he was replaced by Lennie Zalesky.  (TT 445:10-15; 2271:20-25.)

289. During Fall 2001, plaintiffs Ng and Mansourian told Zalesky that they expected both a spot on the roster and scholarships, even though they knew that they could not defeat any of the male wrestlers in try-outs; they also threatened to bring litigation.  (TT 2274:23-2275:22.)

290. Even after Burch left UC Davis, he continued to communicate with plaintiffs.  In September 2001, he advised them to make UC Davis cut them because "that helps your case."  (TT 446:21-448:9.)

291. In October 2001, Zalesky conducted "wrestle-offs" between wrestlers of a similar weight class to determine who, based on skill, would get a position on the 30 person team.  (TT 2282:10-2283:22.)

a.   Zalesky had sole decision-making authority as to who would be placed on the men's intercollegiate wrestling roster.  (TT 2284:3-15; 2128:12-14.)

b.   The wrestle-offs were consistent with the terms of the VRP approved by OCR and with the approach followed by coaches of other intercollegiate teams at UC Davis.  (DX CC; TT 1469:13-1470:16; 1492:21-1494:1; 1515:8-1516:6;, 1551:15-1552:15; 2263:8-25; TT 2564:1-2570:15.)

292. In the wrestle-offs, Mancuso quickly pinned Ng; Ng was about 20 pounds lighter than Mancuso, but had no weight classes available at her size.  (TT 543:23-544:12 573:18-24; 2284:22-2286:24.)

293. Mancuso proceeded to wrestle-off against male wrestler Serokin who pinned her; Serokin was subsequently pinned by another male wrestler.  (TT 573:25-574:4; 2286:25-2287:16.)

294. Besides plaintiffs Ng and Mancuso, several males were also eliminated from the men's varsity wrestling roster as a result of the wrestle-off.  (TT 2287:17-2289:5; JX 50.)

295. Mansourian declined to participate in the wrestle-off. She wrote Zalesky that "intercollegiate wrestling is too much for right now," citing her work and class schedule.  (TT 216:13-218:15; 2290:1-2291:5; DX BB.)

296. Mansourian also indicated that she was interested in wrestling at the club level; she later completed the paperwork to form a wrestling club sport team.  (TT 216:13-218:15; 227:2-6; 2290:1-2291:5; DX BB, DD.)

297. However, Mansourian did not participate in club wrestling.  (TT 227:7-9.)

298. Mancuso and Ng also had the option to join the wrestling club sport team, as did male student-athletes who were cut from the men's varsity wrestling team, but neither Mancuso nor Ng chose to join the wrestling club. (TT 586:14-587:17; 2302:9-2303:16.)

   a.   Two of the male wrestlers who were cut from the intercollegiate team in Fall 2001 joined the wrestling club sport team and were later selected for membership on the intercollegiate team. (TT 2303:9-2305:23.)

299. After October 2001, plaintiffs Ng, Mansourian, and Mancuso did not wrestle with the men's intercollegiate wrestling program again. (Pretrial Order ¶ 43.)

300. Zalesky invited women wrestlers to the January 2002 Aggie Open by posting the event flyer on the UC Davis website and sending it to the coaches of the Menlo College and Lassen Community College women's wrestling teams. He also called the coach at Menlo College; he learned that the Menlo College team would be in Oregon at the time of the Aggie Open. Zalesky expected women to wrestle in the Aggie Open and ordered medals for the women's division. (TT 2294:19-2301:5.)

   a.   In an e-mail to Burch, with copy to Vanderhoef, Franks, Gill-Fisher and wrestling supervisor Larry Swanson, Mancuso criticized UC Davis for not publicizing the Aggie Open, though she admitted she did not know what efforts Zalesky had made to publicize the event. (PX 151; TT 576:22-584:7.)

   b.   On behalf of the four UC Davis employees copied on the e-mail, Zalesky responded to Mancuso and explained the efforts he made to publicize the event. (TT 2294:19-2301:5.)

64

c.   Mancuso responded to Swanson and Vanderhoef, stating that they should correspond directly with her and not have Zalesky respond on their behalf.  (TT 576:22-584:7.)

d.   As late as January 2002, Burch was still providing Mancuso advice regarding the controversy over women's wrestling at UC Davis, and suggesting that Mancuso contact Helen Thomson again.  (TT 577:4-578:16; PX 151.)

**G.   Availability of Intercollegiate Competition and Interest in Women's Wrestling between 1998 and 2005**

301. Between 1995 and 2001, no four-year California colleges had an all-women's intercollegiate wrestling team.  (TT 397:7-17.)

302. Menlo College elevated their women's wrestling club to varsity status in approximately Fall 2001.  (TT 397:14-17.)

303. Lee Allen, the coach of the women's wrestling club and later intercollegiate wrestling team at Menlo College, testified that he had no knowledge of any other California University having a women's wrestling club program except California State University Bakersfield.[28]  (Allen Dep. at 66:9-12.)

304. Kent Bailo, Executive Director of the United States Girls' Wrestling Association testified that he knew of only four to six official varsity level women's wrestling programs at the college level.  These included two institutions in California, one of which subsequently ended the program, and institutions in

---

[28]   San Jose State University began a women's club in 2006. (Redman Dep. at 77:21-25.)

Oregon, Missouri, Kentucky, and Oklahoma.[29]  (Bailo Dep. at
40:18-41-20.)  Bailo did not distinguish between two-year and
four-year institutions or between NCAA divisions.  (Id.)
Further, it is unclear whether these teams were in existence in
the 2000-2001 or 2001-2002 school years.

305. Despite assertions that women were participating on a
handful of PAC-10 teams, there were no women wrestlers in any
PAC-10 varsity dual meet lineups.  (TT 382:3-11.)

306. Rather, women's wrestling competition consisted only of
open tournaments, which allow anyone to compete.  (TT 271:20-22;
366:22-25; 2475:15-20.)

307. The only open tournaments identified by Burch were the
Aggie open, a tournament with California State University
Bakersfield, the Sunkist Open, a tournament in the Bay Area, a
tournament in Michigan, a tournament in Arizona, a tournament in
Las Vegas, and a tournament in San Diego.  (TT 2471:22-2472:4;
2479:15-20.)

308. Competition that consists solely of one open tournament
per year does not constitute legitimate *intercollegiate*
competition.  (TT 1863:8-1864:18.)

309. No proposal for elevation of women's wrestling to
intercollegiate status was ever submitted to the athletic
department.  (TT 705:10-12; 1656:19; 1734:12-14; 2159:1-3.)

310. Even plaintiffs did not believe they would be able to
find ten students who were interested in forming a club team; as

---

[29]     He also noted that women's programs existed at one
time, but were eliminated at institutions in Minnesota, Oklahoma,
and Kansas.  (Bailo Dep. at 41:4-20.)

such, they requested, and the administration agreed, to waive the minimum number of participants necessary to form a club sport team.  (TT 1241:24-1244:13; 1691:25-1694:3; JX 58.)

311. There is no evidence that any female student, including plaintiffs, ever participated in the wrestling club at UC Davis in the years relevant to this litigation.[30]  (See TT 227:7-9; 586:14-587:17.)

312. As of October 2000, Warzecka had reviewed participation rates in women's athletics in high school, which UC Davis received from the California Interscholastic Federation.  (TT 1104:3-7.)  He testified that at the time, more female athletes were participating on high school baseball teams than were wrestling in high school.  (TT 1106:2-6.)

313. During the relevant time period, the NCAA did not recognize women's wrestling as a sport or as an emerging sport. (See Redman Dep. at 162:12-13; TT 1106:20.)

/////
/////
/////
/////
/////
/////
/////
/////

---

[30]   Redman testified that he was informed that approximately eight to ten girls practiced regularly with the club team in 2006 and approximately eleven girls practiced regularly with the club team in 2007.  (Redman Dep. at 151:22-152:11.)  He had no personal knowledge of this information.

67

**IV.   Individual Defendants[31]**

    **A.   Pam Gill-Fisher**

        **1.   Employment and Duties at UC Davis**

    314. Defendant Pam Gill-Fisher ("Gill-Fisher") was a coach or administrator in the UC Davis Athletic Department from 1973 to 2006. (Pretrial Order ¶ 13.)

        a.   UC Davis hired Gill-Fisher as a student in 1968, and then as a full-time career employee in 1973. (TT 1437:19-23.)

        b.   From 1973 to 2006, she held various positions in athletic administration. (TT 1591:4-1593:4.)

        c.   From 1985 to 2003, she was an Associate Athletic Director and Supervisor of Physical Education. (TT 1591:15-22.)

        d.   Gill-Fisher became a Senior Associate Athletic Director in 2003. (Pretrial Order ¶ 13; TT 1592:25-1593:4.)

        e.   Since the 1970s, Gill-Fisher was an active member in the National Association of Collegiate Women Athletics Administrators ("NACWAA"), serving on the board of directors and as president in 2003-04. (TT 1605:24-1607:16.)

    315. Gill-Fisher's duties as an Associate Athletic Director and Senior Associate Athletic Director included supervising eight sports, coordinating sports medicine, overseeing the Compliance Office regarding NCAA and UC Davis athletic eligibility, and overseeing academic advising. (TT 1593:5-19.)

---

[31]   The court notes that some Findings of Fact set forth herein are repetitive of those set forth, *supra*. However, the court reiterates and expounds upon the relevant Findings of Fact where it clarifies each individual defendant's role in the claims asserted against them.

1    a.   Men's wrestling was not among the eight sports she
2    supervised.  (TT 1594:2-3.)

3    b.   Gill-Fisher's compliance role as Associate
4    Athletic Director involved NCAA and UC Davis athletic eligibility
5    compliance.  (TT 1648:17-1649:8.)

6    c.   Gill-Fisher provided NCAA and University
7    compliance training to UC Davis coaches through monthly meetings.
8    (TT 1595:7-22.)

9    d.   Dennis Shimek, not Gill-Fisher, was the Title IX
10   Compliance Officer and met quarterly with coaches regarding Title
11   IX compliance issues.  (TT 1595:23-1596:9.)

12   316. Gill-Fisher served as the Senior Woman Administrator, a
13   position required by the NCAA, from 1991 until December 31, 2006.
14   (Pretrial Order ¶ 13.)

15   a.   The key duty of the Senior Woman Administrator was
16   serving on various NCAA committees.  (TT 1604:3-11, 1605:3-20.)

17   b.   The position of Senior Woman Administrator did not
18   give Gill-Fisher any additional authority or responsibility at UC
19   Davis regarding Title IX or gender equity issues.  (TT
20   1604:15-1605:2.)

21   317. Gill-Fisher was not responsible for Title IX compliance
22   at UC Davis.  She did not have the authority to dictate which
23   prong UC Davis used to comply with Title IX requirements
24   regarding accommodation of athletic interests for women.  (TT
25   1604:18-1605:2.)

26   a.   The campus and the Title IX Compliance Officer
27   were responsible for ensuring UC Davis complied with Title IX.
28   (TT 1649:4-8.)

69

   b.   Gill-Fisher did not have unilateral authority to change the scope of the athletic program to address issues of athletic participation opportunities.  (<u>See</u> TT 1621:19-23; 1638:10-19.)

318. Gill-Fisher's primary involvement in Title IX issues at UC Davis was to evaluate and report to the relevant decision makers; she also recommended actions that she believed the athletic department should take.

   a.   Her Title IX reports addressed both the "laundry list" of items related to the treatment of male and female athletes (i.e. equitable provision of coaching, training, and other services) and the equity of the intercollegiate participation opportunities available to male and female student-athletes.

319. Gill-Fisher used her reports to advocate for changes in the women's intercollegiate athletic program, including the expansion of women's intercollegiate athletic participation opportunities.  (<u>See, e.g.</u>, JX 17.)

320. Gill-Fisher served on the sub-committee that wrote the January 1972 report about women's athletics at UC Davis, which recommended that the campus should add women's gymnastics and badminton as intercollegiate sports.  (TT 1616:10-1621:10; JX 15.)

321. Upon request of the Vice Chancellor of Student Affairs, she chaired the UC Davis committee that wrote the campus' first Title IX Report in May 1976.  (TT 1613:24-1616:6; DX A.)

322. In July 1978, Gill-Fisher and Barbara Jahn wrote a Title IX review, which recommended, *inter alia*, that women's

cross-country be considered an intercollegiate sport for 1978. The report also pointed out the need for improvement in securing equality for women athletes in use of practice facilities and the lack of a full-time coach for women's gymnastics. (TT 1622:5-1623:12; JX 16.)

323. In 1989-1990, Gill-Fisher chaired the committee that prepared UC Davis' comprehensive Title IX report, which recommended establishing steps to increase women's participation opportunities. (JX 17, at 10-17; TT 636:19-640:8; 1630:9-1633:13.)

324. In March 1990, Gill-Fisher separately wrote a memo regarding Title IX issues that had arisen as the Title IX review committee report was being completed. Specifically, Gill-Fisher expressed concern over the addition of men's lacrosse and the size of the football team, which had a large squad size, a JV team, and a number of redshirts; she was concerned that the size of the football team was not justifiable. (DX B; TT 1636:24-1640:23.)

325. Around the same time as the comprehensive Title IX review, Gill-Fisher began preparing periodic Title IX reports at the request of the Title IX Compliance Officer, Shimek. (TT 1627:10-1630:5; 2343:17-2344:10; PX 8.)

a. The first such report was issued on June 23, 1989, and focused on "laundry list" items, such as coaching, facilities, and uniforms, and did not discuss compliance in the area of participation opportunities. (PX 8; TT 1629:2-1630:5.)

326. On June 27, 1991, Gill-Fisher submitted a Title IX review to then Athletic Director Jim Sochor, noting the

discrepancy in male and female participation rates and that no steps had been taken to establish steps to increase participation opportunities for women.  (JX 18; TT 1641:2-1644:5.)

327. On December 20, 1991, Gill-Fisher submitted an update regarding Title IX compliance from June to December 1991, noting that participation opportunities remained a problem.  (JX 19; TT 641:23-643:7.)

328. On June 5, 1992, Gill-Fisher prepared the next Title IX review, again noting that participation opportunities were a major concern.  She testified that her concern was based on an understanding that Cal-NOW was investigating Title IX compliance at the California State University system and that diligence to Title IX issues was needed because the economic situation would make it easy to ignore regulatory compliance otherwise.  (JX 21; TT 1644:6-1644:25.)

329. In November 1992, Gill-Fisher wrote a Title IX compliance memorandum to Athletic Director Keith Williams, warning of some backsliding on movement toward Title IX compliance.  (JX 22; TT 1646:2-1649:9.)

a.   In order to deal with participation ratios, the memorandum recommended, *inter alia*, eliminating all junior varsity teams, establishing roster caps for all sports, and adding women's crew and women's golf.  (Id.)

b.   Gill-Fisher also warned that UC Davis needed to implement a plan to address participation ratios or face an OCR complaint or potential lawsuit.  (Id.)

   c. Junior varsity football and men's junior varsity basketball were dropped following the recommendation from Gill-Fisher.  (JX 26; TT 649:11-651:12; 1638:10-14.)

  330. In December 1992, Gill-Fisher alerted then Vice Chancellor for Student Affairs, Bob Chason, to the participation ratio issue and identified potential solutions, including capping men's rosters and adding women's sports.  (JX 23; TT 1389:2-1389:25.)

  331. On May 27, 1993, Gill-Fisher wrote a strongly-worded Title IX report to athletic director Williams, expressing major concern over participation ratios.  (PX 25.)

   a. Gill-Fisher opined that the University was not providing women with participation opportunities as required by law.  (PX 25.)

   b. Gill-Fisher was concerned that football was mandated to have 180 participants but still had 250, while (1) there were 40 women on a national championship club water polo team, and (2) there was strong interest in forming an intercollegiate women's crew team.  (PX 25.)

   c. Gill-Fisher testified that she took a strong tone in the May 1993 report because she wanted to get Williams' attention.  (TT 1649:12-1650:8)

  332. In September 1994, after funding for additional women's intercollegiate athletic teams was approved, Gill-Fisher sent a memorandum to Shimek and Williams, thanking the campus administration for taking a step forward in Title IX compliance. However, she also recommended using roster caps for some men's sports that had significant numbers of participants beyond what

was needed to field a competitive team.  (TT 1651:20-1653:25; JX 26.)

333. Gill-Fisher opined that the addition of the three women's sports resulted in UC Davis' compliance with Prong Two of the three-part test.  (TT 1661:13-23.)

334. In December 1996, Gill-Fisher wrote Warzecka a memorandum advising that the addition of the three women's sports would help, but not completely solve, the overall participation discrepancy.  She recommended managing the size of the men's sports that may have had more participants than necessary for competition.  (TT 1661:24-1663:3; JX 35.)

a.   UC Davis subsequently adopted a roster management program, resulting in a vast improvement in the overall participation ratio.  (See JX 89.)

b.   She considered the improvement "a move in the right direction."  (TT 1663:5-1664:7.)

335. Gill-Fisher chaired the committee to add a new varsity women's sport in 2003-04.  She contacted sports clubs and intramurals to solicit proposals; advancing gender equity was a primary factor in the selection of teams.  (TT 1726:5-1727:17; JX 74.)

**2.   Involvement with Women Wrestlers**

336. Gill-Fisher had no personal bias or animus against the sport of wrestling or women's participation in intercollegiate wrestling.

a.   In her view, "there isn't anything a woman should be denied the opportunity to do."  (TT 1640:8-20; 1701:15-25.)

    b.   Johnston testified that when she was a student at UC Davis, she knew that Gill-Fisher was a big supporter of women's athletics.  Indeed, Gill Fisher asked Johnston to speak to some of her classes regarding Title IX and her experience as a female wrestler.  (Johnston Dep. at 50:1-11; TT 1656:24-1657:9.)

    c.   Johnston also testified that Gill-Fisher seemed supportive of women's wrestling.  (Johnston Dep. at 50:17-24.)

337. Gill-Fisher testified that in her opinion there was never a separate women's varsity wrestling team at UC Davis.  Her opinion was based on her understanding that there was never a separate roster, schedule, budget, or compliance meeting regarding women wrestlers.  (TT 1686:21-1687:4.)

    a.   Indeed, on one occasion Gill-Fisher asked Reinis and Schwarzberg if they wanted to form a women's wrestling team. (TT 1672:12-1674:8.)

    b.   In Gill-Fisher's opinion as an athletic administrator and an active woman in intercollegiate athletics, the best way to develop women's wrestling would have been to start a women's club team separate from the men's intercollegiate wrestling team.  (TT 1672:12-1674:8.)

338. The court finds that there is no credible evidence that Gill-Fisher acted in a hostile manner toward any woman wrestler.

    a.   In 1999-2000, the Compliance Coordinator informed Gill-Fisher that Reinis and Schwarzburg had been attending wrestling practice for at least six months without physical clearance, which meant that the two women were not covered by ICA insurance.  After Burch asserted that the women didn't need paperwork, Gill-Fisher went directly to Reinis and Schwarzberg

75

and asked them to complete the paperwork in her office, which they did.  (TT 394:16-397:1; 1669:20-1672:11.)  The court finds that this incident is not evidence that Gill-Fisher was hostile to women's wrestling; rather, it confirms she was doing her duty to oversee compliance with NCAA and UC Davis athletic eligibility policies.[32]

　　　　　b.　As set forth above, the court does not find that Gill-Fisher acted in a hostile manner toward plaintiffs at ASUCD meetings.

339. Gill-Fisher had no role in selecting the wrestling team roster for 2000-2001 or for any other time.  (TT 1680:15-1681:8.)

340. The claim that a women's varsity wrestling team had been cut came to Gill-Fisher's attention via an e-mail from the men's varsity wrestling team captain, Maben.  Gill-Fisher responded that UC Davis had never actually sponsored women's wrestling as a varsity sport.  She invited Maben to meet with her; he never did.  (TT 1686:2-15; PX 99.)

341. Prior to the taping of the OCR complaint on the door in April 2001, no woman wrestler had ever told Gill-Fisher that they believed she was responsible for removing them from the wrestling team.  (TT 1688:15-20.)

342. When the proposal of separate roster caps was made, she recommended that UC Davis seek the opinion of Title IX attorneys to determine whether separate men's and women's roster caps for the men's intercollegiate wrestling team was a good idea.  (TT 1691:25-1692:13.)

---

[32]　　The court does not find Burch's characterization of the event to be credible.

a.   As a layperson, Gill-Fisher was skeptical about the possibility of separate roster caps in wrestling because it could open all men's sports to separate women's roster caps.  (TT 1693:20-1694:3.)

b.   She did not believe the intent of Title IX was merely to "ramp up" the number of women participants in men's sports if the women had no realistic opportunities to compete. (TT 1694:8-15.)

343. Gill-Fisher was aware that OCR approved a process for conducting try-outs for the wrestling team.  (TT 1723:21-1725:1.)

344. She was also aware that Zalesky intended to select students for membership on the team based on a demonstration of the skills required to compete against PAC-10, Division I wrestling teams, the conference and division in which the UC Davis men's intercollegiate wrestling team competed.  This did not alarm Gill-Fisher, as she had used that same method for selecting team members when she was a coach.  (TT 1723:18-1725:22; DX AA.)

**B.   Greg Warzecka**

**1.   Employment and Duties at UC Davis**

345. Defendant Warzecka has been UC Davis's Athletic Director since 1995 and is responsible for the overall direction, leadership, and management of the intercollegiate athletic program.  (Pretrial Order ¶ 12.)

a.   Warzecka reviewed and verified UC Davis' EADA Reports.  (TT 995:21-996:4; 996:11-20; 1009:1-1016:13-17.)

b.   He also had significant involvement in decisions about adding or eliminating sports in the intercollegiate

1  athletic program.  (TT 981:11-23.)  However, these decisions were

2  always made collaboratively.  (<u>Id.</u>)

3          c.    He was also responsible for overseeing UC Davis

4  varsity team coaches and could reverse the decision of a coach if

5  he thought it was improper.  (TT 979:20-980:21; 981:7-10.)

6      346. At the inception of Warzecka's tenure as Athletic

7  Director, the athletic department was dealing with an unexpected

8  budget deficit of over $400,000; it took until 2000-2001 to

9  balance the budget and resolve the deficit.  (TT 2002:1-2006:7.)

10     347. When he arrived at UC Davis, Warzecka inherited the

11 responsibility of ensuring that the newly created women's water

12 polo, crew, and lacrosse teams were sufficiently established to

13 begin competing in 1996-1997.  Warzecka planned to fully fund the

14 three new sports before adding any more new teams, which included

15 bringing coaches of the three new women's team up to full-time

16 status.  (TT 2028:12-2029:8; 2032:11-2033:9; 2037:9-2045:17; JX

17 41, 43.)

18     348. When he started, Warzecka met with Shimek and reviewed

19 hundreds of documents to ascertain the status of gender equity

20 issues at UC Davis.  (TT 2012:5-2013:8.)  Warzecka and Shimek

21 agreed that the Title IX workgroup should be more active.  (TT

22 2023:1-2028:10; 2362:14-2364:5; PX 59.)

23     349. In December 1998, Warzecka received a letter from Linda

24 Joplin at Cal NOW regarding the women's athletic program at UC

25 Davis, to which he responded.  (TT 2033:10-2034:18; JX 41.)

26         a.    Warzecka reiterated the goal of getting to within

27 five percent of women's enrollment by 1999-2000.  (JX 41.)

28

b.   He explained that women's golf could not be added in 1998 because there was little competition in Division II and UC Davis already had women's gymnastics as its lone, allowable Division I sport.

c.   He also explained that while he gave thought to adding field hockey, UC Davis did not have a proper facility for field hockey or the ability to fund one at that time.[33]   (TT 2034:5-2036:22; JX 41.)

350.  In May 1999, Warzecka participated, as part of the Title IX workgroup, in creating a three year plan for equity in athletics.

a.   Per the EADA report for 1998-1999, the male to female participation ratio in athletics was within 7.2 percent of the male to female undergraduate ratio.  (JX 89.)  The stated goal was to reduce the ratio to 5 percent during the 1999-2000 school year; Warzecka set the 5 percent ratio as a goal based on legal interpretations and a consent decree.  (TT 1039:13-25; 2030:13-2031:11; see also TT 2361:15-2362:12.)

b.   UC Davis came within 1 percent of meeting that goal.  (JX 89.)

c.   The plan stated that athletics administrators would review whether it could add women's golf, field hockey, or an equestrian sport every two years.  (TT 2037:9-2042:6; JX 41.)

---

[33]   The court notes that the multi-use field, the funds for which plaintiffs complain should have been used to add women's sports, provided a field surface suitable for a field hockey team.  (TT 2152:12-16; 2168:8-2169:11.)  Moreover, as set forth below, the funds could not have been used to add new teams because they were not in the general operating budget.

351. In the context of the Title IX workgroup, Warzecka participated in updating the gender equity plan in 2001-2002. (JX 48; JX 49; TT 2055:19-2058:16.)

    a.    The updated plan kept the 5 percent goal and noted that it had not been achieved previously due to increases in the female undergraduate population.  (JX 49.)

    b.    Assuming the female undergraduate population did not rise further, UC Davis planned to reach the 5 percent goal by continued roster management, particularly for the larger teams in men's sports, and by adding another women's sport if necessary. (JX 49.)

352. Warzecka participated in drafting all of the remaining gender equity plans UC Davis had in place through December 2005. Although the format of the plans changed to match the NCAA template, the substance remained the same; the plan was to monitor the participation ratios, manage the size of the men's rosters, and periodically review whether to add new women's sports.  (TT 2059:5-2061:14; DX MM; DX PP.)

353. In addition to the three teams added at the start of his tenure, Warzecka oversaw the evolution of indoor track & field into a separate women's sport.

    a.    Women had been competing in indoor track & field events before Warzecka came to UC Davis, but the school had not declared indoor track & field as a separate sport from outdoor track & field.  (TT 2048:18-2049:3.)

    b.    At Vochatzer's request, Warzecka increased the budget for track & field so that the team could compete in more

80

indoor track & field competitions.  (TT 1565:2-22; 2048:11-2050:19.)

  c. In the 1998-1999 school year, UC Davis declared indoor track & field as a separate sport.  (TT 2049:23-2050:9.)

 354. Warzecka implemented a roster management program as part of his efforts to achieve gender equity; he did so based on his understanding that roster management was approved in the decision of <u>Neal v. California State University</u>, 198 F.3d 763 (9th Cir. 1999), and would help address the participation ratio. (TT 2064:20-2068:18; 2098:15-2099:12.)

 355. The review and planning Warzecka participated in with the Title IX workgroup led UC Davis to add the new women's golf team in 2004.

  a. Warzecka appointed Gill-Fisher to chair a committee to review the proposals.  (TT 2142:13-2143:10; 1726:7-1735:13; JX 80.)

  b. After receiving the committee's review, Warzecka recommended that golf be added as the next intercollegiate sport for women based on (1) golf's status as an NCAA and conference sport; (2) abundant intercollegiate competition; (3) popularity at the high school and junior college level; (4) UC Davis' receipt of numerous e-mail inquiries about the availability of women's golf; (5) campus support for a women's golf team; and (6) the availability of a local facility.  (TT 2160:1-2163:11; 2241:23-2244:17; JX 81.)

  c. The other sports that had applied for elevation to varsity status presented challenges that golf did not, such as

finding local competition or available facilities.  (TT 2134:23-2158:25; JX 80.)

d.   Further, Warzecka had promised in December 1998 that he would periodically review whether it was appropriate to add women's golf in response to an inquiry from the President of Cal-NOW.  (TT 2033:12-2034:25; 1656:4-13, 1731:1-1732:8; JX 22; JX 41.)

e.   UC Davis' gender equity plan also stated that the campus would review the potential for adding golf.  (TT 2037:9-2042:6; JX 41.)

f.   Warzecka's recommendation to elevate golf was not motivated by any sexually discriminatory motive; he recommended granting varsity status to a popular sport that both he and the campus had promised it would consider elevating.

356. The actions taken during Warzecka's tenure led to an expansion in the number of women's participation opportunities from 211 participation opportunities in 1995-96 to 401 in 2005-06.  The participation ratio improved from 20 percent in 1995-1996 to 5 percent in 2005-2006.  (JX 89.)

357. In Warzecka's opinion, UC Davis was in compliance with Title IX's equal accommodation requirement via Prong Two of the three-part test between 1995 and 2006.  (TT 2021:6-2022:5.)

a.   Warzecka did not believe the drop of over sixty participation opportunities in 1998-1999 and 2000-2001 took UC Davis out of Prong Two compliance.

b.   Warzecka approved of moving the JV teams to club status because he concluded the lack of competition was a

legitimate reason and he "felt it was the right thing to do."
(TT 2071:9-2074:4, 2076:21-2077:7.)

c.    Warzecka testified that the rest of the drop was
due to normal fluctuations in the size of some women's teams,
which rose again in 2001-2002 and 2002-2003.  (TT 2075:10-2076:2;
JX 89.)

### 2.    Involvement with Women Wrestlers

358. As part of the roster management program, Warzecka
allotted a limited number of roster spots to each men's
intercollegiate team; the wrestling team had a roster cap of 30,
which was increased to 34, for 2000-2001.  (TT 407:24-408:23;
410:7-412:18; 2099:14-2102:18; JX 44.)

359. Warzecka was aware that women had been practicing with
the wrestling team and had "unofficial status" on it.  (TT
2083:23-2089:2; 2090:11-14; 2092:20-2096:14; 2100:10-12; DX
UU-YY.)

360. Warzecka had no role in selecting the wrestling team
roster for 2000-2001, or any other time; Burch chose to fill the
roster for the 2000-2001 men's intercollegiate wrestling team
with only male students.  (TT 2105:8-2106:8; JX 46.)

361. When Burch left the women off the roster, Warzecka
suggested that Burch work with the women to form a club sport
team.  (TT 1087:17-1088:23; 2104:7-2105:5.)

362. Warzecka met with Mansourian and Ng, following
Mansourian's January 2001 throat injury to explain that (1) since
Burch had not included them on the roster, they were not covered
by intercollegiate athletics insurance policy; and (2) they could
move to club status to use the club sports insurance policy.  He

made an exception to policy to allow Mansourian and Ng to use taping and icing services and to waive the minimum number of students normally needed to form a club team. (TT 2106:14-2111:23; <u>see also</u> TT 96:14-99:13; 490:8-491:10; JX 51.)

363. The court does not find credible Mansourian and Ng's claim that Warzecka was hostile to them during the January 2001 meeting.

   a.   Mansourian and Ng misconstrued other aspects of the January meeting, such as Warzecka's discussion of liability insurance by claiming that Warzecka told them they were a "liability" and that he lied to them with regards to how NCAA rules applied to the mixed-gender team issue. (TT 96:25-96:15; 490:14-20; 491:3-6.)

   b.   Further, Warzecka's actions of allowing them to continue practicing with the wrestling team, waiving policies to give them access to the weight room and training services, and helping them form a club team by waiving minimum requirements are not consistent with Mansourian and Ng's claim that he was hostile to them in the January 2001 meeting.

364. After the January meeting, Warzecka e-mailed Burch to inform him about the meeting with Mansourian and Ng.  Burch did not reply to the e-mail. (TT 427:11-429:10; 2111:8-2113:4; JX 51.)

365. Warzecka did not hear anything about the women wrestlers until approximately April 30, 2001, when he received a memo notifying him that Mansourian and Ng had filed a complaint with the OCR regarding the wrestling team. (TT 2113:8-19; JX 53.)

84

366. He immediately met with Gill-Fisher and contacted Shimek and Franks.  (TT 2113:9-2114:6.)

367. Following an investigation to determine why the women believed the athletic department administration had removed them from the wrestling team, Warzecka promptly agreed with the decision to place them on the team roster for the remainder of the school year, as they had requested.  (TT 2114:8-25.)

368. Following the protest staged by several wrestlers at the 2001 Aggie Auction in May 2001, Warzecka tried to meet with members of the wrestling team.  However, they stood up when Warzecka walked in the room and refused to talk with him.  (TT 2117:25-2119:2.)

369. On June 14, 2001, after it was clear his contract would not be renewed and after he had submitted his initial request that included only male students, Burch submitted a request for athletic grants in aid for women wrestlers.  (TT 2122:18-2123:22; JX 68)  On June 26, 2001, Warzecka sent an e-mail to Burch explaining that UC Davis had a policy that outgoing coaches cannot offer scholarships.  (TT 2123:23-2124:22; JX 69.)

370. Warzecka hired Lenny Zalesky as the wrestling coach for 2001-2002, and like all other varsity coaches, Zalesky had full authority to choose the members of the team so long as he stayed within the roster cap.  (TT 2125:4-23; DX AA.)

371. Warzecka relied on the VRP approved by OCR and instructed his staff to ensure that try outs held by Zalesky in Fall 2001 were conducted in accord with the procedures approved by OCR.  (TT 2125:12-2127:16; 2171:8-2172:6; 2173:8-9.)

85

372. Warzecka did not attend the wrestling try-outs. Warzecka did not know whether women would try-out, but later learned that Mancuso may have tried out.  (TT 2128:9-2129:15.)

373. Warzecka did not have any contact with Mancuso other than a message she may have left for him.  She did not make any effort to go to Warzecka's office.  (TT 558:8-22, 564:14-565:11, 573:6-12.)

374. Mancuso copied Warzecka and other UC Davis employees on an email she sent to Burch regarding her perception that Aggie Open was not properly publicized in 2002.  Zalesky responded on behalf of the UC Davis recipients.  (TT 576:22-581:25; PX 151.)

**C.   Robert Franks**

**1.   Employment and Duties at UC Davis**

375. Defendant Robert Franks ("Franks") was the Associate Vice Chancellor for Student Affairs at UC Davis from 1994 to 2004 (with short stints as Acting Vice Chancellor at one point and Interim Vice Chancellor at another).  (Pretrial Order ¶ 11.)

a.   A number of service units reported directly to him, including Intercollegiate Athletics.  (Id.)

b.   Defendant Warzecka, as the UC Davis Athletic Director, reported directly to Franks.  (Id.)  Franks provided Warzecka with direction regarding the operation of the athletic department and could override Warzecka's decisions.  (TT 979:4-19.)

376. Franks reported to the Vice Chancellor for Student Affairs.  (See Sakaki Dep. at 11:2-12:20.)  The current Vice Chancellor for Student Affairs, Judy Sakaki, testified that if

anything were to go wrong within her area of responsibility, that would ultimately be her responsibility. (Sakaki Dep. at 50:1-4.)

377. Franks was the Associate Vice Chancellor for Student Affairs when the student body approved fee increases that would fund three additional women's varsity teams. (TT 1196:12-1197:9.) Franks approved Williams' recommendation to add women's water polo, lacrosse, and crew. (TT 1199:25-1200:8.)

378. Franks was aware that female athletic participation opportunities were not substantially proportionate to female undergraduate enrollment during the time period at issue in this case. (TT 1210:1-1211:8.)

    a. Franks found it difficult to achieve Prong One compliance because women's enrollment fluctuated from year to year. (TT 1210:1-1211:1.)

379. However, he did not direct Warzecka to eliminate opportunities for males because he understood the campus was compliant under Prong Two at all relevant times. (TT 1210:1-1212:9.)

    a. Moreover, he was "comforted" by the fact that over time, the differences in the proportionality disparity ratios were "shrinking." (TT 1211:18-1212:5.)

380. Franks approved the roster management program. Although reducing athletic opportunities was counter to UC Davis' philosophy, Franks realized it was necessary to reduce the size of a number of men's programs to comply with Title IX while dealing with resource constraints. (TT 1214:18-1216:1; JX 37.)

87

381. Limited resources[34] only made it possible to add one team, women's golf, in response to the proposals submitted in 2003.  Franks would have added every team that wanted intercollegiate status if there were resources to do so.  (TT 1216:2-19.)

382. As part of his job responsibilities to ensure gender equity in the athletic department, Franks reviewed UC Davis' EADA reports and equity plans.  (TT 1141:2-10; 1142:15-17.)

## 2.   Involvement with Women Wrestlers

383. The first time Franks became aware of any issue regarding wrestling was May 2, 2001, when he received a copy of a notice dated April 30, 2001.  The notice stated that several women wrestlers had filed an OCR complaint seeking reinstatement on the wrestling team.  (TT 1222:6-1223:21; JX 53.)

384. Franks never told Burch that he could not include women on the wrestling team roster.  (TT 1221:12-20.)

385. Once on notice, Franks immediately discussed the OCR complaint with Shimek and Warzecka.  (TT 1225:7-15.)  Franks agreed with Shimek's suggestion that the women wrestlers be placed back on the roster of the men's wrestling team for the remainder of the 2000-2001 school year.  (TT 1225:24-1226:10.)

386. When Franks became aware that Burch refused to reinstate the women wrestlers, he immediately contacted them to

---

[34]    The court finds plaintiffs' suggestion that defendants should have used funds that it provided for facility development and improvement and for athletic scholarships to add women's teams without merit.  The undisputed evidence demonstrates that defendants were required to use the money for the purposes stated on the initiative ballots, which did not include adding to the operating budget of the athletic department for the expansion of women's teams.  (TT 1203:13-1209:9.)

inform them they had been placed on the wrestling team roster. He also offered to meet with them in person.  (TT 1226:11-1228:8; 1236:12-1238:10; JX 56.)

387. When Masourian and Ng replied by e-mail that they could not accept reinstatement until speaking to their attorneys, Franks advised that he understood and reiterated his willingness to meet again with them in person.  (TT 1239:22-1240:22; JX 57.)

388. On May 10, 2001, a student demonstration in favor of reinstating the women wrestlers was conducted at the administration building, Mrak Hall, which houses Franks' office as well as the Chancellor's office.  (TT 1229:9-1234:13.)

   a.   Franks was alerted that Ng had organized the protest.  (TT 1231:23-1232:16.)

   b.   Protests were a common occurrence on campus.  (TT 1232:17-24.)

   c.   Franks had no objection to the protest, nor was he angry that it took place.  The protest went forward as planned.  (TT 1233:5-1234:13.)

389. Ng and Mansourian met with Franks on May 16, 2001, less than a week after he contacted them about being placed on the team roster; the meeting was cordial.  (TT 185:11-13; 537:8-14; 1241:2-23.)  The women wrestlers never indicated that they had any problem with equal opportunity in the UC Davis athletic department, aside from their removal from the wrestling team in 2000-2001.  (TT 1224:4-1225:6.)

390. As set forth above, Franks agreed to look into issues raised by Plaintiffs, including whether UC Davis would establish a separate roster cap for women wrestlers, whether it would waive

the minimum number of students required for creation of a women's wrestling club sport team, and whether the club team could practice at the same time as the intercollegiate team.

391. As set forth above, after consultation with Shimek, Warzecka, Gill-Fisher, and two Title IX attorneys, it was decided that a separate roster cap would not be established.  However, UC Davis agreed to waive the minimum number of members required to establish a wrestling club and allow the club team to practice at the same time as the intercollegiate wrestling team.

392. This was communicated by Franks to Mansourian and Ng on May 17, 2001.  (TT 1241:24-1244:13, 1245:20-1246:17; JX 58.)

393. In May 2001, Franks contacted Bob Oliver of the NCAA to inquire about the number of girls wrestling in high school.  The numbers did not indicate to Franks that there was sufficient interest for UC Davis to consider adding an intercollegiate women's wrestling team.  (TT 1217:13-1218:23.)

394. Franks did not promise any of the plaintiffs a spot on the varsity team for succeeding years because he believed that should be determined by the coach.  (TT 1238:16-1239:4.)  He also believed that giving plaintiffs a spot on the team without requiring them to undergo a competitive process would be unfair to the rest of the student body, who would have to compete to be on an intercollegiate team.  (TT 1245:1-19.)

395. Franks was not involved with wrestling team tryouts in Fall 2001.  He was aware that Zalesky intended to select team members based on the skills they demonstrated.  Franks did not believe it was unfair for women to have to try out against men,

90

because they were trying out for a place on the men's wrestling team.  (TT 1251:3-22.)

### D.   Larry Vanderhoef

#### 1.   Employment and Duties at UC Davis

396. Defendant Larry Vanderhoef ("Vanderhoef") was the Chancellor of UC Davis from 1994 to August 2009.  (Pretrial Order ¶ 10.)

397. In general, the Chancellor is the chief campus officer and is responsible for the organization and operation of the campus.  (Id.)

398. As Chancellor, Vanderhoef was ultimately responsible for approximately 25,000 undergraduates, over 5,000 additional graduate and professional students, and nearly 30,000 employees. (TT 1318:11-1319:25; 1324:13-17.)

a.   By necessity, the Chancellor of an organization the size of UC Davis must delegate responsibility to others, including the Vice Chancellors and Deans.  (TT 1281:1-1282:6; 1318:17-1322:3.)

b.   Vanderhoef had trusted staff members who directed phone calls, e-mails, and mail to the appropriate administrators. (TT 1322:7-1324:8.)

c.   Vanderhoef delegated the responsibility of meeting with students regarding complaints to members of his administration.  (TT 1321:7-1322:10; 1359:15-25.)

399. Vanderhoef agreed that, as the Chancellor, he had the ultimate responsibility to ensure there was gender equity in UC Davis' educational programs, including intercollegiate athletics. (TT 1261:10-22; 1263:25-1264:6.)

a.   However, Vanderhoef relied on his staff to carry out their job duties in an informed and acceptable manner.  (TT 1268:24-1270:17.)

b.   He relied on the Vice Chancellor for Student Affairs to oversee intercollegiate athletics.  (TT 1272:25-1274:12.)

c.   Vanderhoef relied on the Vice Chancellors to provide written gender equity plans as required.  (TT 1327:6-16.)

400. For five or six years, Carol Wall was the Vice Chancellor for Student Affairs.  Vanderhoef had confidence in her ability to handle gender equity issues because she was a champion and spokesperson for those issues.  (TT 1325:6-21)

401. Vanderhoef also relied on Franks, Warzecka, Gill-Fisher, and Shimek to address issues pertaining to intercollegiate athletics and gender equity.  He had confidence in their ability to address such issues in a fair and competent manner.  (TT 1282:2-6; 1284:3-6, 1285:4-25; 1325:19-1327:13, 1331:14-1332:25.)

402. Vanderhoef was frequently updated on the status of Title IX compliance in the athletic department.  He admitted that these updates were monthly, but could be as often as weekly "if there was lots going on."  (TT 1265:6-1266:3.)

403. While he was Chancellor, Vanderhoef received reports from committees related to Title IX and gender equity.  (TT 1267:10-17.)

404. Vanderhoef was directly responsible for dealing with political figures.  (TT 1330:24-1331:11.)

/////

### 2. Involvement with Women Wrestlers

405. Vanderhoef was aware of the women wrestlers' OCR complaint.

a.   However, Shimek had dealt directly with OCR for a number of years, and Vanderhoef relied on him to respond to OCR; Vanderhoef was aware that Shimek did respond.   (TT 1331:6-1332:16.)

b.   Vanderhoef did not personally investigate the allegation that the women wrestlers had been removed from the team because he had faith in Student Affairs, Franks, and Warzecka regarding the situation.   (TT 1340:7-16.)

c.   In May 2001, Vanderhoef heard from Franks that the women wrestlers' discrimination complaint was baseless and that Shimek was "well in the loop."   Franks informed Vanderhoef about the problem because the women wrestling situation was beginning to generate negative publicity.   (TT 2543:10-2545:25; PX 90.)

406. After Assemblywoman Thomson wrote to him on behalf of the women wrestlers and threatened to withhold state funding for a planned laboratory building, Vanderhoef personally communicated with Thomson in order to address her concerns about the treatment of women in the UC Davis wrestling program.   (TT 1338:22-1342:19; JX 65-66.)

a.   After meeting with Vanderhoef, Thomson withdrew her threat to withhold funds for the laboratory building.   (TT 1342:6-1345:6; JX 65-67.)

407. In one of his communications with Thomson, Vanderhoef proposed that an independent or Blue Ribbon Panel be convened to assess the intercollegiate athletic program.   If Thomson had

93

indicated she was in favor of such an assessment and if the Vice Chancellor of Student Affairs had recommended that it be done, Vanderhoef would have agreed that such a process should take place.  (TT 1299:3-1300:19.)   However, Thomson never made such an indication, and the Vice Chancellor of Student Affairs never made such a recommendation.

408. Vanderhoef did not have any recollection of receiving any calls or e-mails from plaintiffs.  (TT 1324:9-12.)

409. Vanderhoef also did not recall seeing the student petitions plaintiffs circulated.  (TT 1360:17-23; PX 86.)

410. Vanderhoef was aware that there were newspaper articles about the women wrestlers.  (TT 1361:12-1362:4)

411. Vanderhoef was also aware that there was an e-mail campaign relating to the women wrestlers.  (TT 1370:18-22.)

     a.   He did not read any of the specific e-mails.  (TT 1371:14-1372:7.)

     b.   A rote response to some of the e-mails was sent out with his approval.  (TT 1372:8-11.)

412. As of October 2001, Vanderhoef was aware that OCR considered the issues pertaining to the women wrestlers to be resolved, based on the VRP.  There was nothing that occurred after that date that caused him to believe he should take further action.  (TT 1334:5-15; DX CC.)

**CONCLUSIONS OF LAW**

**I.   Title IX**

Congress enacted Title IX of the Education Amendments of 1972 to prohibit gender discrimination by educational institutions that receive federal funding.  20 U.S.C. § 1681; <u>see</u>

94

<u>Barrett v. West Chester Univ. of Pa.</u>, No. Civ. A. 03-CV-4978,
2003 WL 22803477, at *4 (E.D. Pa. Nov. 12, 2003).   Specifically,
Title IX provides,

> No person in the United States shall, on the basis of
> sex, be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under
> any education program or activity receiving Federal
> financial assistance . . . .

20 U.S.C. § 1681.[35]   "Congress enacted Title IX in response to
its finding - after extensive hearings held in 1970 by the House
Special Subcommittee on Education - of pervasive discrimination
against women with respect to educational opportunities."   <u>Cohen
v. Brown Univ. ("Cohen II")</u>, 101 F.3d 155, 165 (1st Cir. 1996).
The goals of Title IX were "to avoid the use of federal resources
to support discriminatory practices" and "to provide individual
citizens effective protection against those practices."   <u>Id.</u>
(quoting <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 677, 704 (1979)).[36]

"[W]hile Title IX prohibits discrimination, it does not
mandate strict numerical equality between the gender balance of a
college's athletic program and the gender balance of its student
body."   <u>Id.</u>; 20 U.S.C. § 1681(b).   As such, "a court assessing
Title IX compliance may not find a violation *solely* because there
is a disparity between the gender composition of an educational

[35]   At the time it was enacted, "Congress included no
committee report with the final bill and there were apparently
only two mentions of intercollegiate athletics during the
congressional debate."   <u>Cohen</u>, 991 F.2d at 893 (citations
omitted).

[36]   "Although the statute itself provides for no remedies
beyond the termination of federal funding, the Supreme Court has
determined that Title IX is enforceable through an implied
private right of action, and that damages are available for an
action brought under Title IX."   <u>Cohen II</u>, 101 F.3d at 167
(internal citations omitted).

95

institution's student constituency, on the one hand, and its athletic programs, on the other hand." Id. at 894-95.  However, statistical evidence of disparate impact may be highly relevant to the determination of whether an institution violated Title IX. Id. at 895.

### A.   Application to College Athletic Programs

In practice, Title IX reaches the vast majority of all accredited colleges and universities.  Cohen v. Brown Univ. ("Cohen I"), 991 F.2d 888, 893 (1st Cir. 1993).  It wasn't until 1974, however, that institutions became aware that the statute applied to athletic programs.  (TT 897:7-9.)

In 1984, the Supreme Court held that Title IX was "program-specific"; as such, "its tenets applied only to the program(s) which actually received federal funds and not to the rest of the university."  Cohen I, 991 F.2d at 894 (citing Grove City College v. Bell, 465 U.S. 555, 574 (1984)).  "Because few athletic departments [were] direct recipients of federal funds . . . ., Grove City cabined Title IX and placed virtually all collegiate athletic programs beyond its reach."  Id.

In 1988, in response to Grove City, Congress reinstated an institution-wide application of Title IX by passing the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687.  Id.  "The Restoration Act required that if any arm of an education institution received federal funds, the institution as a whole must comply with Title IX's provisions."  Id.  Accordingly, subsequent to 1988, there was no question that Title IX applied to college athletic programs.  Id.  However, as a result of (1) the "slow and steady" pace that even plaintiffs' expert testified

was acceptable for social change of this magnitude and (2) the ambiguity regarding the applicability of Title IX to intercollegiate athletics, there was virtually no enforcement of Title IX with respect to intercollegiate athletics between 1980 and 1992.  (TT 907:4-8; 857:9-19; 1791:11-23.)

## B.   Relevant Regulations and Agency Action

Title IX "sketches wide policy lines, leaving the details to regulating agencies." Cohen I, 991 F.2d at 893.  When Title IX was implemented, the agency responsible for enacting appropriate regulations was the Department of Health, Education, and Welfare ("HEW"). Id. at 895.  The HEW issued implementing regulations in 1975 and the subsequent 1975 Interpretation. See id.  The HEW was subsequently divided into the Department of Health and Human Services ("HHS") and the Department of Education ("DOE"). Roberts v. Colo. State Bd. of Agric., 998 F.2d 824, 828 n.3 (10th Cir. 1993).  The DOE, acting through the Office for Civil Rights ("OCR"), is the agency charged with administering Title IX.  Id. The OCR released a clarification of its Title IX enforcement policies in 1996.

The court must accord agency interpretation of Title IX "appreciable deference."  Cohen, 991 F.2d at 896 (citing Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 844 (1984)).  "The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX."  Id. (citations omitted); see Mansourian v. Regents of the Univ. of Cal., 602 F.3d 957, 965 n.9 (9th Cir. 2010).

97

### 1. The 1975 Regulations

In 1975, the HEW issued implementing regulations to Title IX. <u>Cohen I</u>, 991 F.2d at 895.  The regulations generally provide

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club, or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a).  Specifically, as applied to intercollegiate athletics, the regulations interpret the statute as requiring funding recipients to "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c); 45 C.F.R. § 86.41[37]; <u>Cohen I</u>, 991 F.2d at 897 ("Equal opportunity to participate lies at the core of Title IX's purpose.").

There are two components to Title IX's equal athletic opportunity requirement: "effective accommodation" and "equal treatment."[38]  <u>Mansourian</u>, 602 F.3d at 964.  Title IX's "effective accommodation" requirements derive from 34 C.F.R. § 106.41(c)(1), which bases Title IX compliance, in part, on whether "the selection of sports and levels of competition

---

[37]     In 1979, Congress divided HEW into the HHS and DOE; at that time "the existing regulations were left within HHS's arsenal while, at the same time, [DOE] replicated them as part of its own regulatory armamentarium." <u>Cohen I</u>, 99 F.2d at 895.  For purposes of clarity, the court cites to the DOE regulations at 34 C.F.R. § 106.

[38]     The "equal treatment" Title IX standard, in contrast, derives from 34 C.F.R. § 106.41(c)(2)-(10), which has been interpreted by OCR to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes."  Plaintiffs assert that they are not pressing any unequal treatment claims.  To the extent plaintiffs asserted such claims, the court previously dismissed them.  (Mem. & Order [Docket #226], filed Oct. 18, 2007.)

effectively accommodate the interests and abilities of members of both sexes." Effective accommodation claims "concern the opportunity to participate in athletics." Id.

However, the regulations do allow for the provision of separate teams for men and women "where the selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Nevertheless, "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." Id. The regulations define "contact sports" as including "boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact." Id.

### 2. The 1979 Interpretation

In 1979, in response to numerous complaints alleging Title IX violations with regard to discrimination in athletics, the HEW issued a policy interpretation explaining the ways in which institutions may effectively accommodate the interests and abilities of their student-athletes. 44 Fed. Reg. 71413, 71413 (Dec. 11, 1979), Ex. 3 to Joint Request for Judicial Notice, filed June 6, 2011 ("1979 Interpretation"), at 18. The 1979 Interpretation "delineates three general areas in which the OCR will assess compliance with the effective accommodation section of the regulation." Roberts, 998 F.2d at 828. These three general areas are:

99

a.    The determination of athletic interests and abilities of students;

b.    The selection of sports offered; and

c.    The levels of competition available including the opportunity for team competition.

Id.

With respect to the determination of athletic interests and abilities of students, the 1979 Interpretation sets forth that a university "may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing" so long as the methods (1) "take into account the nationally increasing levels of women's interests and abilities"; (2) "do not disadvantage members of an underrepresented sex"; (3) "take into account team performance records"; and (4) are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex." (1979 Interpretation at 27.)

With respect to the selection of sports, the 1979 Interpretations clarifies that "the regulation does not require institutions to integrate their teams nor to provide exactly the same choice of sports to men and women." (Id.) As applied to contact sports, "[e]ffective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex" if "(1) [t]he opportunities for members of the excluded sex have historically been limited; and (2) [t]here is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team." (Id.)

100

Finally, with respect to assessment of effective accommodation in opportunities for intercollegiate competition, the 1979 Interpretation sets forth the "three part test" for measuring compliance with Title IX.  Id.; see also Mansourian, 602 F.3d at 965.  Under this test, a university may demonstrate compliance by showing that (1) "intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments"; or (2) the institution has "a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members" of the historically underrepresented sex; or (3) "the interests and abilities of the members of [the historically underrepresented sex] have been fully and effectively accommodated by the present program."  (1979 Interpretation at 27.)

### 3.   The 1996 Clarification

In 1996, the OCR published a clarification of the "effective accommodation" test.  (Ex. 4 to Joint Request for Judicial Notice, filed May 5, 2011 ("1996 Clarification"), at 36, 38.)  The introductory letter from Norma V. Cantu, the Assistant Secretary for Civil Rights, emphasized that "the Clarification does not provide strict numerical formulas or 'cookie cutter' answers to the issues that are inherently case- and fact-specific."  (Id. at 39.)  Indeed, the letter expressly notes that "Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities" and concedes that an attempt to set forth such

formulas or answers would "deprive institutions of the flexibility to which they are entitled when deciding how best to comply with the law." (Id.)  However, the Clarification "provides specific factors that guide an analysis of each part of the three-part test" and includes examples "to demonstrate, in concrete terms, how these factors will be considered." (Id. at 41.)

## C.   Prong 2

Plaintiffs assert that defendant UC Davis violated Title IX's mandate to effectively accommodate the interests and abilities of members of both sex.  For the purposes of this litigation only, and for purposes of the Title IX claim only, UC Davis stipulates that during the time period it believes is relevant to the Title IX claim, the ratio of male and female participants in intercollegiate athletics was not always substantially proportionate to the ratio of male and female undergraduate enrollment at the University.  UC Davis further stipulates that during that time period, there was at least one sport for women that was not offered at the intercollegiate level for which there was (1) an expressed interest in competing at the intercollegiate level; (2) sufficient ability among interested students to compete at the intercollegiate level; and (3) arguably sufficient intercollegiate competition for that sport in the geographic area in which UC Davis usually competes.  Based on this stipulation, the parties agree that plaintiffs are relieved of their burden of proof with respect to Prong One and Prong Three of the three-prong test to establish a violation of Title IX.  As such, the parties agreed that UC Davis bore the burden of

proving that it was in compliance under Prong Two during the relevant time period.[39]   (Joint Stipulation [Docket #564], filed May 6, 2011.)

Under Prong Two, an institution can establish compliance with Title IX by showing "that it has a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the underrepresented sex." (1996 Clarification at 42.)   "In effect, part two looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion."   (Id.)

In analyzing Prong Two compliance, the court looks at "the entire history of the athletic program, focusing on the participation opportunities provided for the underrepresented sex." (Id.)   "There are no fixed intervals of time within which an institution must have added participation opportunities," nor "is a particular number of sports dispositive." (Id.)   "Rather, the focus is on whether the program expansion was responsive to developing interests and abilities of the underrepresented sex." (Id.)   Evidence of a history of program expansion may include (1) "an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the

---

[39]   The court previously held that even if a "shorter, more current period of aggressive remedial efforts may be highly relevant to establishing compliance with Prong Two, the court "must review the entire history of the athletic program in determining whether UC Davis was compliant with Title IX when plaintiffs were students." (Mem. & Order [Docket #545], filed Apr. 29, 2011, at 5.)   The court noted, however, that plaintiffs may only recover damages based upon *actual* harm that they *personally suffered*. (Id. at 6.)

underrepresented sex"; (2) "an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex"; and (3) "an institution's affirmative response to requests by students or others for addition or elevation of sports."  (Id. at 43.)

The court must also assess whether the institution can demonstrate "a continuing (i.e., present) practice of program expansion as warranted by developing interests and abilities." (Id. at 42.)  Evidence of a continuing practice of program expansion may include (1) "an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports . . . and the effective communication of the policy or procedure to students"; and (2) "an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities."  (Id. at 43.)  An institution's "nondiscriminatory assessments of developing interests and abilities" and "timely actions in response to the results" are also persuasive evidence of a continuing practice of program expansion.  (Id.)

At bottom, Prong Two "considers an institution's *good faith* remedial efforts through *actual program expansion*."  (Id.) (emphasis added).  The inquiry "focuses on whether an institution has expanded the number of intercollegiate participation opportunities for women, but provides institutions flexibility in choosing which teams they add."  Mansourian 602 F.3d at 965. "The number of participation opportunities for women is defined by the number of female athletes who actually participate in

varsity athletics."[40]  Id. at 965-66.  Prong Two thus "focuses primarily, but not exclusively, on increasing the number of women's athletic opportunities rather than increasing the number of women's teams."  Id. at 969.

Increased proportional opportunities for the underrepresented sex reached solely as a result of the reduction of the overrepresented sex will not establish compliance under Prong Two.  (1996 Clarification at 43.)  "[T]he ordinary meaning of the word 'expansion' may not be twisted to find compliance under this prong when schools have increased the relative percentages of women participating in athletics by making cuts in both men's and women's sports programs."  Roberts, 998 F.2d at 830.

Moreover, an institution may rely on Prong Two, despite normal upward or downward fluctuations in participation opportunities.  (TT 833:7-834:12.)  Indeed, both Dr. Lopiano and Dr. Grant testified that normal fluctuations may result in greater or lesser participation opportunities, based on factors such as a larger graduating class or a larger recruited class. (See TT 833:7-18.)

The Clarification counsels that the efforts of an institution should be assessed from a flexible and case-specific approach.  As such, "[i]n the event that an institution eliminated any team for the underrepresented sex," the court should evaluate the circumstances surrounding such action. "However, an institution can still meet part two if, overall, it

---

[40]  "[A]thletes who participate in more than one sport are counted as a participant for each sport they play."  Id. at 966.

can show a history and continuing practice of program expansion for that sex." (1996 Clarification at 43.)

The 1996 Clarification sets forth four examples to help illustrate in what types of circumstances compliance with Prong Two could be established. The three most relevant examples provide as follows:

> At the inception of its women's program in the mid-1970s, Institution C established seven teams for women. In 1984 it added a women's varsity team at the request of students and coaches. In 1990 it upgraded a women's club sport to varsity team status based on a request by the club members and an NCAA survey that showed a significant increase in girls high school participation in that sport. Institution C is currently implementing a plan to add a varsity women's team in the spring of 1996 that has been identified by a regional study as an emerging women's sport in the region. The addition of these teams resulted in an increased percentage of women participating in varsity athletics at the institution. Based on these facts, OCR would find Institution C in compliance with part two because it has a history of program expansion and is continuing to expand its program for women to meet their developing interests and abilities.
>
> . . .
>
> In the mid-1970s, Institution E established five teams for women, In 1979 it added a women's varsity team. In 1984 it upgraded a women's club sport with twenty-five participants to varsity team status. At that time it eliminated a women's varsity team that had eight members. In 1987 and 1989 Institution E added women's varsity teams that were identified by a significant number of its enrolled and incoming female students when surveyed regarding their athletic interests and abilities. During this time it also increased the size of an existing women's team to provide opportunities for women who expressed interest in playing that sport. Within the past year, it added a women's varsity team based on a nationwide survey of the most popular girls high school teams. Based on the addition of these teams, the percentage of women participating in varsity athletics at the institution has increased. Based on these facts, OCR would find Institution E in compliance with part two because it has a history of program expansion and the elimination of the team in 1984 took place within the context of continuing program

106

expansion for the underrepresented sex that is
responsive to their developing interests.

Institution F started its women's program in the early
1970s with four teams.  It did not add to its women's
program until 1987 when, based on requests of students
and coaches, it upgraded a women's club sport to
varsity team status and expanded the size of several
existing women's teams to accommodate significant
expressed interest by students.  In 1990 it surveyed
its enrolled and incoming female students; based on
that survey and a survey of the most popular sports
played by women in the region, Institution F agreed to
add three new women's teams by 1997.  It added a
women's team in 1991 and 1994.  Institution F is
implementing a plan to add a women's team by the spring
of 1997.  Based on these facts, OCR would find
Institution F in compliance with part two.  Institution
F's program history since 1987 shows that it is
committed to program expansion for the underrepresented
sex and it is continuing to expand its women's program
in light of women's developing interests and abilities.

(Id. at 43-44.)

In this case, defendant UC Davis has not demonstrated that,
while plaintiffs were students at the University, it had a
continuing practice of program expansion that was demonstrably
responsive to the developing interests and abilities of the
underrepresented sex.  Rather, the undisputed evidence
demonstrates that while plaintiffs were students, UC Davis
eliminated more than 60 actual participation opportunities for
women.  Indeed, while in 1998-1999 there were 424 total female
participants in student intercollegiate athletics, there were
only 363 total female participants in student intercollegiate
athletics in 2004-2005.  Such evidence demonstrates overall

program contraction of actual female participation opportunities, not expansion.[41]

### 1.   History of Program Expansion

The court notes that UC Davis has a strong history of supporting women's participation in athletics.  Indeed, in 1970, two years before the enactment of Title IX, "The Davis View" expressly contemplated the expansion and development of women's intercollegiate athletic programs.  In 1972, UC Davis already had seven women's intercollegiate athletic teams.  It upgraded women's cross-country to varsity status in 1978.  Further, when it legitimately eliminated women's field hockey at the end of the 1982-1983 school year based upon the decreasing level of interest and viable intercollegiate athletic opportunities, UC Davis immediately replaced the sport with women's soccer in the fall of 1983.

Moreover, UC Davis acknowledged its obligation to comply with Title IX even when there was virtually no enforcement in the 1980s and early 1990s.  In the late 1980s, UC Davis hired Shimek as a Title IX compliance expert.  It also commissioned a comprehensive report in 1989, which was completed sometime in 1990, to review, *inter alia*, gender equity in athletic participation opportunities.  The report unabashedly found that UC Davis was currently not in compliance under any prong of the three-part test and recommended the expansion of women's participation opportunities.

---

[41]   While the court notes the increasingly smaller disparity in proportional opportunities from 2001-2002 through 2005-2006, this positive movement is irrelevant to the court's inquiry under Prong Two.  See Roberts, 998 F.2d at 830.

In response, and despite state budget cuts that threatened to eliminate almost all of its athletic program,[42] UC Davis retained all of its existing teams and added three new women's varsity sports, increasing female participation opportunities by 131 in the 1996-1997 school year.  These three new sports were added after a formal submission process that documented the interest of current and future female student-athletes, the availability of viable intercollegiate competition, and the ability to immediately locate and fund the resources necessary to support the sport.  Subsequently, UC Davis officially added women's varsity indoor track & field in the 1998-1999 school year.  That same year, UC Davis achieved its highest number of total female participants with 426 female student participation opportunities.  (JX 89.)

Accordingly, viewing the entirety of the circumstances, at the time the first plaintiff entered UC Davis as a freshman in Fall 1998, UC Davis had a history of program expansion responsive to the developing interests and abilities of women.  While the court notes the stagnation of expansion between the elevation of women's cross-country to varsity status in 1978 and the addition

---

[42]    The court notes that financial concerns cannot justify gender discrimination.  "If a school . . . elect[s] to stray from substantial proportionality and fail[s] to march uninterruptedly in the direction of equal athletic opportunity, it must . . . fully and effectively accommodate the underrepresented gender's interests and abilities, even if that requires it to give the underrepresented gender . . . what amounts to a larger slice of a shrinking athletic-opportunity pie."  Cohen v. Brown Univ. ("Cohen IV"), 101 F.3d 155, 176 (1st Cir. 1996).  However, the court acknowledges the efforts undertaken by UC Davis to expand women's athletic participation opportunities while still continuing programs that would benefit both male and female student-athletes.

109

of three varsity sports in 1995, the court concludes that the shorter, more current period of aggressive remedial efforts, which resulted in the elevation of women's water polo, lacrosse, crew, and indoor track & field, demonstrates a history of good faith remedial efforts through program expansion.  Cf. Roberts, 998 F.2d at 830 (holding that the defendant institution could not demonstrate a practice of program expansion where the last team was added 16 years before the case was decided and three women's sports had subsequently been eliminated); Cohen I, 991 F.2d at 903 (holding that the defendant institution could not demonstrate a history of program expansion where there was "impressive growth" in the 1970s but no additional opportunities added over the next two decades).

### 2.   Continuing Practice of Program Expansion

However, despite its best intentions to the contrary, UC Davis did not have a continuing practice of program expansion at the time plaintiffs were students.  Indeed, in 1999-2000, there were 424 female participation opportunities at UC Davis; the next year, such opportunities had decreased to 407, and the following year, they had decreased to 361.  While the participation numbers increased slightly in 2002-2003 to a total of 389 opportunities, they again decreased the following year to 373 and again the next year to 363.  It was not until the 2005-2006 school year that the participation rates rose again to 401 total female participants.  However, this was still 25 less participation opportunities than in the 1998-1999 school year.  Under the circumstances, the court cannot conclude that UC Davis had a continuing practice of

program expansion in the face of such a decline in actual participation opportunities.

Of utmost significance to this court's determination is the elimination of the junior varsity or "B" teams for women's water polo and women's lacrosse after the 2000-2001 school year, which accounted for approximately 30 lost participation opportunities for women.  The court notes that these teams were eliminated for legitimate, non-discriminatory reasons; the coaches of both these teams recommended that they be reinstituted at the club level to provide greater competitive opportunities so that athletes who did not have the skill to make the varsity team could potentially develop into varsity level athletes.  (See TT 1494:2-1495:6; TT 1634:8-1635:10.)  However, while the elimination of these teams does not create a Title IX violation in and of itself, the *failure to replace these opportunities* prevents UC Davis from relying on Prong Two to establish compliance.  Rather than expanding athletic participation opportunities, UC Davis contracted athletic participation opportunities through the elimination of two women's "B" teams.  See Ollier v. Sweetwater Union High Sch. Dist., 604 F. Supp. 2d 1264, 1272-1273 (S.D. Cal. 2009) (holding that "[a]lthough a slight decrease in athletic participation in a given year will not be fatal to showing compliance with Title IX," defendants cannot establish Prong Two compliance where there is no steady increase in female participation).  At bottom, the University lost approximately 30 actual participation opportunities, which were not the result of "normal fluctuation" and which it never replaced.  This, by definition, is not program expansion.  See Favia v. Indiana Univ.

111

of Penn., 812 F. Supp. 578, 585 (W.D. Pa. 1993) (holding that the defendants failed to demonstrate compliance with Prong Two where "the levels of opportunities for women to compete went from low to lower.")

The court concludes that even if it accepted Dr. Grant's crediting theory, it still could not find UC Davis in compliance due to the un-replaced elimination of these varsity opportunities. Dr. Grant testified that for purposes of Prong Two compliance, adding three new intercollegiate sports for women at once in the 1996-1997 school year should be given the same effect as if one sport were added in 1996-1997, another in 1999-2000, and a third in 2002-2003. (TT 1848:17-1850:4.) Grant opined that to hold otherwise would encourage institutions to withhold granting varsity status, except for within accepted intervals, in order to ensure Prong Two compliance; such withholding would deprive entire intercollegiate generations of the opportunity to compete in those subsequently added sports. While the court finds Grant's logic persuasive, it fails to address the impact of the elimination of teams within the crediting period. Moreover, the court finds it problematic to recognize a nine-year "credit" for the addition of three varsity teams, when the University cut two teams and over thirty actual participation opportunities within that same nine-year period.

The court's conclusion is in accordance with the examples provided in the 1996 Clarification. First, UC Davis cannot compare itself to Institution C. The 1996 Clarification provides that Institution C, a university that had seven teams in the 1970s, would be compliant under Prong Two where it had added a

112

new varsity team in 1984, elevated a club team to varsity status in 1990, and implemented a plan to add a varsity team in 1996. However, while UC Davis elevated three club teams to varsity status in 1995 and declared indoor track & field as a separate varsity team in 1998, it also eliminated two women's varsity "B teams." As such, the comparison to Institution C is inapt.[43]

Second, UC Davis cannot find safe harbor in a comparison to Institution E. The 1996 Clarification noted that an institution would be compliant, even if it eliminated a women's varsity team that had eight members, where it elevated a club team consisting of twenty-five members to varsity status that same year. In this case, UC Davis eliminated two "B teams," with the net effect of losing approximately 30 actual participation opportunities. No new participation opportunities immediately replaced them. Rather, it was not until 2005-2006 that UC Davis added women's golf, which only resulted in 7 additional participation opportunities. Accordingly, UC Davis is not akin to Institution E.

Importantly, the court notes that the elimination of women's participation opportunities on the men's varsity wrestling team is irrelevant to the court's conclusion that UC Davis did not have a continuing practice of program expansion. Rather, the failure of plaintiffs to make the men's varsity wrestling team is akin to normal, legitimate fluctuations of the numbers on any varsity squad based upon the talent, skill, and potential of the

---

[43]   Likewise, the 1996 Clarification example relating to Institution F does not include any elimination of women's teams or actual participation opportunities.

113

enrolled student-athletes.  To find otherwise would belie common sense and the practicalities of intercollegiate athletics.  For example, if a talented female athlete tried out for and made an intercollegiate men's football team, EADA reports would reflect that female participation opportunity in varsity football.  Upon graduation, it is likely that the sole female participation opportunity in football would be eliminated.  To equate the elimination of a sole female participation opportunity on a men's sport as the elimination of an entire women's varsity sport not only runs counter to the purposes of Title IX, it also disincentivizes institutions from giving extraordinarily talented women the opportunity to compete in arenas traditionally occupied by men and in sports for which there are currently no viable female intercollegiate opportunities.[44]

Finally, the court notes that the issues raised regarding UC Davis' non-compliance with Title IX are difficult, particularly in light of the dearth of guidance in this area of the law.  Universities should be encouraged to add as many athletic participation opportunities for women as soon as they can;

---

[44]    Further, to require an institution to maintain women's participation opportunities on men's intercollegiate teams without imposing the same requirements on all participants would not only impugn the integrity of intercollegiate athletics, but would also be based on an overbroad, generalized, and discriminatory assumption that women can never compete against men.  See Weinberger v. Wiesenfeld, 420 U.S. 636, 642-43 (1975).  Such an assumption would be particularly damaging and demeaning in the context of Title IX, where statutory provisions already take into account the physiological differences between men and women in the provision of separate teams.  See Frontiero v. Richardson, 411 U.S. 677, 684-87 (1973) (noting the dangers of gender discrimination "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage").

application of rigid time tables should not encourage dalliance on the part of institutions in order to ensure compliance under clarifications that were meant to demonstrate the flexibility accorded institutions.   Further, universities should be encouraged to make decisions based upon the best interests of their student-athletes; if there is insufficient competition or opportunity at the collegiate level, universities should not sacrifice the experience of their students in order to facially comply with Title IX.   Moreover, the court acknowledges that large universities with a commitment to an expansive intercollegiate athletic program for both men and women may confront more difficulties with respect to the fluctuation in the number of participants in varsity athletics and the appropriate ratio between enrollment and athletic participation.

However, the gravamen of Prong Two compliance is an ever-increasing number of actual participation opportunities for the underrepresented sex, in this case women.   When an institution loses over 60 such opportunities in two years and never fully regains all of those opportunities over the next four years, such an institution cannot be held to be Title IX compliant under Prong Two.

### D.   Competitive Sports Provision

Plaintiffs also assert that defendant UC Davis violated the separate teams/contact sports provision of Title IX's implementing regulations and policy interpretations. Specifically, plaintiffs assert that because UC Davis provided wrestling opportunities for men, it was required to provide wrestling opportunities for women.

1   As set forth above, 34 C.F.R. § 106.41 provides that where
2   an institution provides a team for one sex, but not for the
3   underrepresented sex, "the excluded sex must be allowed to try-
4   out for the team offered unless the sport involved is a contact
5   sport," such as wrestling.  The 1979 Policy Interpretation
6   further explains that, for purposes of the regulation, effective
7   accommodation requires that "if an institution sponsors a team
8   for members of one sex in a contact sport, it *must* do so for
9   members of the other sex" where (1) opportunities for members of
10  the excluded sex have been historically limited; (2) there is
11  sufficient interest and ability among the members of the excluded
12  sex to sustain a viable team; and (3) there is a reasonable
13  expectation of intercollegiate competition for that team.
14  (Emphasis added.)

15  "Intercollegiate competition" means competitive
16  opportunities among other collegiate student-athletes.  See Cohen
17  v. Brown Univ. ("Cohen III"), 101 F.3d 155, 186 (1st Cir. 1996)
18  (approving district court's statement that 'intercollegiate'
19  teams are those that 'regularly participate in varsity
20  competition.'").  Further, the 1979 Policy Interpretation
21  expressly provides that "[i]nstitutions are not required to
22  upgrade teams to intercollegiate status or otherwise develop
23  intercollegiate sports absent a reasonable expectation that
24  [such] intercollegiate competition in that sport will be
25  available within the institution's normal competitive regions."
26  (1997 Policy Interpretation at 28); see Roberts, 998 F.2d at 831.

27  In this case, UC Davis was not required to provide a
28  separate women's wrestling team because the undisputed evidence

116

demonstrates that there was not a reasonable expectation of intercollegiate competition for such a team.[45]   Between 1995 and 2001, no four-year California colleges had an all-women's intercollegiate wrestling team.   In Fall 2001, there was one women's wrestling team in California.   The only women's club program at a four-year University was at California State University Bakersfield.   (See TT 1847:6-19 (noting the importance of available intercollegiate competition within a reasonable geographical area in order to provide the best competition to student-athletes at a reasonable cost to the institution).) Indeed, the Executive Director of the United States Girls' Wrestling Association testified that he knew of only four to six official intercollegiate women's wrestling teams.[46]   Under these circumstances, UC Davis was not required to sponsor a separate women's varsity wrestling program.   (see TT 1684:15-18 (noting that a competition season that consists of nothing but open matches would not be considered legitimate intercollegiate competition).)

---

[45]   The court also notes that there were also never more than four or five women at any one time who wanted to participate in wrestling during the time Burch was the head wrestling coach. However, because the court concludes that there was not a reasonable expectation of intercollegiate competition, let alone intercollegiate competition in UC Davis' normal competitive regions, the court need not determine whether there was sufficient interest and ability among the members of the excluded sex to sustain a viable team.

[46]   As noted, it is unclear whether any or all of these teams were in existence at the time plaintiffs were students, or more specifically, when UC Davis implemented the "wrestle-off" policy in Fall 2001.   As this court has noted in numerous orders, plaintiffs never tried out for the men's varsity wrestling team after Fall 2001; as such, it is unclear whether the same policy would have applied.   Furthermore, such conduct is outside the relevant statute of limitations.

117

1    Further, even if the court broadened the scope of

2 "intercollegiate competition" to include "open" tournaments,

3 there was still not a reasonable expectation of competition.

4 Burch identified a total of eight open tournaments, only four of

5 which he identified as located in California.  Further, there was

6 no evidence that there was sufficient competition for female

7 intercollegiate wrestlers at these open tournaments.  For

8 example, while an unofficial member of the men's intercollegiate

9 wrestling team, plaintiff Ng twice was unable to compete in UC

10 Davis' own tournament, the Aggie Open, because there were no

11 competitors in her weight class.

12    Accordingly, the court concludes that UC Davis did not

13 violate Title IX by failing to sponsor a separate women's

14 intercollegiate wrestling team.[47]

15    _____

16    [47]    The court acknowledges that once women wrestlers were
   allowed to join the men's intercollegiate wrestling team, neither
17 the contact sports exemption nor any other provision of Title IX
   or its implementing regulations allowed UC Davis to discriminate
18 on the basis of sex.  Mercer v. Duke Univ., 401 F.3d 199, 202
   (4th Cir. 2005.)

19    The evidence is undisputed that prior to the imposition of
20 the roster cap in Fall 2000, Burch did not cut anyone who was
   willing to come to practices and attempt to compete.  (TT 143:21-
21 23; 452:18-454:11; Collier Dep. at 60:23-61:4 ("[R]egardless of
   gender, if people were willing to come out and compete and do
22 what they could, [Burch] wanted to keep them on the team.  And
   that applies to males, too.  If there were guys that weren't very
23 good wrestlers but they were at least trying to do what they
   could, he wanted to try and keep them if he could.").

24    The court concludes that Burch did not discriminate against
25 plaintiffs on the basis of sex when he did not include them on
   the roster in Fall 2000.  Burch told Warzecka that the women were
26 not on the roster because they were not competitive against the
   men on the team.  As such, he cut them from the team as a result
27 of their lack of competitive skill and potential, not because of
   their gender.  Further, to the extent that Burch did not give
28 them a sufficient opportunity to demonstrate skill, UC Davis
   reinstated them on the team and gave them such an opportunity the

### E.   Plaintiffs' Miscellaneous Claims

Finally, plaintiffs assert that defendants violated Title IX by failing to (1) take formal steps to continuously monitor the developing interests and abilities of the underrepresented sex; (2) have an adequate plan to expand women's opportunities; and (3) effectively communicate or consistently follow a policy for adding or elevating teams.[48]   However, plaintiffs identify no bases in Title IX, its implementing regulations, or even its Policy Interpretations or Clarifications that impose such requirements.

First, there is no requirement that an institution must take formal steps to continuously monitor the developing interests and

_____

next year.

The court also concludes that UC Davis did not discriminate against plaintiffs or women wrestlers on the basis of sex in requiring them to participate in "wrestle-offs" against men in order to make the team.  Not only were plaintiffs cut from the team, but other men who could not meet the skill requirement were also cut.

At bottom, plaintiffs were only allowed to participate on the team when Burch's no-cut policy applied to everyone, including men and women.  When plaintiffs were required to demonstrate competitive skill and ability to compete on an intercollegiate men's wrestling team, they, like some men, could not demonstrate the requisite skill.  Cf. Mercer, 401 F.3d at 202 (allowing the plaintiff to proceed on her claim for gender discrimination because she alleged that the football coach allowed other, less qualified walk-on male kickers to remain on the team).

[48]   As has been a consistent practice in this litigation, much like their newly advanced Title IX claim based upon alleged violation of the separate teams/contact sports provisions, plaintiffs only advanced and argued these new theories in their proposed findings of fact and conclusions of law.  For example, there is no mention of any of these new theories of the case in their trial brief or at any time prior to the conclusion of the trial.  However, for the sake of completeness, the court also addresses these claims.

119

abilities of the underrepresented sex in order to comply with Title IX.  Plaintiffs assert that "[t]he 1996 OCR Guidance states that schools should continuously monitor the developing interests and abilities of the underrepresented sex so that they can promptly respond to them as they develop by adding new sports." (Pls.' Proposed Conclusions of Law [Docket #625], filed July 19, 2011.)  However, while the 1996 Clarification notes that it would find an institution's efforts to monitor developing interests and abilities of the underrepresented sex persuasive in demonstrating compliance with Prong Two, it expressly notes that "institutions have flexibility in choosing a nondiscriminatory methods of determining athletic interests and abilities" and that "elaborate scientific validation of assessments" is not required.  (1996 Clarification at 42, 44.)  Moreover, while the 1996 Clarification provides that an institution's evaluation of interest "*should* be done periodically," it does not state that an institution *must* do so in order to avoid violating Title IX.  (1996 Clarification at 45.)  Accordingly, the court finds that any failure by UC Davis to formally monitor the developing interests and abilities of female athletes is not an independent violation of Title IX.[49]

Second, plaintiffs similarly fail to identify any source of law that requires an institution to have a plan, let alone a specific type of plan, to expand women's opportunities in order to comply with Title IX.  Plaintiffs point to the introductory letter to the 1996 Clarification to support their contention that

_____

[49]   As set forth above, the court found that UC Davis informally monitored undergraduate interest and abilities through analysis of participation in club sports and intramurals.

1 an adequate plan must include certain details and timetables;

2 however, nothing in this letter discusses the requirement of a

3 plan or what such a plan would need to include.  Rather, the 1996

4 Clarification makes clear that compliance is measured by actual

5 expansion; an institution cannot rely on mere promises or plans

6 to expand.  (1996 Clarification at 42); see Favia, 812 F. Supp.

7 at 585 ("You can't replace programs with promises.").

8 Accordingly, the court finds that any failure by UC Davis to

9 establish a particular type of plan is not an independent

10 violation of Title IX.[50]

11     Finally, the failure to effectively communicate or

12 consistently follow a policy for adding or elevating teams is

13 not, standing alone, a violation of Title IX.  The 1996

14 Clarification provides that an institution's implementation of

15 nondiscriminatory policy or procedure for requesting the addition

16 of sports and the effective communication of that policy is a

17 factor, "among others," that may be evidence of a continuing

18 practice of program expansion.  (1996 Clarification at 42.)

19 However, nothing in the 1996 Clarification lends support to

20 plaintiffs' contention that failure to do so is an independent

21 basis for finding a violation of Title IX.

22     The court notes that a formal monitoring system, a detailed

23 plan for expanding women's opportunities, and consistent, well-

24 communicated policies for expanding teams are all laudable goals

25 in accomplishing the purposes of Title IX.  However, none of them

26 are required under the statute, regulations, or interpretations,

27

28     [50]   As set forth above, the court found that UC Davis
generated a number of plans to achieve gender equity.

121

as currently written.  Furthermore, courts are not legislators.
They are not Chancellors or Vice Chancellors of public
universities.  While plaintiffs' suggestions may more effectively
or efficiently result in the equal provision of athletic
opportunities, it is not within the province of the court to tell
UC Davis how to achieve Title IX compliance, at least not in a
case that seeks only declaratory relief and money damages.
Rather, the court's role is to determine whether a violation has
taken place.  Because they have failed to demonstrate that there
is any requirement in law for their suggested measures,
plaintiffs are not entitled to any relief for the failure, if
any, to follow such measures.[51]

**II.  42 U.S.C. § 1983: Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment
provides that no State shall "deny to any person within its
jurisdiction the equal protection of the laws."  U.S. Const.
Amdt. 14, § 1.  This is "essentially a direction that all
similarly situated persons should be treated alike."  <u>City of
Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985).  "The
purpose of the equal protection clause of the Fourteenth
Amendment is to secure every person within the State's
jurisdiction against intentional and arbitrary discrimination,
whether occasioned by express terms of a statute or by its
improper execution through duly constituted agents."  <u>Sioux City</u>

---

[51]    Moreover, to the extent plaintiffs only sought to
bolster their arguments regarding Prong Two compliance, the court
declines to conclude that any of these alleged failures were
dispositive of the court's holding regarding defendants' Title IX
liability.

122

Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923); see Williams v. Vidmar, 367 F. Supp. 2d 1265, 1270 (N.D. Cal. 2005) (noting that the Equal Protection clause "is not a source of substantive rights or liberties, but rather a right to be free from discrimination in statutory classifications and other governmental activity"). Accordingly, "[t]o establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional."[52] Flores v. Morgan Hill Unified Sch. Dist. ("Flores"), 324 F.3d 1130, 1134 (9th Cir. 2003) (citing Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000); Oona R.S. v. McCaffrey, 143 F.3d 473, 476 (9th Cir. 1998)).

Where a University decides "to sponsor intercollegiate athletics as part of its educational offerings, this program 'must be made available to all on equal terms.'" Haffer v. Temple Univ., 678 F. Supp. 517, 525 (E.D. Pa. 1998) (quoting Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954)). The Ninth Circuit has recognized that not only must "*overall* athletic opportunities . . . be equal" to satisfy the Equal Protection Clause, but also that "denial of an opportunity in a specific sport, even when overall opportunities are equal, can be a

---

[52]   A party seeking to uphold a gender-based classification must demonstrate that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982). In this case, defendants submit neither evidence nor argument in support of an important governmental objective or a substantial relationship.

violation of the equal protection clause." <u>Clark v. Arizona</u>
<u>Interscholastic Ass'n</u>, 695 F.2d 1126, 1130-31 (9th Cir. 1982);
<u>Leffel v. Wisconsin Interscholastic Athletic Ass'n</u>, 444 F. Supp.
1117, 1122 (D. Wis. 1978) ("[T]he defendants may not afford an
educational opportunity to boys that is denied to girls."). The
standard under the Equal Protection Clause is "one of
comparability, not absolute equality," where male and female
teams are given "substantially equal support" for "substantially
comparable programs." <u>Hoover v. Meilkejohn</u>, 430 F. Supp. 164,
170 (D. Colo. 1977).

Where female athletes have sought the opportunity to be a
part of a men's team, courts have consistently held that there is
no legal entitlement to a position on such a team; rather, Equal
Protection merely requires an equal opportunity to compete for
such a position.[53]  <u>See Force v. Pierce City R-VI Sch. Dist.</u>, 570
F. Supp. 1020, 1031 (W.D. Mo. 1983); <u>see also Brenden v. Indep.</u>
<u>Sch. Dist. 742</u>, 477 F.2d 1292, 1302 (8th Cir. 1973) (holding that
the "failure to provide the plaintiffs with an individualized
determination of their own *ability to qualify* for positions" on
men's athletic teams violated the Equal Protection Clause);
<u>Croteau v. Fair</u>, 686 F. Supp. 552, 554 (E.D. Va. 1988) ("[T]here
is no constitutional or statutory right to play any position on
any athletic team.  Instead, there is only the right to compete
for such a position on equal terms and to be free from sex
discrimination in state action."); <u>Lantz v. Ambach</u>, 620 F. Supp.

---

[53]     A state actor may still attempt to uphold a regulation
restricting a female athlete's opportunity to compete for a spot
on a men's team if there is a substantial justification for such
restriction.  <u>See Force</u>, 570 F. Supp. 1020, 1031 (W.D. Mo. 1983).

663 (S.D.N.Y. 1985) (holding unconstitutional a regulation that prevented the female plaintiff from trying out for the men's junior varsity football team, but noting that the plaintiff "obviously has no legal entitlement to a starting position"); Gilpin v. Kansas State High Sch. Activities Ass'n, 377 F. Supp. 1233, 1243 (D. Kan. 1973) (noting that rule barring participation in competition by a plaintiff who "has proven herself capable of competing with the other members of her team" was unconstitutional); Israel v. West Virginia Secondary Schools Activities Comm'n, 182 W. Va. 454, 459-60 (1989); Darrin v. Gould, 85 Wash. 2d 859, 877-78 (1975).  The extent to which a woman qualifies for or plays on a men's team "must be governed solely by her abilities, as judged by those who coach her." Force, 570 F. Supp. at 1031; Lantz, 620 F. Supp. at 665.  Courts have repeatedly emphasized that "the mandate of equality of opportunity does not dictate a disregard of differences in talents and abilities among individuals.  There is no right to a position on an athletic team.  There is a right to compete for it on *equal terms*."  Hoover v. Meiklejohn, 430 F. Supp. 164, 171 (D. Colo. 1977); see Force, 570 F. Supp. at 1031; Lantz, 620 F. Supp. at 665; see also Croteau, 686 F. Supp. at 554.

Proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003).  Such intent is satisfied by a showing that the defendants either intentionally discriminated or acted with deliberate indifference.  Flores, 324 F.3d at 1135. Discriminatory intent "implies that the decision maker . . .

125

selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 279 (1979); <u>see</u> <u>Flores v. Pierce</u>, 617 F.2d 1386, 1389 (9th Cir. 1980) (recognizing that the deviation from previous procedural patterns and the adoption of an ad hoc method of decision making without reference to fixed standards, among other things, were sufficient to raise an inference of pretext on an equal protection claim).  Deliberate indifference may be found if a school official or administrator responds or fails to respond to known discrimination in a manner that is clearly unreasonable. <u>See</u> <u>Flores</u>, 324 F.3d at 1135.

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988).

"[D]irect, personal participation is not necessary to establish liability for a constitutional violation."  <u>Kwai Fun Wong v. United States</u>, 373 F.3d 952, 966 (9th Cir. 2004)). Supervisors can be held liable under § 1983:

> (1) for setting in motion a series of acts by others,
> or knowingly refusing to terminate a series of acts by
> others, which they knew or reasonably should have known

would cause others to inflict constitutional injury;
(2) for culpable action or inaction in training,
supervision, or control of subordinates; (3) for
acquiescence in the constitutional deprivation by
subordinates; or (4) for conduct that shows a "reckless
or callous indifference to the rights of others."

Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

"The critical question is whether it was reasonably foreseeable

that the action of the particular . . . officials who are named

as defendants would lead to the rights violations alleged to have

occurred . . . ." Wong, 373 F.3d at 966.  Moreover, the Ninth

Circuit has expressly held that school officials "are liable for

their own discriminatory actions in failing to remedy a known

[discriminatory] environment." Oona R.S., 143 F.3d at 477

(affirming the district court's holding that individual

defendants were not entitled to qualified immunity from the

plaintiff's peer sexual harassment claim based upon a known

hostile environment).

In this case, plaintiffs' claims are based upon their

contention that each individual defendant carried out a systemic

policy of providing unequal athletic opportunities to female

students at UC Davis.  The court held that claims arising from

the "elimination" of women's wrestling opportunities and the

implementation of the "wrestle-off" policy were time-barred, but

noted that defendants' conduct with respect to these alleged

events might be relevant to their state of mind.  However,

plaintiffs' evidence focused in disproportionately large part

upon these events.  Accordingly, for the sake of completeness,

the court addresses the matters herein where appropriate.

/////

127

## A.   Pam Gill-Fisher

Based upon the evidence submitted, the court concludes that defendant Gill-Fisher is not liable for alleged Equal Protection violations arising out of the alleged systemic policy of providing unequal athletic opportunities because she had no authority or control over the provision or elimination of athletic opportunities.   Accordingly, she cannot be found to have caused any deprivation to plaintiffs as a result of her action or inaction.

The undisputed evidence submitted at trial establishes that Gill-Fisher's duties at UC Davis did not include any authority to change the composition of the athletic participation opportunities offered to student-athletes.   Gill-Fisher's duties included the supervision of eight sports, coordination of sports medicine, oversight of the Compliance Office regarding NCAA and UC Davis athletic eligibility, and oversight of academic advising.   While Gill-Fisher served as the Senior Woman Administrator, a position required by the NCAA, the position did not give Gill Fisher any additional authority or responsibility at UC Davis regarding Title IX or gender equity.   Gill-Fisher also participated on various evaluation and reporting committees regarding Title IX.   However, her participation in such committees did not grant her any authority to direct or change either athletic department policy or the actual composition of the UC Davis ICA program.

Moreover, to the extent that Gill-Fisher was involved in discussions and recommendations regarding gender equity at UC Davis, the record is replete with evidence of her consistent,

enduring efforts to increase athletic participation opportunities for women, achieve equitable participation opportunities for women proportionate to enrollment, and ensure equal treatment in coaching, practice facilities, competition, and all resources available to varsity athletes.  Indeed, there is absolutely no credible evidence that Gill-Fisher ever ceased or even lightened her efforts to bring full gender equality to the intercollegiate athletic program at UC Davis.  Since the enactment of Title IX, Gill-Fisher consistently recommended that more women's intercollegiate opportunities be offered, including recommendations, *inter alia*, that (1) gymnastics and badminton be added in 1972; (2) cross-country be added in 1978; (3) crew and golf be added in 1992; (4) water polo be added in 1993; and (5) more women's intercollegiate athletic sports be added in 2003.

Further, Gill-Fisher steadfastly maintained that UC Davis needed to achieve gender equity both through the consistent addition of women's participation opportunities and the management of men's participation opportunities.  In addition to her recommendations that UC Davis add more teams, Gill-Fisher alerted decision-makers to the problems in disproportionate athletic opportunities in reports and memos in 1972, 1978, 1989, 1990, 1991, 1992, 1993, 1994, and 1996.  She also participated in subsequent gender equity reports, which noted the need to consistently evaluate whether the athletic participation opportunities available to men and women were proportional to their respective enrollment.  Even after UC Davis elevated three club teams to varsity status in 1995, Gill-Fisher informed the Athletic Director that the participation discrepancy was not

129

1  solved.   Further, Gill-Fisher advocated for roster management of

2  men's teams, particularly football, to aid in achieving gender

3  proportionality since 1990.

4      Gill-Fisher's strong advocacy for gender equality and

5  recommendations to decision-makers both directed attention to the

6  issue and resulted in positive change.   However, the strength and

7  effectiveness of her advocacy does not equate to authority or

8  responsibility over the composition of the athletic program.

9  Indeed, the court finds it ironic that, in effect, plaintiffs

10  seek to hold Gill-Fisher liable for equal protection violations

11  *because* she consistently, and at many times unsolicitedly,

12  advocated for the need for more equality in the provision of

13  women's athletic participation opportunities and because such

14  advocacy was often effective.

15      Finally, the court concludes that Gill-Fisher's interaction

16  with plaintiffs and the other women wrestlers at UC Davis neither

17  evinces hostile intent toward female athletes generally or female

18  wrestlers specifically.   Gill-Fisher was supportive of female

19  wrestlers; she even had Johnston speak to her classes regarding

20  her experience as a female wrestler.   Gill-Fisher encouraged

21  female wrestlers to develop women's wrestling as a sport; she

22  suggested that female wrestlers develop a club sport to establish

23  an identity beyond individual female participants with unofficial

24  status on the men's team.   Gill-Fisher was not involved with any

25  decision to remove plaintiffs from the wrestling team; those

26  decisions rested firmly with both Burch and Zalesky.   Finally,

27  although she had no role or responsibility in developing,

28  approving, or supervising the procedure for try-outs, Gill-Fisher

130

was aware that plaintiffs were given an opportunity to try-out for the men's intercollegiate wrestling team, using the standards that applied to all interested student wrestlers.  Based upon this evidence, the court cannot conclude that Gill-Fisher violated plaintiffs' rights in relation to their opportunity to participate in women's wrestling.

Accordingly, the court concludes that plaintiffs have failed to substantiate any claim that defendant Gill-Fisher violated the Equal Protection Clause through her actions or inaction.[54]

### B.   Greg Warzecka

Based upon the evidence submitted, the court also concludes that defendant Warzecka is not liable for alleged Equal Protection violations arising out of the alleged systemic policy of gender discrimination through the unequal provision of athletic opportunities[55] because, to the extent plaintiffs could

---

[54]   Alternatively, for the reasons set forth below, defendant Gill-Fisher would also be entitled to qualified immunity.

[55]   In plaintiffs' Proposed Conclusions of Law, they assert that defendants violated the Equal Protection Clause through (1) inequitably allocating varsity athletic participation opportunities on the basis of sex; and (2) engaging in a systematic discrimination against female students in the operation of the varsity athletic program.  Plaintiffs do not articulate the difference between these two theories of liability.  Moreover, the gravamen of both theories is that defendants discriminated against female students on the basis of gender in its allocation of athletic opportunities and failure to promote additional women's club teams to varsity status.  Accordingly, the court address both theories of liability on this basis.

To the extent that plaintiffs intend to claim some policy or practice of discrimination outside the allocation of athletic participation opportunities, there is no credible evidence to support such a claim.

prove such a violation, he is entitled to qualified immunity.[56]
Similarly, the court concludes that defendant Warzecka is also
entitled to qualified immunity for any Equal Protection
violations arising out of (1) the failure to impose separate and
distinct requirements for women student-athletes to qualify for
the men's varsity wrestling team; or (2) the failure to create a
separate women's varsity wrestling team.

## 1. Qualified Immunity

"Government officials who perform discretionary functions
generally are entitled to qualified immunity from liability for
civil damages 'insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known.'" Flores, 324 F.3d at 1134
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[57]
"Qualified immunity shields federal and state officials from
money damages unless a plaintiff pleads facts showing (1) that
the official violated a statutory or constitutional right, and
(2) that the right was 'clearly established' at the time of the
challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080

---

[56]   The court also notes that the evidence is not wholly
conclusive regarding Warzecka's responsibility for any
constitutional deprivation.  While Warzecka testified that he had
significant involvement in decisions about adding or eliminating
sports in the intercollegiate athletic program, he also testified
that these decisions were always made collaboratively.  Because
the court concludes that Warzecka is entitled to qualified
immunity, it need not decide whether "significant involvement" is
sufficient to confer liability under § 1983.

[57]   Because qualified immunity is an affirmative defense,
defendants bear the burden of establishing they are entitled to
it.  Provencio v. Vazquez, 258 F.R.D. 626, 633 (E.D.Cal. 2009) (
citing Crawford-El v. Britton, 523 U.S. 574, 586-87 (1998);
Benigni v. Hemet, 879 F.2d 473, 479 (9th Cir. 1988)).

(2011).  It is within the court's "sound discretion" to address these two prongs in any sequence it deems appropriate.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  However, a court "need not find a prior case with identical, or even 'materially similar,' facts."  <u>Flores</u>, 324 F.3d at 1136-37 (quoting <u>Hope</u>, 536 U.S. 730).  Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  <u>Hope</u>, 536 U.S. at 741.  Rather, a court must "determine whether the preexisting law provided the defendants with fair warning that their conduct was unlawful."  <u>Flores</u>, 324 F.3d at 1137 (internal quotations omitted) (noting that case law can render the law clearly established).  Specifically, the Supreme Court has held:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."

<u>Hope</u>, 536 U.S. at 739 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)); <u>see</u> <u>al-Kidd</u>, 580 F.3d at 971 (noting that "dicta, if sufficiently clear, can suffice to clearly establish a constitutional right.") (internal quotation omitted)).  "[T]he proper fact-specific inquiry . . . is not whether the law is settled, but whether, in light of clearly established law and the

information available to him, a reasonable person in [defendant's] position could have objectively believed his actions to be proper." <u>Floyd v. Laws</u>, 929 F.2d 1390, 1394 (9th Cir. 1991) (citing <u>Anderson</u>, 483 U.S. at 641).

### 2. Equal Athletic Participation Opportunities for Women

At the time of the alleged discriminatory conduct in this case, the law, as set forth by the United States Supreme Court and the Ninth Circuit, was clear that the Equal Protection Clause of the Fourteenth Amendment creates the right to be free from purposeful discrimination in education by state actors. <u>Mississippi Univ. for Women</u>, 458 U.S. at 731; <u>Oona, R.S.</u>, 143 F.3d at 476 (holding that it was clearly established well prior to 1988 that the Equal Protection clause proscribed any purposeful discrimination by state actors on the basis of gender). More specifically, as early as 1982, the Ninth Circuit recognized that the Equal Protection Clause may be violated when overall athletic opportunities are unequal as well as when there is inequality in opportunity in a given sport. <u>Clark</u>, 695 F.2d at 1130-31 (acknowledging the Equal Protection right, but holding that the discrimination in favor of an all girls volleyball team was substantially related to an important governmental interest).

However, during the entirety of the time that plaintiffs were students at UC Davis, there was no clearly established law regarding how inequality in athletic participation is measured for purposes of the Equal Protection Clause. Only a single district court held that there were triable issues of fact regarding whether a university violated the Equal Protection

Clause, when its enrollment was comprised of 50% women, but only 33% of its athletic participants were women.  <u>Haffer</u>, 678 F. Supp. at 525-27.

Moreover, there was no clearly established law regarding how the Title IX framework does or does not impact a claim for unequal treatment under the Equal Protection Clause.  Indeed, until the Supreme Court's 2009 decision in <u>Fitzgerald v. Barnstable</u>, 555 U.S. 246 (2009), the Circuits were split regarding whether Title IX was meant to be the exclusive mechanism for addressing gender discrimination in schools. Further, in some instances, courts held that compliance with Title IX did not equate to compliance with the Equal Protection Clause.  <u>See</u> <u>Lantz</u>, 620 F. Supp. at 665-66 (noting that Title IX was neutral regarding mixed competition in contact sports, but holding that the Equal Protection clause required giving the female plaintiff an opportunity to try out); <u>Force</u>, 570 F. Supp. at 1024-25, 1031 (same).  However, in holding that an institution's decision to eliminate men's, but not women's, swimming did not violate the Equal Protection Clause, the Seventh Circuit has noted that "insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible." <u>Kelley v. Bd. of Trs.</u>, 35 F.3d 265, 272 (7th Cir. 1994).

At bottom, the parties have failed to point to, and the court cannot find, any cases that are akin to the one at bar. Specifically, there is no case law that teaches that compliance with Prong Two exculpates defendants from liability for Equal

Protection violations.  Conversely, there is no case law that
teaches that institutions must meet substantial proportionality,
as defined by Title IX's regulations or interpretations, to
comply with the Equal Protection Clause.  There is also no case
law regarding when an individual actor becomes liable for the
unequal provision of athletic opportunities in an athletic
program that serves a university with an enrollment of between
approximately 18,000 to 21,000[58] students; it is unclear whether
a school official becomes liable for that disparity the moment he
or she is hired, a year later, or five years later.  It is under
this patent ambiguity that we address the applicability of
qualified immunity to plaintiffs' almost wholly unique claims for
the alleged systemic, unequal provision of athletic opportunities
for women at UC Davis.

In this case, it is undisputed that, at all relevant times,
defendant Warzecka believed the UC Davis intercollegiate
wrestling program was Title IX compliant under Prong Two.  His
belief was not patently, nor even arguably, unreasonable under
the circumstances.  As demonstrated at trial, even a reknowned
expert in Title IX, who has spent her career testifying on behalf
of female student-athletes, believed that UC Davis was compliant
under Prong Two.  There was no case law that put defendant on
clear notice that UC Davis was not in compliance with Prong Two.
Indeed, as set forth above, the court finds that the issues
relating to UC Davis' compliance are difficult.  Therefore,
because (1) there was (and is) no clearly established law

---

[58]    The court discerns these numbers from the EADA reports.

regarding whether Title IX compliance establishes compliance with the Equal Protection Clause; (2) defendant Warzecka had an objectively and subjectively reasonable belief that UC Davis was compliant with Title IX's effective accommodation provision under Prong Two; and (3) a reasonable person could conclude that compliance with the effective accommodation requirements of Title IX satisfied the requirements of the Equal Protection Clause, defendant Warzecka is entitled to qualified immunity.

Moreover, while a reasonable school official might have been on notice that substantial proportionality may not necessarily be achieved with a 5 percent disparity between enrollment and athletic participation, a reasonable official was not on notice that such a disparity would violate the Equal Protection Clause. When defendant became Athletic Director in 1995, women's actual participation opportunities were at 211 and there was a 20 percent disparity between the female enrollment and the female participation in intercollegiate athletics. The next year the disparity had decreased to 11 percent and the actual participation opportunities had risen to 348. In 1998-1999, when the first plaintiff entered the University, UC Davis had its highest number of female participation opportunities, 426, and the disparity had decreased to 6 percent. While the following three years fluctuated between 7 percent, 9 percent, and back to 7 percent, in plaintiff Mansourian and Mancuso's final years at Davis, the disparity had decreased to 6 percent and 5 percent, respectively. Because there was (and is) no statutory, regulatory, or common law that defines the measure of "comparable equality" for purposes of Equal Protection, the court cannot find

that a reasonable person in defendant Warzecka's position would not think his efforts to narrow the gender proportion disparity to 5 percent were proper.

Accordingly, the court concludes that defendant Warzecka is entitled to qualified immunity for plaintiffs' claim arising out of any alleged systemic policy of providing unequal athletic opportunities to female student-athletes.[59]

### 3. Separate Requirements for Try-Outs or Provision of a Separate Women's Wrestling Team

At the time of the alleged discriminatory conduct in this case, the law, as set forth by the few federal courts and state courts to address this issue, provided that the Equal Protection Clause required that women athletes be given the opportunity to try out for a men's team if there was not a comparable women's team. Force, 570 F. Supp. at 1031; Lantz, 620 F. Supp. at 665; Hoover, 430 F. Supp. at 171; see Israel, 182 W. Va. at 459-60. However, all of these cases emphasized that there was no constitutional or statutory right to make the team. Id.; see Croteau, 686 F. Supp. at 554. Moreover, each of these cases expressly noted that the right to compete must be on equal terms as the other student-athletes, and the decision on whether a

---

[59]   Further, to the extent plaintiffs assert claims based upon the failure to (1) create gender equity plans with timetables and detailed plans; or (2) formally assess the athletic interests of current and prospective students, defendants are clearly entitled to qualified immunity. Plaintiffs cite, and the court cannot find, any authority that would put an official on any type of notice that such failures would constitute an Equal Protection Clause violation.  Moreover, the court notes that plaintiffs provide absolutely no authority to support their contention that these failures equate to the denial of "equal protection of the law."

138

female makes or plays on a team "must be governed solely by her abilities, as judged by those who coach her." <u>Force</u>, 570 F. Supp. at 1031; <u>Lantz</u>, 620 F. Supp. at 665; see <u>Croteau</u>, 686 F. Supp. at 554; <u>Hoover</u>, 430 F. Supp. at 171; see <u>Israel</u>, 182 W. Va. at 459-60; see also <u>Brenden</u>, 477 F.2d at 1302 (8th Cir. 1973).

With respect to women athletes' opportunity to participate on men's wrestling team, one of the three district court cases to address the issue noted that "it is far from clear that the refusal to sanction a mixed-gender contact sport violates the Fourteenth Amendment." <u>Barnett v. Texas Wrestling Ass'n</u>, 16 F. Supp. 2d 690, 695-96 (N.D. Tex. 1998) (noting that the defendants failed to raise the issue on summary judgment). However, both of the other district courts to address the issue have held that a female athlete should be allowed to try out for the male wresting team. <u>Saint v. Nebraska Sch. Activities Ass'n</u>, 684 F. Supp. 626 (D. Neb. 1988); ; see also <u>Adams v. Baker</u>, 919 F. Supp. 1496, 1503 (D. Kan. 1996). In <u>Saint</u>, the plaintiff was a sophomore in high school who requested permission to participate on the boys' high school wrestling team. However, according to league rules, girls were not permitted to participate on the boys' team. <u>Id.</u> at 627. The league asserted that the regulation should be upheld because it sought to protect "the health and safety of the female athletes." <u>Id.</u> at 628. The league presented expert testimony that school-age females are generally at a competitive disadvantage in co-ed contact sports because (1) "they have a smaller total body mass with less of the total mass being muscle and more being fat tissue"; (2) "female strength levels are less than that for males"; (3) "female speed capabilities are not

139

comparable to the male"; and (4) "female muscle power output is considerably less than [that] of males." <u>Id.</u> at 629.   The expert concluded that these differentials are "sufficiently great enough to create a significant competitive disadvantage for the female and raise her potential for injury to a high level." <u>Id.</u>

The court noted that such expert testimony "contains nothing more than generalized statements applicable to typical school-age females in the population at large" and that plaintiff had already shown that she was physically capable to join the team. The court reasoned that "any boy may join the wrestling team, regardless of his body size, strength level, speed capability, muscle power output or any other factor which might have a bearing on his potential for injury," and that "such a paternalistic gender-based classification," which resulted from "ascribing a particular trait or quality to one sex, when not all share that trait or quality, [was] not only inherently unfair, but generally tends only to perpetuate 'stereotypical notions' regarding the proper roles of men and women." <u>Id.</u> (quotations ommitted).   Accordingly, the court held that plaintiff had shown a high probability of success on the merits and issued a temporary restraining order preventing the league from refusing to permit the plaintiff to wrestle on the boys' wrestling team. <u>Id.</u>

In this case, as an initial matter, there is no credible evidence that defendant Warzecka had a discriminatory animus towards or was hostile to female wrestlers.   To the contrary, as set forth above, the court found that Warzecka was willing to make special exceptions regarding club sport requirements,

140

training room access, and varsity weight room access to better enable women wrestlers, including plaintiffs, to participate in wrestling after Burch cut them from the men's team.

Second, to the extent that such conduct constitutes an Equal Protection Clause violation, defendant was not on notice that requiring women student-athletes to compete for a position on a men's intercollegiate team against men student-athletes using the same standard set of rules and criteria was a constitutional violation.  Rather, as set forth above, the consistent holding of the body of law in this area is that women should be entitled to a right to *compete* for a spot on a men's team *under equal terms*. In fact, the reasoning behind these decisions would counsel against utilizing separate criteria for different genders.  By implicitly stating that no woman could ever successfully compete against a man, Warzecka and UC Davis would potentially be "ascribing a particular trait or quality to one sex, when not all share that trait or quality"; "such a paternalistic gender-based classification" could serve to perpetuate 'stereotypical notions' regarding the proper roles of men and women" as student-athletes, generally, and as wrestlers, specifically.  See Saint, 684 F. Supp. at 629.  Moreover, plaintiffs fail to cite to, and the court cannot find, any case that required an institution to apply different standards to women that wished to participate on a men's team.  Accordingly, under the state of the law at the time plaintiffs were students, defendant Warzecka did not violate a clearly established right by requiring female wrestlers to compete against male wrestlers under the same conditions; rather, "a reasonable person in [his] position could have objectively

141

believed his actions to be proper." <u>Houghton v. South</u>, 965 F.2d 1532, 1534 (9th Cir. 1992) (quotations and citations omitted).

Finally, defendant was not on notice that failure to sponsor a separate women's wrestling team was a constitutional violation. Again, plaintiffs fail to cite to, and the court cannot find, any case that required an institution to provide a separate women's team to comply with the Equal Protection Clause. <u>Cf.</u> <u>Hoover</u>, 430 F. Supp. at 172 (noting that the defendants may comply with the Equal Protection Clause by (1) fielding separate teams for males and females; (2) discontinuing the sport as an interscholastic activity; or (3) permitting both sexes to compete on the same team).

Therefore, the court concludes that defendant Warzecka is entitled to qualified immunity for plaintiffs' claims arising out of any alleged failure to create separate standards for competition or separate varsity opportunities for women wrestlers.

**C.   Robert Franks**

For the reasons set forth above, the court likewise concludes that defendant Franks is not liable for alleged Equal Protection violations arising out of (1) the alleged systemic policy of gender discrimination through the unequal provision of athletic opportunities; (2) the failure to impose separate and distinct requirements for women student-athletes to qualify for the men's varsity wrestling team; or (3) the failure to create a separate women's varsity wrestling team.  To the extent

142

plaintiffs could prove any such violations, he is entitled to qualified immunity.[60]

With respect to plaintiffs' claims for systemic violations, Franks, like Warzecka, consistently and reasonably believed that UC Davis was complying with its gender equity requirements under Title IX. Further, like Warzecka, Franks saw increasingly smaller proportional disparities between the number of female enrollment and the number of female athletic participation opportunities. Under the ambiguous state of the law in this area at the time plaintiffs were students, the court concludes that defendant Franks is entitled to qualified immunity for plaintiffs' claim arising out of any alleged systemic policy of providing unequal athletic opportunities to female student-athletes.

With respect to plaintiffs' claims arising from women's wrestling opportunities, there is no credible evidence that defendant Franks had a discriminatory animus towards or was hostile to female wrestlers. To the contrary, as set forth above, the court found that Franks immediately reinstated plaintiffs on the wrestling team once the complaint was filed with OCR. He met with plaintiffs, investigated their requests,

---

[60] The court also notes that the evidence is not wholly conclusive regarding Frank's responsibility for any constitutional deprivation. While Franks testified that the intercollegiate athletic program and Athletic Director reported directly to him, the Vice Chancellor for Student Affairs testified that any problems under her province, including the intercollegiate athletic program, was ultimately her responsibility. Because the court concludes that Franks is entitled to qualified immunity, it need not decide whether Frank's level of responsibility is sufficient to confer liability under § 1983.

and ultimately relayed the administration's agreement to waive the number of students required to form a women's wrestling club and to allow the club to practice at the same time as the intercollegiate team.  Franks was aware that in Fall 2001, Zalesky intended to select team members based on the skills they demonstrated, and believed such a process was fair to all student-athletes trying out for a place on the men's wrestling team.  For the same reasons set forth in the court's discussion of defendant Warzecka's liability, the court concludes that defendant Franks is entitled to qualified immunity because he did not violate a clearly established right by requiring female wrestlers to compete against male wrestlers under the same conditions in order to make the varsity squad or by failing to create a separate women's team.

### D.   Larry Vanderhoef

Finally, the court similarly concludes that defendant Vanderhoef is entitled to qualified immunity for any alleged Equal Protection violations arising out of (1) the alleged systemic policy of gender discrimination through the unequal provision of athletic opportunities; (2) the failure to impose separate and distinct requirements for women student-athletes to qualify for the men's varsity wrestling team; or (3) the failure to create a separate women's varsity wrestling team.  Vanderhoef was informed and, like Warzecka and Franks, reasonably believed that UC Davis was Title IX compliant at all relevant times. Vanderhoef was further informed, and reasonably believed, that the situation involving the women's wrestlers had been appropriately resolved.  Under the law in existence at the time

144

students were plaintiffs, Vanderhoef's actions or inaction did not violate a clearly established constitutional right. Accordingly, he is not liable for any alleged Equal Protection Clause violations.

**III. Damages**

Because, as set forth above, defendant UC Davis failed to demonstrate a continuing practice of program expansion, plaintiffs are entitled to damages for the actual harm they suffered as female students at UC Davis who were interested in participating in intercollegiate athletics.  However, because plaintiffs could not demonstrate that defendant Gill-Fisher caused any constitutional deprivation and because all individual defendants are entitled to qualified immunity for any alleged constitutional violations, plaintiffs are not entitled to punitive damages.  As this stage of the litigation dealt with liability and as the parties have not fully briefed all issues relating to damages, the court makes no further rulings regarding potential limitations on the measure of damages in this case.

The court notes, though, that it finds the evolution and potential impacts of this case troubling.  It has been clear to the court throughout the arduous eight years of litigation that, for plaintiffs, this case has always been about wrestling.  Based upon (1) blatant misrepresentations by a person plaintiffs trusted, who manipulated such trust for personal motives wholly unrelated to gender equity; (2) subsequent misinterpretations by plaintiffs of the conduct of UC Davis athletic administrators, who undoubtedly had the best interest of all their students at heart; and (3) interference and advocacy by media and public

145

figures, who were unaware of all the facts, plaintiffs believed that they had been wronged.  Almost four years ago, the court held, however, that plaintiffs claims arising out of any alleged elimination of wrestling and implementation of the "wrestle-off" policy were time-barred.  Based upon a very liberal reading of the complaint and arguments advanced only in oral argument on defendants' motion, the court found that plaintiffs had a viable claim relating to the entire athletic program's provision of athletic opportunities to women, a claim that these plaintiffs had never previously advanced.

Moreover, the subsequent litigation and bench trial demonstrated that, for plaintiffs, this case was still about wrestling.  Indeed, this claim ceased even putatively being about corrective action for the entirety of UC Davis female students four years ago, when the class claims were dismissed and plaintiffs lacked standing to pursue injunctive relief.  Rather, such relief was accorded through a class action settlement, the stipulated Judgement and Order for which was entered on October 20, 2009.  (See Brust v. Regents of the Univ. of Cal., No. 2:07-cv-1488, [Docket #121].)

Finally, the evidence at trial bore out that while UC Davis failed to comply with Title IX during the time that plaintiffs were students at UC Davis, plaintiffs' complaints about defendants' conduct relating to wrestling were meritless.  This troubling juxtaposition of the court's conclusions would seem to place severe limitations on the damages these plaintiffs may recover.  However, the court leaves any such limitations for

146

1    further argument on the motions in limine to precede the damages

2    phase of trial and any such determinations to they jury.

3                     **CONCLUSION**

4        For the foregoing reasons, plaintiffs have prevailed on

5    their claims against UC Davis for ineffective accommodation of

6    female student-athletes under Title IX based upon UC Davis'

7    failure to demonstrate a continuing practice of program

8    expansion.  However, plaintiffs have not prevailed on any other

9    theories of Title IX liability.  Moreover, plaintiffs have not

10    prevailed on their claims for Equal Protection Clause violations

11    against any of the individual defendants.  As such, defendants

12    Larry Vanderhoef, Greg Warzecka, Pam Gill-Fisher, and Robert

13    Franks are DISMISSED.

14        IT IS SO ORDERED.

15    DATED: August 3, 2011

16

17                     FRANK C. DAMRELL, JR.
                      UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28